# 23-1259

In the
# United States Court of Appeals
## For the Second Circuit

ELAVON, INC.,

*Plaintiff-Appellant,*

– v. –

JOSEPH KATZ, JOSEPH MERING, SHLOMO KORNHAUSER, DEVORAH MERING, MORDECHAI KOHN, MORDECHAI LEVY, NAFTULI MORGENSTERN, SARA BERGER, SARAH T. LEVI, SHLOMO BERGER, SOLOMON LEVY, SUSSMAN BLEIER and ASHER JUNGREISZ,

*Defendants-Appellees,*

*(See inside cover for continuation of caption and appearances)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK (BROOKLYN)

## JOINT APPENDIX


JOSEPH KATZ
*Defendant-Appellee Pro Se*
82 South 8th Street
Brooklyn, New York 11249

SHLOMO KORNHAUSER
*Defendant-Appellee Pro Se*
1053 51st Street
Brooklyn, New York 11219

THE GINZBURG LAW FIRM, P.C.
*Attorneys for Plaintiff-Appellant*
200 Village Center Drive, Unit 7045
Freehold, New Jersey 07728
(732) 284-3841
daniel@ginzburglawfirm.com

NEWMAN & GREENBERG LLP
*Attorneys for Defendant-Appellee Joseph Mering*
950 3rd Avenue
New York, New York 10022
(212) 308-7900
syurowitz@newmangreenberg.com

– and –

SILVERTOWN OF NY, INC., ESTER WERZBERGER, CHAN FRIEDMAN, JOHN DOES # 1-10, ABC COMPANIES 110 and ERWIN GANZFRIED,

*Defendants.*


MORDECHAI KOHN
*Defendant-Appellee Pro Se*
15 Yale Drive
Monsey, New York 10952

NAFTULI MORGENSTERN
*Defendant-Appellee Pro Se*
15 Stephens Place, Unit 301
Spring Valley, New York 10977

SARAH T. LEVI
*Defendant-Appellee Pro Se*
1638 52nd Street
Brooklyn, New York 11204

SUSSMAN BLEIER
*Defendant-Appellee Pro Se*
34 South 9th Street, Apartment 6A
Brooklyn, New York 11249

DEVORAH MERING
*Defendant-Appellee Pro Se*
1072 49th Street
Brooklyn, New York 11219

MORDECHAI LEVY
*Defendant-Appellee Pro Se*
1638 52nd Street
Brooklyn, New York 11204

SARA BERGER
*Defendant-Appellee Pro Se*
1306 Vincenzo Drive
Toms River, New Jersey 08753

SHLOMO BERGER
*Defendant-Appellee Pro Se*
1306 Vincenzo Drive
Toms River, New Jersey 08753

ASHER JUNGREISZ
*Defendant-Appellee Pro Se*
1332 55th Street
Brooklyn, New York 11219

## Table of Contents

**Page**

District Court Docket Entries ........................................................ JA-1

Amended Complaint and Jury Demand, Dated July 10, 2021 ......JA-13

Exhibit 1 to Amended Complaint -
Merchant Application and Contract ..........................................JA-54

Consent Notice of Errata as to the Amended Complaint,
Executed on October 11, 2021 ..................................................JA-99

Exhibit 1 to Consent Notice -
[Corrected] Amended Complaint and Jury Demand,
Dated October 11, 2021 ...........................................................JA-101

Declaration of Holly Franklin, for Plaintiff, in Support of
Motion to Dismiss, Executed on December 22, 2021...............JA-142

Memorandum and Order of Honorable Margo K. Brodie,
Dated September 30, 2022 .......................................................JA-144

Judgment of The United States District Court Eastern
District of New York, Dated September 30, 2022,
Appealed From ..........................................................................JA-164

Notice of Appeal, Dated September 13, 2023..............................JA-165

Order Dismissing Appeal, Dated June 27, 2023..........................JA-166

Notice of Appeal, Dated November 1, 2022................................JA-168

APPEAL,ACO

# U.S. District Court
# Eastern District of New York (Brooklyn)
# CIVIL DOCKET FOR CASE #: 1:20-cv-00908-MKB-RER

Elavon, Inc. v. Silvertown of NY, Inc. et al
Assigned to: Chief Judge Margo K. Brodie
Referred to: Magistrate Judge Ramon E. Reyes, Jr
Demand: $1,024,000
Cause: 28:1332 Diversity-Contract Dispute

Date Filed: 02/19/2020
Date Terminated: 09/30/2022
Jury Demand: Plaintiff
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

**Plaintiff**

**Elavon, Inc.**

represented by **Daniel Ginzburg**
The Ginzburg Law Firm, P.C.
151 Highway 516, Unit 736
Old Bridge, NJ 08857
732-284-3841
Fax: 862-345-9112
Email: daniel@ginzburglawfirm.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Silvertown of NY, Inc.**
*TERMINATED: 07/10/2021*

**Defendant**

**Ester Werzberger**
*TERMINATED: 07/10/2021*

represented by **Yitzchak Eliezer Soloveichik**
Bronstein, Gewirtz & Grossman, LLC
60 East 42nd Street
Suite 4600
New York, NY 10165
212-697-6484
Fax: 212-697-7296
Email: soloveichik@bgandg.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Chan Friedman**
*TERMINATED: 07/10/2021*

represented by **Yitzchak Eliezer Soloveichik**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**John Does # 1-10**
*TERMINATED: 07/10/2021*

represented by **Nathaniel Ethan Marmon**
The Law Offices of John F. Baughman, PLLC
The Law Offices of John F. Baughman
299 Broadway, Suite 203
10007
New York, NY 10004
917-968-2772
Email: nmarmon@jfblegal.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**ABC Companies 1-10**
*TERMINATED: 07/10/2021*

**Defendant**

**Erwin Ganzfried**

**Defendant**

**Joseph Katz**

represented by **Jeremy Baruch Stein**
Hartmann Doherty Rosa Berman & Bulbulia, LLC
433 Hackensack Avenue, Suite 1002
07601
Hackensack, NJ 07601
201-441-9056
Fax: 201-441-9435
Email: jstein@hdrbb.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Joseph Mering**

represented by **Jeremy Baruch Stein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Shlomo Kornhauser**

represented by **Jeremy Baruch Stein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Devorah Mering**

represented by **Jeremy Baruch Stein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mordechai Kohn**

represented by **Jeremy Baruch Stein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mordechai Levy**

represented by **Jeremy Baruch Stein**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Defendant**

**Naftuli Morgenstern** represented by **Jeremy Baruch Stein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Sara Berger** represented by **Jeremy Baruch Stein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Sarah T. Levi** represented by **Jeremy Baruch Stein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Shlomo Berger** represented by **Jeremy Baruch Stein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Solomon Levy**

**Defendant**

**Sussman Bleier**

**Defendant**

**Asher Jungreisz**

| Date Filed | # | Docket Text |
|---|---|---|
| 02/20/2020 | 1 | COMPLAINT against All Defendants filing fee $ 400, receipt number ANYEDC-12420525 Was the Disclosure Statement on Civil Cover Sheet completed -YES,, filed by Elavon, Inc.. (Attachments: # 1 Exhibit 1 - Merchant Application and Terms and Conditions, # 2 Exhibit 2 - List of Chargebacks, # 3 Civil Cover Sheet, # 4 Proposed Summons to Chan Friedman, # 5 Proposed Summons to Ester Werzberger, # 6 Proposed Summons to Silvertown of NY Inc.) (Ginzburg, Daniel) (Entered: 02/20/2020) |
| 02/20/2020 | 2 | MOTION for Refund of Fees Paid Electronically *Due to Error* by Elavon, Inc.. (Ginzburg, Daniel) (Entered: 02/20/2020) |
| 02/21/2020 | | Notice: Re: Incomplete Civil Cover Sheet. The Clerk's Office cannot assign this case without a completed Civil Cover Sheet. All questions *** INCLUDING the CERTIFICATION OF ARBITRATION ELIGIBILITY*** section on the second page needs to be answered. Please resubmit corrected Civil Cover Sheet. This event can be found under the event Other Documents - Proposed Summons/Civil Cover Sheet. (Bowens, Priscilla) (Entered: 02/21/2020) |
| 02/21/2020 | 3 | Application 2 for Refund of Fees Paid Electronically. Ordered by Clerk of Court on 2/21/2020. (Marziliano, August) (Entered: 02/21/2020) |

| | | |
|---|---|---|
| 02/21/2020 | 4 | Civil Cover Sheet.. by Elavon, Inc. (Ginzburg, Daniel) (Entered: 02/21/2020) |
| 02/21/2020 | | Case Assigned to Judge Margo K. Brodie and Magistrate Judge Ramon E. Reyes, Jr. Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. (Bowens, Priscilla) (Entered: 02/21/2020) |
| 02/21/2020 | 5 | Summons Issued as to Chan Friedman, Silvertown of NY, Inc., Ester Werzberger. (Bowens, Priscilla) (Entered: 02/21/2020) |
| 02/21/2020 | 6 | In accordance with Rule 73 of the Federal Rules of Civil Procedure and Local Rule 73.1, the parties are notified that ***if*** all parties consent a United States magistrate judge of this court is available to conduct all proceedings in this civil action including a (jury or nonjury) trial and to order the entry of a final judgment. Attached to the Notice is a blank copy of the consent form that should be filled out, signed and filed electronically **only if all** parties wish to consent. The form may also be accessed at the following link: http://www.uscourts.gov/uscourts/FormsAndFees/Forms/AO085.pdf. **You may withhold your consent without adverse substantive consequences**. **Do NOT return or file the consent unless all parties have signed the consent.** (Bowens, Priscilla) (Entered: 02/21/2020) |
| 02/21/2020 | 7 | This attorney case opening filing has been checked for quality control. See the attachment for corrections that were made, if any. (Bowens, Priscilla) (Entered: 02/21/2020) |
| 03/16/2020 | 8 | SUMMONS Returned Executed by Elavon, Inc.. Chan Friedman served on 3/9/2020, answer due 3/30/2020. (Ginzburg, Daniel) (Entered: 03/16/2020) |
| 03/16/2020 | 9 | SUMMONS Returned Executed by Elavon, Inc.. Ester Werzberger served on 3/2/2020, answer due 3/23/2020. (Ginzburg, Daniel) (Entered: 03/16/2020) |
| 04/05/2020 | 10 | Request for Certificate of Default by Elavon, Inc. (Ginzburg, Daniel) (Entered: 04/05/2020) |
| 04/13/2020 | 11 | **VACATED .** Clerk's ENTRY OF DEFAULT It appearing from the docket maintained in this action that defendant Chan Friedman has failed to appear or otherwise defend this action, the default of defendant Chan Friedman is hereby noted pursuant to Rule 55a of the Federal Rules of Civil Procedure. (Poveda, J.) Modified on 5/18/2020 (Vertus, Miriam). (Entered: 04/13/2020) |
| 05/03/2020 | 12 | Corporate Disclosure Statement by Elavon, Inc. identifying Corporate Parent U.S. Bancorp, Corporate Parent Berkshire Hathaway, Inc., Corporate Parent U.S. Bank National Association for Elavon, Inc.. (Ginzburg, Daniel) (Entered: 05/03/2020) |
| 05/07/2020 | | ORDER: A review of the docket entries in this action indicates that there has been no activity in this case since the 11 Clerk's ENTRY OF DEFAULT against Defendant Chan Friedman filed with the Court on 4/13/2020. No later than May 21, 2020 one of the following events must occur: (a) the parties must file a stipulation extending the defendants time to answer, (b) the plaintiff must file a motion for the entry of a notation of default or (c) the defendants must file an answer. If, none of the preceding events occurs by the deadlines set forth above, I will deem the plaintiff to have abandoned the case and will promptly file a Report and Recommendation urging the assigned District Judge to dismiss the case for failure to prosecute. Plaintiff's counsel is directed to provide a copy of this order to his client and to the defendants. Ordered by Magistrate Judge Ramon E. Reyes, Jr on 5/7/2020. (Vertus, Miriam) (Entered: 05/07/2020) |
| 05/15/2020 | 13 | MOTION to Compel -- *Letter request for pre-motion conference in anticipation of a motion to compel arbitration and to dismiss the Complaint* by Ester Werzberger. (Soloveichik, Yitzchak) (Entered: 05/15/2020) |

| | | |
|---|---|---|
| 05/18/2020 | 14 | This is not a Proposed Pretrial Order but a *Motion to Vacate entry of default as to defendant Chana Friedman* by Chan Friedman (Soloveichik, Yitzchak) Event Type Modified on 5/18/2020 (Vertus, Miriam). (Entered: 05/18/2020) |
| 05/18/2020 | | ORDER granting 14 Motion to Vacate 11 Clerk's ENTRY OF DEFAULT It appearing from the docket maintained in this action that defendant Chan Friedman. So Ordered by Magistrate Judge Ramon E. Reyes, Jr on 5/18/2020. (Vertus, Miriam) (Entered: 05/18/2020) |
| 05/21/2020 | 15 | MOTION to Compel -- *Letter request for pre-motion conference in anticipation of a motion to compel arbitration and to dismiss the Complaint* by Chan Friedman. (Soloveichik, Yitzchak) (Entered: 05/21/2020) |
| 05/22/2020 | 16 | RESPONSE to Motion re 13 MOTION to Compel -- *Letter request for pre-motion conference in anticipation of a motion to compel arbitration and to dismiss the Complaint*, 15 MOTION to Compel -- *Letter request for pre-motion conference in anticipation of a motion to compel arbitration and to dismiss the Complaint* filed by Elavon, Inc.. (Ginzburg, Daniel) (Entered: 05/22/2020) |
| 05/27/2020 | | SCHEDULING ORDER: Pre Motion conference set for 6/3/2020 at 10:30 AM. The parties are directed to call 1-888-684-8852 using access code 9801036. If any party has any difficulty accessing the telephone conference, please contact chambers at 718-613-2140. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Ordered by Judge Margo K. Brodie on 5/27/2020. (Valentin, Winnethka) (Entered: 05/27/2020) |
| 06/04/2020 | | Minute Entry re 13 and 15 Motions to Compel. A pre motion conference was held before Judge Margo K. Brodie on June 4, 2020. Daniel Ginzburg appeared on behalf of plaintiff; Yitzchak Eliezer Soloveichik appeared on behalf of defendants Ester Werzberger and Chan Friedman. The Court heard arguments from the parties as to the whether Werzberger and Friedman should be permitted to enforce the arbitration provision in an agreement between plaintiff and Silvertown and set the following briefing schedule for the motion to compel: Werzberger and Friedman shall serve moving papers on or before July 15, 2020; plaintiff shall serve opposition papers on or before August 14, 2020; Werzberger and Friedman shall serve reply papers, if any, on or before August 28, 2020. (Court Reporter Andronikh Barna.) (Williams, Tenisha) (Entered: 06/04/2020) |
| 06/10/2020 | 17 | MOTION for pre motion conference *or for Rule 16 Conference* by Elavon, Inc.. (Ginzburg, Daniel) (Entered: 06/10/2020) |
| 06/10/2020 | 18 | ORDER granting 17 Motion for Pre Motion Conference. Video Initial Conference set for 6/24/2020 at 12:00 PM before Magistrate Judge Ramon E. Reyes, Jr. The attorneys are directed to appear via video and all other participates may join by phone using the Toll number: 1 917-933-2166 and Conference ID: 545 599 095#. Prior to the conference, the parties are to comply with the requirements of Rule 26(f) of the Fed. R. Civ. P. (See attached blank document) **Case Management Statement must be completed and filed on ECF no later than 6/19/2020. Counsel with knowledge and authority must be present. *Per diem* counsel may not appear without prior permission of the Court. Ordered by Magistrate Judge Ramon E. Reyes, Jr on 6/10/2020. (Vertus, Miriam) (Entered: 06/10/2020)** |
| 06/17/2020 | 19 | MOTION to Stay *discovery pending resolution of motion to compel arbitration* by Chan Friedman. (Soloveichik, Yitzchak) (Entered: 06/17/2020) |

| | | |
|---|---|---|
| 06/20/2020 | 20 | CASE MANAGEMENT STATEMENT (Ginzburg, Daniel) (Entered: 06/20/2020) |
| 06/22/2020 | 21 | RESPONSE to Motion re 19 MOTION to Stay *discovery pending resolution of motion to compel arbitration* filed by Elavon, Inc.. (Ginzburg, Daniel) (Entered: 06/22/2020) |
| 06/24/2020 | | NOTICE re: Set/Reset Hearings: Due to a conflict in the Court's calendar the 6/24/2020 Video Initial Conference is rescheduled for 7/1/2020 at 10:00 AM before Magistrate Judge Ramon E. Reyes, Jr. The attorneys are directed to appear via video and all other participates may join by phone using the Toll number: 1 917-933-2166 and Conference ID: 545 599 095#. (Vertus, Miriam) (Entered: 2020-06-22 ) (Entered: 06/24/2020) |
| 07/01/2020 | | Minute Order. for proceedings held before Magistrate Judge Ramon E. Reyes, Jr.: Video Initial Conference held on 7/1/2020. Appearances: Daniel Ginzburg, Esq. for Plaintiff; Yitzchak Soloveichik, Esq. for Defendants Chan Friedman and Ester Werzberger. Discussions held. The 19 Motion to Stay Discovery is granted in part and denied in part. Plaintiff is permitted to engage in limited discovery along the lines discussed on the record. (Microsoft Teams Log #10:17:00-10:43:00) (Meyer, Elise) (Entered: 07/01/2020) |
| 07/16/2020 | 22 | Letter *Cover letter for service of Defendants' motion to compel arbitration* by Ester Werzberger (Soloveichik, Yitzchak) (Entered: 07/16/2020) |
| 07/23/2020 | 23 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 6/3/2020, before Judge Margo K. Brodie. Court Reporter/Transcriber Andronikh M. Barna, Telephone number 718-613-2178. Email address: ambarna.crr@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 8/13/2020. Redacted Transcript Deadline set for 8/24/2020. Release of Transcript Restriction set for 10/21/2020. (Barna, Andronikh) (Entered: 07/23/2020) |
| 07/30/2020 | 24 | TRANSCRIPT of Proceedings held on July 1, 2020, before Judge Reyes. Court Transcriber: Transcription Plus II, Inc. Email address: laferrara44@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.File redaction request using event "Redaction Request - Transcript" located under "Other Filings - Other Documents". Redaction Request due 8/20/2020. Redacted Transcript Deadline set for 8/31/2020. Release of Transcript Restriction set for 10/28/2020. (Rocco, Christine) (Entered: 07/30/2020) |
| 08/14/2020 | 25 | MOTION to Quash *Third-Party Subpoenas* by John Does # 1-10. (Attachments: # 1 Exhibit American Express Subpoena, # 2 Exhibit Chase Subpoena, # 3 Exhibit Citibank Subpoena, # 4 Exhibit Discovery Subpoena) (Marmon, Nathaniel) (Entered: 08/14/2020) |
| 08/14/2020 | 26 | Letter *to Opposing Counsel Confirming Filing of Opposition to Motion to Compel Arbitration* by Elavon, Inc. (Ginzburg, Daniel) (Entered: 08/14/2020) |
| 08/17/2020 | 27 | Consent MOTION for Extension of Time to File Response/Reply as to 25 MOTION to Quash *Third-Party Subpoenas* by Elavon, Inc.. (Ginzburg, Daniel) (Entered: 08/17/2020) |
| 08/18/2020 | | ORDER granting 27 Motion for Elavon, Inc., Extension of Time to File Response/Reply by 8/21/2020 re 25 MOTION to Quash *Third-Party Subpoenas*. Ordered by Magistrate Judge Ramon E. Reyes, Jr on 8/18/2020. (Vertus, Miriam) (Entered: 08/18/2020) |
| 08/21/2020 | 28 | RESPONSE in Opposition re 25 MOTION to Quash *Third-Party Subpoenas* filed by Elavon, Inc.. (Attachments: # 1 Exhibit 1 - Complaint) (Ginzburg, Daniel) (Entered: 08/21/2020) |

| | | |
|---|---|---|
| 08/25/2020 | | ORDER denying 25 Motion to Quash for the reasons stated in plaintiff's opposition 28 . Ordered by Magistrate Judge Ramon E. Reyes, Jr on 8/25/2020. (Reyes, Ramon) (Entered: 08/25/2020) |
| 08/28/2020 | 29 | MOTION to Compel *Arbitration* by Chan Friedman, Ester Werzberger. (Attachments: # 1 Memorandum in Support, # 2 Declaration, # 3 Exhibit A, # 4 Exhibit B) (Soloveichik, Yitzchak) (Entered: 08/28/2020) |
| 08/28/2020 | 30 | REPLY in Support re 29 MOTION to Compel *Arbitration* filed by Chan Friedman, Ester Werzberger. (Attachments: # 1 Declaration, # 2 Exhibit A) (Soloveichik, Yitzchak) (Entered: 08/28/2020) |
| 08/28/2020 | 31 | MEMORANDUM in Opposition re 29 MOTION to Compel *Arbitration* filed by Elavon, Inc.. (Ginzburg, Daniel) (Entered: 08/28/2020) |
| 08/31/2020 | 32 | MOTION for Reconsideration re Order on Motion to Quash by John Does # 1-10. (Marmon, Nathaniel) (Entered: 08/31/2020) |
| 08/31/2020 | 33 | AFFIDAVIT/DECLARATION in Support re 32 MOTION for Reconsideration re Order on Motion to Quash filed by John Does # 1-10. (Attachments: # 1 Exhibit 1 - American Express Subpoena, # 2 Exhibit 2 - Chase Subpoena, # 3 Exhibit 3 - Citibank Subpoena, # 4 Exhibit 4 - Discovery Subpoena) (Marmon, Nathaniel) (Entered: 08/31/2020) |
| 08/31/2020 | 34 | MEMORANDUM in Support re 32 MOTION for Reconsideration re Order on Motion to Quash filed by John Does # 1-10. (Marmon, Nathaniel) (Entered: 08/31/2020) |
| 09/03/2020 | 35 | Letter *Cover letter for courtesy copies of motion papers by Plaintiff and Defendants Friedman and Werzberger in conneciton with Defendants' motion to compel arbitration* by Chan Friedman, Ester Werzberger (Soloveichik, Yitzchak) (Entered: 09/03/2020) |
| 09/04/2020 | | ORDER re 32 MOTION for Reconsideration re Order on Motion to Quash. The Court directs plaintiff to respond to 32 the motion on or before September 11, 2020. Ordered by Judge Margo K. Brodie on 9/4/2020. (Williams, Tenisha) (Entered: 09/04/2020) |
| 09/11/2020 | 36 | MEMORANDUM in Opposition re 32 MOTION for Reconsideration re Order on Motion to Quash filed by Elavon, Inc.. (Attachments: # 1 Declaration of Daniel Ginzburg with Exhibits 1-5) (Ginzburg, Daniel) (Entered: 09/11/2020) |
| 09/15/2020 | 37 | REPLY in Support re 32 MOTION for Reconsideration re Order on Motion to Quash filed by John Does # 1-10. (Marmon, Nathaniel) (Entered: 09/15/2020) |
| 10/26/2020 | | SCHEDULING ORDER: The Court will hold oral argument on November 12, 2020 at 11:00 a.m. The parties are directed to call 1-888-684-8852 using access code 9801036. If any party has any difficulty accessing the telephone conference, please contact chambers at 718-613-2140. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Ordered by Judge Margo K. Brodie on 10/26/2020. (Valentin, Winnethka) (Entered: 10/26/2020) |
| 11/12/2020 | | MINUTE ENTRY: A telephone conference was held on November 12, 2020. Daniel Ginzburg appeared on behalf of plaintiff; Yitzchak Eliezer Soloveichik appeared on behalf of defendants Ester Werzberger and Chan Friedman; Nathaniel Ethan Marmon appeared on behalf of John Does 1 and 2. For the reasons stated on the record, the Court directs the parties to proceed with discovery on the first four bullet points listed in Schedule A to the subpoenas and directs the parties to work to reach an agreement on the scope of the |

| | | |
|---|---|---|
| | | remainder of the requests. The Court reserves decision as to the motion to compel arbitration. (Court Reporter Stacy Mase.) (Goss, Natasha) (Entered: 11/12/2020) |
| 11/30/2020 | 38 | Letter by John Does # 1-10 (Marmon, Nathaniel) (Entered: 11/30/2020) |
| 12/16/2020 | 39 | Letter *to the Court Containing a Stipulation to be "So Ordered"* by Elavon, Inc. (Ginzburg, Daniel) (Entered: 12/16/2020) |
| 01/08/2021 | | ORDER terminating 32 Motion for Reconsideration. See Minute Entry dated November 12, 2020. Ordered by Judge Margo K. Brodie on 1/8/2021. (Valentin, Winnethka) (Entered: 01/08/2021) |
| 02/03/2021 | 40 | STIPULATION AND ORDER, The Banks specified above shall respond to their individual Subpoenas within twenty-one (21) days of being served with this Stipulation. So Ordered by Chief Judge Margo K. Brodie on 2/2/2021. (Piper, Francine) (Entered: 02/03/2021) |
| 02/22/2021 | 41 | ORDER. For the reasons in the attached Memorandum and Order, the Court grants Defendants' motion to compel arbitration. Ordered by Chief Judge Margo K. Brodie on 2/22/2021. (Valentin, Winnethka) (Entered: 02/22/2021) |
| 07/10/2021 | 42 | AMENDED COMPLAINT against Erwin Ganzfried, Joseph Katz, Joseph Mering, Shlomo Kornhauser, Devorah Mering, Mordechai Kohn, Mordechai Levy, Naftuli Morgenstern, Sara Berger, Sarah T. Levi, Shlomo Berger, Solomon Levy, Sussman Bleier, Asher Jungreisz, filed by Elavon, Inc.. (Attachments: # 1 Exhibit 1 to Amended Complaint) (Ginzburg, Daniel) (Entered: 07/10/2021) |
| 07/14/2021 | 43 | Proposed Summons. by Elavon, Inc. (Ginzburg, Daniel) (Entered: 07/14/2021) |
| 07/15/2021 | 44 | Summons Issued Re: 42 Amended as to Sara Berger, Shlomo Berger, Sussman Bleier, Erwin Ganzfried, Asher Jungreisz, Joseph Katz, Mordechai Kohn, Shlomo Kornhauser, Sarah T. Levi, Mordechai Levy, Solomon Levy, Devorah Mering, Joseph Mering, Naftuli Morgenstern. (Piper, Francine) (Entered: 07/15/2021) |
| 07/16/2021 | 45 | AMENDED COMPLAINT against Sara Berger, Shlomo Berger, Sussman Bleier, Erwin Ganzfried, Asher Jungreisz, Joseph Katz, Mordechai Kohn, Shlomo Kornhauser, Sarah T. Levi, Mordechai Levy, Solomon Levy, Devorah Mering, Joseph Mering, Naftuli Morgenstern, filed by Elavon, Inc.. (Attachments: # 1 Exhibit 1 to Amended Complaint) (Ginzburg, Daniel) (Entered: 07/16/2021) |
| 09/21/2021 | 46 | SUMMONS Returned Executed by Elavon, Inc.. Devorah Mering served on 7/27/2021, answer due 8/17/2021. (Ginzburg, Daniel) (Entered: 09/21/2021) |
| 09/21/2021 | 47 | SUMMONS Returned Executed by Elavon, Inc.. Erwin Ganzfried served on 9/10/2021, answer due 10/1/2021. (Ginzburg, Daniel) (Entered: 09/21/2021) |
| 09/21/2021 | 48 | SUMMONS Returned Executed by Elavon, Inc.. Joseph Katz served on 8/5/2021, answer due 8/26/2021. (Ginzburg, Daniel) (Entered: 09/21/2021) |
| 09/21/2021 | 49 | SUMMONS Returned Executed by Elavon, Inc.. Joseph Mering served on 7/27/2021, answer due 8/17/2021. (Ginzburg, Daniel) (Entered: 09/21/2021) |
| 09/21/2021 | 50 | SUMMONS Returned Executed by Elavon, Inc.. Mordechai Kohn served on 7/23/2021, answer due 8/13/2021. (Ginzburg, Daniel) (Entered: 09/21/2021) |
| 09/21/2021 | 51 | SUMMONS Returned Executed by Elavon, Inc.. Mordechai Levy served on 8/2/2021, answer due 8/23/2021. (Ginzburg, Daniel) (Entered: 09/21/2021) |
| 09/21/2021 | 52 | SUMMONS Returned Executed by Elavon, Inc.. Naftuli Morgenstern served on 7/23/2021, answer due 8/13/2021. (Ginzburg, Daniel) (Entered: 09/21/2021) |

| | | |
|---|---|---|
| 09/21/2021 | 53 | SUMMONS Returned Executed by Elavon, Inc.. Sarah T. Levi served on 8/2/2021, answer due 8/23/2021. (Ginzburg, Daniel) (Entered: 09/21/2021) |
| 09/21/2021 | 54 | SUMMONS Returned Executed by Elavon, Inc.. Shlomo Kornhauser served on 8/9/2021, answer due 8/30/2021. (Ginzburg, Daniel) (Entered: 09/21/2021) |
| 09/21/2021 | 55 | SUMMONS Returned Executed by Elavon, Inc.. Sussman Bleier served on 8/9/2021, answer due 8/30/2021. (Ginzburg, Daniel) (Entered: 09/21/2021) |
| 09/21/2021 | 56 | SUMMONS Returned Executed by Elavon, Inc.. Shlomo Berger served on 9/15/2021, answer due 10/6/2021. (Ginzburg, Daniel) (Entered: 09/21/2021) |
| 09/21/2021 | 57 | SUMMONS Returned Executed by Elavon, Inc.. Sara Berger served on 9/15/2021, answer due 10/6/2021. (Ginzburg, Daniel) (Entered: 09/21/2021) |
| 10/04/2021 | 58 | MOTION for pre motion conference *re Motion to Dismiss* by Shlomo Berger, Joseph Katz, Mordechai Kohn, Shlomo Kornhauser, Devorah Mering, Joseph Mering, Naftuli Morgenstern. (Stein, Jeremy) (Entered: 10/04/2021) |
| 10/07/2021 | | ORDER re 58 Defendants' pre-motion conference letter. The Court orders Plaintiff to respond to Defendants' letter on or before October 14, 2021. Ordered by Chief Judge Margo K. Brodie on 10/7/2021. (Shane, Elisabeth) (Entered: 10/07/2021) |
| 10/11/2021 | 59 | RESPONSE in Opposition re 58 MOTION for pre motion conference *re Motion to Dismiss* filed by Elavon, Inc.. (Ginzburg, Daniel) (Entered: 10/11/2021) |
| 10/11/2021 | 60 | Request for Certificate of Default by Elavon, Inc. (Attachments: # 1 Declaration of Daniel Ginzburg with Exhibits 1-4, # 2 Form Certificate of Default) (Ginzburg, Daniel) (Entered: 10/11/2021) |
| 10/11/2021 | 61 | NOTICE by Elavon, Inc. *of Errata As to the Amended Complaint* (Attachments: # 1 Exhibit 1 to Notice of Errata - Corrected Amended Complaint) (Ginzburg, Daniel) (Entered: 10/11/2021) |
| 10/13/2021 | | ORDER denying 58 Motion for Pre Motion Conference. The parties are directed to confer and file a proposed briefing schedule for defendants' motion to dismiss on or before October 25, 2021. Ordered by Chief Judge Margo K. Brodie on 10/13/2021. (Shane, Elisabeth) (Entered: 10/13/2021) |
| 10/18/2021 | 62 | Clerk's ENTRY OF DEFAULT It appearing from the docket maintained in this action that defendant Sussman Bleier, Erwin Ganzfried, Sarah T. Levi, Mordechai Levy has failed to appear or otherwise defend this action, the default of defendant Sussman Bleier, Erwin Ganzfried, Sarah T. Levi, Mordechai Levy is hereby noted pursuant to Rule 55a of the Federal Rules of Civil Procedure. (Poveda, J.) (Entered: 10/18/2021) |
| 10/19/2021 | 63 | Letter *re Proposed Briefing Schedule for Motion to Dismiss* by Shlomo Berger, Joseph Katz, Mordechai Kohn, Shlomo Kornhauser, Devorah Mering, Joseph Mering, Naftuli Morgenstern (Stein, Jeremy) (Entered: 10/19/2021) |
| 10/20/2021 | | ORDER granting 63 Proposed Briefing Schedule. The Court adopts the parties' proposed briefing schedule for defendants' motion to dismiss. Defendants shall serve their motion on or before November 22, 2021; plaintiff shall serve its opposition on or before December 20, 2021; defendants shall serve their reply, if any, and file their motion on or before January 14, 2022. Ordered by Chief Judge Margo K. Brodie on 10/20/2021. (Shane, Elisabeth) (Entered: 10/20/2021) |
| 11/12/2021 | 64 | Letter *enclosing Stipulation Vacating Default* by Sara Berger, Shlomo Berger, Joseph Katz, Mordechai Kohn, Shlomo Kornhauser, Sarah T. Levi, Mordechai Levy, Devorah Mering, |

| | | |
|---|---|---|
| | | Joseph Mering, Naftuli Morgenstern (Stein, Jeremy) Modified on 11/12/2021 (Reyes, Ramon). (Entered: 11/12/2021) |
| 11/12/2021 | | ORDER granting 64 Motion to Vacate 62 Clerk's Entry of Default with respect to Sarah Levi and Mordechi Levy only. Ordered by Magistrate Judge Ramon E. Reyes, Jr on 11/12/2021. (Reyes, Ramon) (Entered: 11/12/2021) |
| 11/22/2021 | 65 | Letter *re Service of Motion to Dismiss Amended Complaint* by Sara Berger, Shlomo Berger, Joseph Katz, Mordechai Kohn, Shlomo Kornhauser, Sarah T. Levi, Mordechai Levy, Devorah Mering, Joseph Mering, Naftuli Morgenstern (Stein, Jeremy) (Entered: 11/22/2021) |
| 12/17/2021 | 66 | Consent MOTION for Extension of Time to File *Opposition to Motion to Dismiss and Reply Brief* by Elavon, Inc.. (Ginzburg, Daniel) (Entered: 12/17/2021) |
| 12/17/2021 | | ORDER granting 66 Motion for Extension of Time to File. The Court grants Plaintiff's request to extend the deadline to serve opposition papers. Plaintiff will serve its opposition on or before December 31, 2021. Defendants will reply, if at all, and file the fully briefed motion on or before February 4, 2022. Ordered by Chief Judge Margo K. Brodie on 12/17/2021. (Shane, Elisabeth) (Entered: 12/17/2021) |
| 12/31/2021 | 67 | Letter *to Chief Judge Brodie Confirming Service of Opposition to Motion to Dismiss* by Elavon, Inc. (Ginzburg, Daniel) (Entered: 12/31/2021) |
| 02/04/2022 | 68 | MOTION to Dismiss *for Lack of Jurisdiction and for Failure to State a Claim* by Sara Berger, Shlomo Berger, Joseph Katz, Mordechai Kohn, Shlomo Kornhauser, Sarah T. Levi, Mordechai Levy, Devorah Mering, Joseph Mering, Naftuli Morgenstern. (Attachments: # 1 Memorandum in Support) (Stein, Jeremy) (Entered: 02/04/2022) |
| 02/04/2022 | 69 | REPLY in Support re 68 MOTION to Dismiss *for Lack of Jurisdiction and for Failure to State a Claim* filed by Sara Berger, Shlomo Berger, Joseph Katz, Mordechai Kohn, Shlomo Kornhauser, Sarah T. Levi, Mordechai Levy, Devorah Mering, Joseph Mering, Naftuli Morgenstern. (Stein, Jeremy) (Entered: 02/04/2022) |
| 02/04/2022 | 70 | MEMORANDUM in Opposition re 68 MOTION to Dismiss *for Lack of Jurisdiction and for Failure to State a Claim* filed by Elavon, Inc.. (Ginzburg, Daniel) (Entered: 02/04/2022) |
| 02/04/2022 | 71 | AFFIDAVIT/DECLARATION in Opposition re 68 MOTION to Dismiss *for Lack of Jurisdiction and for Failure to State a Claim (Along with Exhibits 1-2)* filed by Elavon, Inc.. (Ginzburg, Daniel) (Entered: 02/04/2022) |
| 02/04/2022 | 72 | AFFIDAVIT/DECLARATION in Opposition re 68 MOTION to Dismiss *for Lack of Jurisdiction and for Failure to State a Claim (of Holly Franklin)* filed by Elavon, Inc.. (Ginzburg, Daniel) (Entered: 02/04/2022) |
| 02/07/2022 | 73 | Letter *Enclosing Courtesy Copies of Motion to Dismiss* by Sara Berger, Shlomo Berger, Joseph Katz, Mordechai Kohn, Shlomo Kornhauser, Sarah T. Levi, Mordechai Levy, Devorah Mering, Joseph Mering, Naftuli Morgenstern (Stein, Jeremy) (Entered: 02/07/2022) |
| 07/29/2022 | 74 | MOTION for Leave to File Document *(Motion to Confirm Arbitral Award)* by Elavon, Inc.. (Ginzburg, Daniel) (Entered: 07/29/2022) |
| 08/04/2022 | 75 | RESPONSE to Motion re 74 MOTION for Leave to File Document *(Motion to Confirm Arbitral Award)* filed by Ester Werzberger. (Soloveichik, Yitzchak) (Entered: 08/04/2022) |
| 08/05/2022 | 76 | REPLY to Response to Motion re 74 MOTION for Leave to File Document *(Motion to Confirm Arbitral Award)* filed by Elavon, Inc.. (Ginzburg, Daniel) (Entered: 08/05/2022) |

| | | |
|---|---|---|
| 09/30/2022 | 77 | MEMORANDUM & ORDER: For the reasons stated in the attached Memorandum and Order, the Court grants 68 Motion to Dismiss. Ordered by Chief Judge Margo K. Brodie on 9/30/2022. (Dow, Taylor) (Entered: 09/30/2022) |
| 09/30/2022 | 78 | CLERK'S JUDGMENT that the Moving Defendants' motion is granted; that Plaintiff's fraud and unjust enrichment claims are dismissed against them as time barred;and that Plaintiff's civil conspiracy claim are dismissed against them for failure to state a claim. Signed Brenna B. Mahoney, Clerk of Court by Jalitza Poveda, Deputy Clerk on 9/30/22. (TL) (Entered: 10/04/2022) |
| 10/07/2022 | 79 | REPLY in Support re 76 Reply to Response to Motion *for Leave to File Document (Motion to Confirm Arbitral Award)* filed by Ester Werzberger. (Soloveichik, Yitzchak) (Entered: 10/07/2022) |
| 10/17/2022 | | ORDER denying 74 letter request for pre-motion conference. Plaintiff is granted leave to file a supplemental pleading pursuant to Fed. R. Civ. P. 15(d). Ordered by Chief Judge Margo K. Brodie on 10/17/2022. (TD) (Entered: 10/17/2022) |
| 11/01/2022 | 80 | NOTICE OF APPEAL as to 78 Clerk's Judgment, by Elavon, Inc.. Filing fee $ 505, receipt number ANYEDC-16096876. (Ginzburg, Daniel) (Entered: 11/01/2022) |
| 11/01/2022 | | Electronic Index to Record on Appeal sent to US Court of Appeals. 80 Notice of Appeal Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (VJ) (Entered: 11/01/2022) |
| 11/01/2022 | 81 | Supplemental COMPLAINT , filed by Elavon, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3) (Ginzburg, Daniel) (Entered: 11/01/2022) |
| 11/17/2022 | 82 | MOTION for Refund of Fees Paid Electronically by Elavon, Inc.. (Ginzburg, Daniel) (Entered: 11/17/2022) |
| 11/17/2022 | 83 | MOTION for pre motion conference *Ahead of a Planned Motion for Summary Judgment / Confirm an Arbitral Award* by Elavon, Inc.. (Ginzburg, Daniel) (Entered: 11/17/2022) |
| 11/18/2022 | 84 | APPROVAL re 82 Motion for Refund of Fees Paid Electronically. Signed Brenna B. Mahoney, Clerk of Court by Tiffeny Lee-Harris, Manager on 11/18/2022. (TL) (Entered: 11/18/2022) |
| 11/22/2022 | | ORDER denying 83 Motion for Pre Motion Conference. The parties are directed to confer and file a proposed briefing schedule for Plaintiff's motion for summary judgment on or before December 2, 2022. Ordered by Chief Judge Margo K. Brodie on 11/22/2022. (TD) (Entered: 11/22/2022) |
| 12/02/2022 | 85 | Letter *Enclosing Proposed Briefing Schedule per the Court's November 22, 2022 Order* by Elavon, Inc. (Ginzburg, Daniel) (Entered: 12/02/2022) |
| 12/02/2022 | 86 | Letter *Enclosing Proposed Briefing Schedule per the Court's November 22, 2022 Order (previous letter filed in error)* by Elavon, Inc. (Ginzburg, Daniel) (Entered: 12/02/2022) |
| 12/05/2022 | | ORDER granting 86 Proposed Briefing Schedule. Plaintiff shall serve its motion for summary judgment on or before December 9, 2022; Defendants shall serve their opposition on or before January 9, 2023; and Plaintiff shall serve its reply, if any, and the parties shall file the fully briefed motion, on or before January 23, 2023. Ordered by Chief Judge Margo K. Brodie on 12/5/2022. (TD) (Entered: 12/05/2022) |

**PACER Service Center**

| Transaction Receipt | | | |
|---|---|---|---|
| 01/11/2023 16:46:47 | | | |
| **PACER Login:** | appealteam | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:20-cv-00908-MKB-RER |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELAVON, INC.<br><br>Plaintiff,<br><br>v.<br><br>ERWIN GANZFRIED, JOSEPH KATZ, JOSEPH MERING, SHLOMO KORNHAUSER, DEVORAH MERING, MORDECHAI KOHN, MORDECHAI LEVY, NAFTULI MORGENSTERN, SARA BERGER, SARAH T. LEVI, SHLOMO BERGER, SOLOMON LEVY, SUSSMAN BLEIER and ASHER JUNGREISZ,<br><br>Defendants. | Civil Action No.: 1:20-cv-00908<br><br>**AMENDED COMPLAINT**<br>**<u>AND JURY DEMAND</u>** |

Plaintiff Elavon, Inc. ("Elavon"), by and through its undersigned counsel, as and for its Complaint against defendants Erwin Ganzfried, Joseph Katz, Joseph Mering, Shlomo Kornhauser, Devorah Mering, Mordechai Kohn, Mordechai Levy, Naftuli Morgenstern, Sara Berger, Sarah T. Levi, Shlomo Berger, Solomon Levy, Sussman Bleier and Asher Jungreisz (together, the "Defendants") alleges as follows:

## NATURE OF THE ACTION

1. This is an action for damages arising from the Defendants' fraud and unjust enrichment, which caused Elavon to suffer over one million dollars in damages.

## THE PARTIES

2. At all relevant times herein, Elavon was, and remains, a corporation duly organized and existing pursuant to the laws of the State of Georgia and headquartered in Tennessee, and authorized to transact business within the State of New York.

3. At all relevant times herein, Elavon was, and remains, a wholly-owned subsidiary of U.S. Bank National Association, a federally-chartered banking institution.

4. Upon information and belief, each of the Defendants is a resident of the State of New York, and each is a resident of Kings County, with the exception of defendants Erwin Ganzfried and Mordechai Kohn, who are residents of Rockland County.

## SUBJECT MATTER JURISDICTION

5. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Elavon and Defendants are each citizens of different States, namely Georgia and Tennessee (Elavon) and New York (Defendants), and the overall amount in controversy exceeds $75,000 exclusive of interest and costs.

6. Elavon's claims against several individual Defendants exceed $75,000 exclusive of interest and costs.

7. Elavon respectfully requests that the Court exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the claims against the other Defendants because they are so factually and legally related to the claims within the Court's original jurisdiction that they form part of the same case or controversy pursuant to Article III of the United States Constitution.

## VENUE

8. Pursuant to 28 U.S.C. § 1391(b)(1), venue is proper in the Eastern District of New York because at least one Defendant resides in Kings County, New York, and all Defendants are residents of the State of New York.

9. Alternatively, venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL BACKGROUND

### A. Elavon And Silvertown Enter Into A Contract For Credit Card Processing

10. Non-party Silvertown of NY, Inc. ("Silvertown")[1] was a corporation formed pursuant to the laws of the State of New York on or about November 13, 2009.

11. Elavon and Silvertown entered into a written contract incorporating by reference a Terms of Service and a Merchant Operating Guide (collectively hereinafter, the "Contract"). Silvertown signed the Contract on July 22, 2010. A true and correct copy of the Contract is annexed hereto as Exhibit 1.

12. In the Contract, Silvertown represented to Elavon that it was operating a "silver store." (Exhibit 1 at 1).

13. The purpose of the Contract was to establish a relationship between Elavon and Silvertown pursuant to which Elavon would act as Silvertown's credit card processor. Elavon's services would permit Silvertown to accept credit cards as payment for the sale of its merchandise.

14. As required, Elavon provided Silvertown with merchant access into the VISA, MasterCard, American Express and Discover payment networks in exchange for compensation based primarily on a miniscule percentage of each processed credit card transaction.

[1] Silvertown was a former party to this litigation. However, the Court granted its motion to compel arbitration. (*See* ECF No. 41).

15. Pursuant to the terms of the Contract, Silvertown was obligated to reimburse Elavon for customer "chargebacks."

16. A "chargeback," more commonly known as a credit card "dispute," is a reversal of a transaction between a merchant and a customer credit cardholder. Chargebacks typically occur because of a customer's dissatisfaction with the goods or services provided by a merchant.

17. If substantiated, a chargeback results in a credit card processor, like Elavon, reimbursing the customer's credit card-issuing bank the amount of a disputed transaction. The card-issuing bank will then post a credit to the cardholder's balance.

18. Pursuant to VISA, MasterCard, American Express and Discover regulations, credit card processors like Elavon bear the responsibility of reimbursing credit cardholders for chargebacks regardless of whether the processors themselves are able to obtain reimbursement from their merchant customers.

**B. Silvertown and the Defendants Engaged In a Scheme to Use Credit Cards As a Form of Lending**

19. According to Silvertown's July 22, 2010 application to Elavon, it expected its monthly credit card sales to be approximately $25,000. (Exhibit 1).

20. By June 2015, however, Silvertown was processing $715,000 worth of transactions per month.

21. Many, if not all, of the credit card transactions Silvertown submitted to Elavon were fake in that they did not represent bona fide exchanges of payment for goods or services. In these transactions, Silvertown did not agree to provide any goods or services to "customers" presenting their credit cards to Silvertown for payment, and the "customers" did not expect Silvertown to provide them with any goods or services.

22. The non-bona fide transactions in which neither Silvertown nor the "customers" expected to provide or receive, respectively, goods or services are referred to herein as the "Sham Transactions," and the "customers" engaging in the Sham Transactions are referred to herein as "Sham Customers."

23. Each of the Defendants is a Sham Customer.

24. Without any goods or services involved, the Sham Transactions were in effect loans made by the Sham Customers to Silvertown.

25. Silvertown's charging of various amounts to the Sham Customers' credit cards resulted in monthly debts owed by the Sham Customers to their credit card-issuing banks.

26. As part of the lending scheme, Silvertown promised the Sham Customers that it would either repay their debts directly to their card-issuing banks or transfer funds to them so that they themselves could repay their card-issuing banks.

27. Silvertown did not have sufficient revenue from bona fide business transactions to reimburse the Sham Customers. As a result, it charged other credit cards belonging to the same or different Sham Customers to obtain sufficient funds for its reimbursement obligations.

28. Funds derived from later Sham Transactions were used to pay down the debt incurred through earlier Sham Transactions, so that a constant stream of increasing Sham Transactions was necessary to pay down the credit card debts.

### C. <u>The Lending Operation Ends and Defendants Shift Their Debt Onto Elavon</u>

29. This state of events was untenable because Silvertown would eventually have been required to process monthly charges exceeding $1 million just to keep up with its repayment obligations to the Sham Customers.

30. As a result, Silvertown informed the Sham Customers, including the Defendants, that it would no longer process credit card transactions and, therefore, be unable to repay their debts to the credit card-issuing banks and/or provide funds to them to pay down the obligations resulting from the lending scheme.

31. Without Silvertown's transfers of funds, the Defendants would be left with sizable debts due and owing to their credit card-issuing banks that they would be required to repay using their own funds.

32. Instead of using their own funds, however, Defendants, using suggestions by non-party TransMedia Payment Services, Ltd., sometimes trading as Intercept Advisory Firm, Ltd. ("TransMedia"), and with Silvertown's assistance and cooperation, worked to shift their debt onto Elavon.

33. TransMedia touts itself as "a credit card chargeback loss prevention firm that works with merchants, to help them win chargebacks." *See* TransMedia, http://tranmedia.com/ite/why-choose-us.htm (last accessed July 10, 2021). TransMedia's expertise is the rules and regulations promulgated by Visa, MasterCard, Discover and American Express concerning credit card processing and chargeback procedures (the "Processing Rules").

34. Owing to its expertise and understanding of the Processing Rules, TransMedia's instruction to Silvertown and the Defendants included an explanation of the overall chargeback cycle, the identities and roles of the participants in the chargeback cycle as it related to their particular intended chargebacks, and the prerequisites to commencing chargebacks and successfully concluding them.

35. The foregoing specific information was necessary for the Defendants to eliminate their debt to their card-issuing banks by taking all steps necessary to conclude their chargebacks successfully.

36. Pursuant to the Processing Rules, Elavon was required to refund card-issuing banks and the Defendants the amount of the chargebacks regardless of whether Silvertown maintained sufficient reserves for Elavon to recoup for itself the amount of the refunds.

37. The Processing Rules are publicly available, and with TransMedia's help, Silvertown and the Defendants were able to review and understand them in sufficient detail. Among Defendants' knowledge was that Elavon would ultimately be responsible for Defendants' debts upon initiation of a chargeback.

38. Between August 2015 and September 2016, Defendants presented Elavon with numerous chargebacks to Silvertown's account. The chargebacks resulted in Elavon reimbursing Defendants' card-issuing banks over $1 million. As intended, Silvertown did not have sufficient amounts in its account to compensate Elavon.

39. In turn, the card-issuing banks used Elavon's funds to satisfy the debts owed to them by the Defendants, resulting in elimination of any liability on the part of the Defendants. In effect, Elavon paid off the Defendants' debts to their card-issuing banks.

**D. The Defendants Engaged In A Fraudulent Scheme To Present Elavon Sham Transactions For Pecuniary Gain**

40. Beginning on or about August 3, 2015 and continuing through September 21, 2016, Silvertown's account with Elavon became the subject of approximately 92 chargebacks of various amounts (the "Subject Chargebacks").

41. The Subject Chargebacks were all predicated on Sham Transactions.

42. The Processing Rules state that a credit card holder must initiate a chargeback by contacting his or her credit card-issuing bank and affirming non-receipt of the promised goods or services.

43. Upon receiving a report of a disputed transaction from its customer, the credit card-issuing bank will transmit the chargeback statement using either the Visa, MasterCard, Discover or American Express electronic communications system, as appropriate, to the merchant's credit card processor, which transmits it to the merchant for a response. At this point, the burden shifts to the merchant either to accept the chargeback or provide facts showing that the credit card holder did receive the goods and/or services paid for. Simultaneously, the credit card holder will receive a provisional credit for the amount of the chargeback.

44. In the event that the merchant accepts the chargeback, its defense to the credit card holder's dispute is found to be insufficient, or the merchant fails to respond, the chargeback will be confirmed and the formerly provisional credit to the card holder will become permanent. As described above, the Processing Rules dictate that the credit card processor bears pecuniary responsibility for the chargeback amount even if the amount exceeds the balance of a merchant's account with the credit card processor.

45. On or about the dates specified below, using their knowledge of the Processing Rules, the Defendants contacted their credit card-issuing banks and stated to them that Silvertown had failed to provide the goods or services purchased in Sham Transactions. These representations were false because the Defendants never intended to purchase goods or services from Silvertown. Nonetheless, the Defendants requested that the issuing banks initiate the Subject Chargebacks.

46. The Subject Chargebacks, organized by Defendant, are set forth below. The "Sale Date" column represents the date on which each transaction was originally processed; the "Chargeback Date" column represents the date on which the cardholder contacted the issuing bank and requested a chargeback based on false premises; and the "Reason Code" and "Reason Code Description" columns represent the issuing bank code and interpretation of the code, respectively, assigned to the chargeback based on the cardholder's misrepresentative description to the issuing bank of the purported dispute with Silvertown.

*a. <u>Erwin Ganzfried ("Ganzfried")</u>*

| Card No. | Issuer | Amount | Sale Date | Chargeback Date | Reason Code | Reason Code Description |
|---|---|---|---|---|---|---|
| x11008 | American Express | $18,360.00 | 07/06/15 | 8/1/15 | C05 | Goods/Services Canceled |
| x11008 | American Express | $7,272.00 | 07/08/15 | 8/1/15 | C05 | Goods/Services Canceled |
| x11008 | American Express | $13,360.00 | 07/07/15 | 8/1/15 | C05 | Goods/Services Canceled |
| x11008 | American Express | $18,720.00 | 07/02/15 | 8/1/15 | C05 | Goods/Services Canceled |
| x11008 | American Express | $7,272.00 | 07/02/15 | 8/4/15 | C05 | Goods/Services Canceled |
| x11008 | American Express | $18,180.00 | 06/09/15 | 8/4/15 | C05 | Goods/Services Canceled |
| x11008 | American Express | $12,540.00 | 06/14/15 | 8/5/15 | C05 | Goods/Services Canceled |
| x11008 | American Express | $9,972.00 | 06/08/15 | 8/8/15 | C05 | Goods/Services Canceled |
| x11008 | American Express | $11,720.00 | 06/11/15 | 8/8/15 | C05 | Goods/Services Canceled |
| x11008 | American Express | $10,000.00 | 06/02/15 | 8/8/15 | C05 | Goods/Services Canceled |
| x11008 | American Express | $15,540.00 | 05/21/15 | 8/8/15 | C05 | Goods/Services Canceled |
| x11008 | American Express | $18,650.00 | 05/18/15 | 8/8/15 | C05 | Goods/Services Canceled |
| x11008 | American Express | $15,000.00 | 05/31/15 | 8/8/15 | C05 | Goods/Services Canceled |
| x11008 | American Express | $13,500.00 | 04/29/15 | 8/12/15 | C05 | Goods/Services Canceled |
| x11024 | American Express | $10,000.00 | 05/07/15 | 8/8/15 | C05 | Goods/Services Canceled |
| x11024 | American Express | $15,000.00 | 04/20/15 | 8/12/15 | C05 | Goods/Services Canceled |
| x11024 | American Express | $5,000.00 | 04/12/15 | 8/12/15 | C05 | Goods/Services Canceled |
| x11024 | American Express | $27,000.00 | 5/17/15 | 8/14/15 | 154 | Cancellation Inquiry |
| x11008 | American Express | $42,360.00 | 7/5/15 | 8/14/15 | 154 | Cancellation Inquiry |
| x11008 | American Express | $26,720.00 | 7/7/15 | 8/14/15 | 154 | Cancellation Inquiry |
| x11008 | American Express | $24,736.00 | 7/5/15 | 8/14/15 | 154 | Cancellation Inquiry |
| x11008 | American Express | $36,072.00 | 7/6/15 | 8/14/15 | 154 | Cancellation Inquiry |

47. Ganzfried's representations to American Express on the dates listed above to support Reason Codes C05 and 154 that he cancelled previously ordered goods or services was knowingly false because he never ordered nor expected to receive any goods or services from Silvertown. Rather, Ganzfried made the false representations in order to obtain compensation, i.e., the elimination of his debt, to which he was not entitled.

48. Based on his knowledge of the Processing Rules, Ganzfried made the misrepresentations to American Express with the intention and knowledge that American Express would transmit the misrepresentations to Elavon because he knew that the Processing Rules required Elavon to be the entity issuing funds to American Express canceling out his debt.

49. Similarly, Ganzfried made the misrepresentations with the intention that Elavon would rely on them because he knew that Elavon's acceptance and processing of the chargebacks was necessary, pursuant to the Processing Rules, for him to achieve his goal of eliminating his debt to American Express.

50. Elavon justifiably relied on Ganzfried's misrepresentations because it had no reason to disbelieve or even doubt his claim that he truly did order goods and/or services from Silvertown, and that Silvertown failed to deliver them, leading Ganzfried to resort to the chargeback process. Moreover, pursuant to the Processing Rules, Elavon had only thirty (30) days to respond to the chargebacks, a portion of which was spent awaiting Silvertown's responses thereto. It was impossible for Elavon to investigate the chargebacks and reach any final conclusion within the permitted thirty-day window.

51. Had Elavon suspected or known that Ganzfried's representations were false, it would have alerted American Express to this fact and asked it not to process the chargebacks or

reverse them because they were predicated on a falsehood, or sought equitable and/or declaratory relief. However, Elavon had no such suspicion or knowledge, and therefore justifiably relied on Ganzfried's misrepresentations.

52. Upon Ganzfried's initiation of the chargebacks, American Express debited the amounts of the chargebacks from Elavon and provided him a provisional credit. Concurrently, Elavon contacted Silvertown to ask that it respond to the chargeback.

53. Silvertown, as part of the scheme to shift Ganzfried's debt to American Express to Elavon, did not contest or respond to the chargebacks, eventually causing American Express to make the provisional credit permanent.

54. As a result of the chargeback becoming permanent, Elavon incurred damages because, as planned, Silvertown did not have sufficient funds in its account to reimburse Elavon for the sums it forwarded to American Express as part of the chargeback process.

*b. <u>Joseph Katz ("Katz")</u>*

| Card No. | Issuer | Amount | Sale Date | Chargeback Date | Reason Code | Reason Code Description |
|---|---|---|---|---|---|---|
| x2763 | Discover | $9,954.00 | 4/13/15 | 8/8/15 | 8002-RN2 | Credit Not Processed |
| x2763 | Discover | $6,900.00 | 6/30/15 | 8/8/15 | 8002-RN2 | Credit Not Processed |

55. Katz's representations to Discover on the dates listed above to support Reason Code 8002-RN2 that he was entitled to a credit from Silvertown for undelivered silverware was knowingly false because that chargeback code requires a preexisting order of goods or services, and Katz never ordered nor expected to receive any goods or services from Silvertown.

56. Rather, Katz made the false representations in order to obtain compensation, i.e., the elimination of his debt, to which he was not entitled.

57. Based on his knowledge of the Processing Rules, Katz made the misrepresentations to Discover with the intention and knowledge that Discover would transmit the misrepresentations to Elavon because he knew that the Processing Rules required Elavon to be the entity issuing funds to Discover canceling out his debt.

58. Similarly, Katz made the misrepresentations with the intention that Elavon would rely on them because he knew that Elavon's acceptance and processing of the chargebacks was necessary, pursuant to the Processing Rules, for him to achieve his goal of eliminating his debt to American Express.

59. Elavon justifiably relied on Katz's misrepresentations because it had no reason to disbelieve or even doubt his claim that he truly did order goods and/or services from Silvertown, and that Silvertown failed to deliver them, leading Katz to resort to the chargeback process. Moreover, pursuant to the Processing Rules, Elavon had only thirty (30) days to respond to the chargebacks, a portion of which was spent awaiting Silvertown's responses thereto. It was impossible for Elavon to investigate the chargebacks and reach any final conclusion within the permitted thirty-day window.

60. Had Elavon suspected or known that Katz's representations were false, it would have alerted Discover to this fact and asked it not to process the chargebacks or reverse them because they were predicated on a falsehood, or sought equitable and/or declaratory relief. However, Elavon had no such suspicion or knowledge, and therefore justifiably relied on Katz's misrepresentations.

61. Upon Katz's initiation of the chargebacks, Discover debited the amounts of the chargebacks from Elavon and provided him a provisional credit. Concurrently, Elavon contacted Silvertown to ask that it respond to the chargeback.

62. Silvertown, as part of the scheme to shift Katz's debt to Discover to Elavon, did not contest or respond to the chargebacks, eventually causing Discover to make the provisional credit permanent.

63. As a result of the chargeback becoming permanent, Elavon incurred damages because, as planned, Silvertown did not have sufficient funds in its account to reimburse Elavon for the sums it forwarded to Discover as part of the chargeback process.

c. *Joseph Mering ("J. Mering")*

| Card No. | Issuer | Amount | Sale Date | Chargeback Date | Reason Code | Reason Code Description |
|---|---|---|---|---|---|---|
| x2004 | American Express | $15,455.40 | 06/07/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $28,540.00 | 06/11/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $25,000.00 | 06/21/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $3,600.00 | 05/10/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $28,000.00 | 06/15/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $10,000.00 | 05/18/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $45,000.00 | 06/21/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $22,360.00 | 06/08/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $10,000.00 | 06/14/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $20,000.00 | 06/02/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $15,000.00 | 05/07/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $5,000.00 | 05/26/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $7,000.00 | 05/19/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $12,720.00 | 06/10/15 | 9/15/15 | 154 | Goods/Services Cancelled |

| | | | | | | |
|---|---|---|---|---|---|---|
| x2004 | American Express | $20,000.00 | 05/10/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $20,000.00 | 05/31/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $40,000.00 | 06/17/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $3,572.00 | 06/03/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $20,360.00 | 06/09/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $15,000.00 | 06/01/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $7,000.00 | 06/03/15 | 9/15/15 | 154 | Goods/Services Cancelled |

64. J. Mering's representations to American Express on the dates listed above to support Reason Code 154 that he cancelled previously ordered goods or services was knowingly false because he never ordered nor expected to receive any goods or services from Silvertown. Rather, J. Mering made the false representations in order to obtain compensation, i.e., the elimination of his debt, to which he was not entitled.

65. Based on his knowledge of the Processing Rules, J. Mering made the misrepresentations to American Express with the intention and knowledge that American Express would transmit the misrepresentations to Elavon because he knew that the Processing Rules required Elavon to be the entity issuing funds to American Express canceling out his debt.

66. Similarly, J. Mering made the misrepresentations with the intention that Elavon would rely on them because he knew that Elavon's acceptance and processing of the chargebacks was necessary, pursuant to the Processing Rules, for him to achieve his goal of eliminating his debt to American Express.

67. Elavon justifiably relied on J. Mering's misrepresentations because it had no reason to disbelieve or even doubt his claim that he truly did order goods and/or services from Silvertown, and that Silvertown failed to deliver them, leading J. Mering to resort to the chargeback process.

Moreover, pursuant to the Processing Rules, Elavon had only thirty (30) days to respond to the chargebacks, a portion of which was spent awaiting Silvertown's responses thereto. It was impossible for Elavon to investigate the chargebacks and reach any final conclusion within the permitted thirty-day window.

68. Had Elavon suspected or known that J. Mering's representations were false, it would have alerted American Express to this fact and asked it not to process the chargebacks or reverse them because they were predicated on a falsehood, or sought equitable and/or declaratory relief. However, Elavon had no such suspicion or knowledge, and therefore justifiably relied on J. Mering's misrepresentations.

69. Upon J. Mering's initiation of the chargebacks, American Express debited the amounts of the chargebacks from Elavon and provided him a provisional credit. Concurrently, Elavon contacted Silvertown to ask that it respond to the chargeback.

70. Silvertown, as part of the scheme to shift J. Mering's debt to American Express to Elavon, did not contest or respond to the chargebacks, eventually causing American Express to make the provisional credit permanent.

71. As a result of the chargeback becoming permanent, Elavon incurred damages because, as planned, Silvertown did not have sufficient funds in its account to reimburse Elavon for the sums it forwarded to American Express as part of the chargeback process.

*d. <u>Shlomo Kornhauser ("Kornhauser")</u>*

| Card No. | Issuer | Amount | Sale Date | Chargeback Date | Reason Code | Reason Code Description |
|---|---|---|---|---|---|---|
| x5816 | Citibank | $1,872.00 | 06/29/15 | 9/11/15 | 4860 | Credit Not Processed |

| | | | | | | |
|---|---|---|---|---|---|---|
| x5816 | Citibank | $1,872.00 | 04/29/15 | 9/11/15 | 4860 | Credit Not Processed |
| x5816 | Citibank | $9,754.00 | 06/29/15 | 10/8/15 | 4860 | Credit Not Processed |
| x5816 | Citibank | $7,854.00 | 06/25/15 | 10/8/15 | 4860 | Credit Not Processed |
| x5816 | Citibank | $9,236.00 | 06/25/15 | 10/8/15 | 4860 | Credit Not Processed |
| x5816 | Citibank | $9,727.20 | 06/25/15 | 10/8/15 | 4860 | Credit Not Processed |
| x5816 | Citibank | $9,218.00 | 06/25/15 | 10/8/15 | 4860 | Credit Not Processed |
| x5816 | Citibank | $9,720.00 | 04/29/15 | 10/8/15 | 4860 | Credit Not Processed |
| x5816 | Citibank | $8,817.00 | 06/25/15 | 10/8/15 | 4860 | Credit Not Processed |
| x5816 | Citibank | $9,772.00 | 06/29/15 | 10/8/15 | 4860 | Credit Not Processed |
| x5816 | Citibank | $8,540.00 | 06/25/15 | 10/8/15 | 4860 | Credit Not Processed |
| x5816 | Citibank | $9,854.00 | 6/29/2015 | 10/8/15 | 4860 | Credit Not Processed |

72. Kornhauser represented to Citibank on the dates listed above that he had purchased silverware from Silvertown, but heard that Silvertown was closing or being sold, and therefore requested and was denied a credit for those purchases. These representations were false because Kornhauser had never purchased anything from Silvertown.

73. Therefore, the statements he made to support Reason Code 4860 that he was entitled to a credit because was knowingly false because Reason Code 4860 requires a preexisting order of goods and/or services, and Kornhauser never ordered nor expected to receive any goods

or services from Silvertown. Rather, Kornhauser made the false representations in order to obtain compensation, i.e., the elimination of his debt, to which he was not entitled.

74. Based on his knowledge of the Processing Rules, Kornhauser made the misrepresentations to Citibank with the intention and knowledge that Citibank would transmit the misrepresentations to Elavon because he knew that the Processing Rules required Elavon to be the entity issuing funds to Citibank canceling out his debt.

75. Similarly, Kornhauser made the misrepresentations with the intention that Elavon would rely on them because he knew that Elavon's acceptance and processing of the chargebacks was necessary, pursuant to the Processing Rules, for him to achieve his goal of eliminating his debt to Citibank.

76. Elavon justifiably relied on Kornhauser misrepresentations because it had no reason to disbelieve or even doubt his claim that he truly did order goods and/or services from Silvertown, and that Silvertown failed to deliver them, leading Kornhauser to resort to the chargeback process. Moreover, pursuant to the Processing Rules, Elavon had only thirty (30) days to respond to the chargebacks, a portion of which was spent awaiting Silvertown's responses thereto. It was impossible for Elavon to investigate the chargebacks and reach any final conclusion within the permitted thirty-day window.

77. Had Elavon suspected or known that Kornhauser's representations were false, it would have alerted Citibank to this fact and asked it not to process the chargebacks or reverse them because they were predicated on a falsehood, or requested a compliance hearing from MasterCard, or sought equitable and/or declaratory relief. However, Elavon had no such suspicion or knowledge, and therefore justifiably relied on Kornhauser misrepresentations.

78. Upon Kornhauser's initiation of the chargebacks, Citibank debited the amounts of the chargebacks from Elavon and provided him a provisional credit. Concurrently, Elavon contacted Silvertown to ask that it respond to the chargeback.

79. Silvertown, as part of the scheme to shift Kornhauser's debt to Citibank to Elavon, did not contest or respond to the chargebacks, eventually causing Citibank to make the provisional credit permanent.

80. As a result of the chargeback becoming permanent, Elavon incurred damages because, as planned, Silvertown did not have sufficient funds in its account to reimburse Elavon for the sums it forwarded to Citibank as part of the chargeback process.

*e. Devorah Mering ("D. Mering")*

| Card No. | Issuer | Amount | Sale Date | Chargeback Date | Reason Code | Reason Code Description |
|---|---|---|---|---|---|---|
| x7951 | Citibank | $4,500.00 | 05/21/15 | 1/20/16 | 30 | Services/Goods Not Rendered |

81. On the date listed above, D. Mering represented to Citibank that she purchased silverware manufactured in China and shipped to Silvertown. This representation was false because D. Mering never purchased or intended to purchase anything from Silvertown.

82. D. Mering's representations to Citibank on the dates listed above to support Reason Code 30 that Silvertown did not render services/goods to her was knowingly false because D. Mering never ordered nor expected to receive any services or goods from Silvertown. Rather, D. Mering made the false representations in order to obtain compensation, i.e., the elimination of his debt, to which she was not entitled.

83. Based on her knowledge of the Processing Rules, D. Mering made the misrepresentations to Citibank with the intention and knowledge that Citibank would transmit the misrepresentations to Elavon because she knew that the Processing Rules required Elavon to be the entity issuing funds to Citibank canceling out her debt.

84. Similarly, D. Mering made the misrepresentations with the intention that Elavon would rely on them because she knew that Elavon's acceptance and processing of the chargebacks was necessary, pursuant to the Processing Rules, for her to achieve her goal of eliminating her debt to Citibank.

85. Elavon justifiably relied on D. Mering misrepresentations because it had no reason to disbelieve or even doubt her claim that she truly did order services from Silvertown, and that Silvertown failed to deliver them, leading D. Mering to resort to the chargeback process. Moreover, pursuant to the Processing Rules, Elavon had only thirty (30) days to respond to the chargebacks, a portion of which was spent awaiting Silvertown's responses thereto. It was impossible for Elavon to investigate the chargebacks and reach any final conclusion within the permitted thirty-day window.

86. Had Elavon suspected or known that D. Mering's representations were false, it would have alerted Citibank to this fact and asked it not to process the chargebacks or reverse them because they were predicated on a falsehood, or requested a compliance hearing from Visa, or sought equitable and/or declaratory relief. However, Elavon had no such suspicion or knowledge, and therefore justifiably relied on D. Mering's misrepresentations.

87. Upon D. Mering's initiation of the chargebacks, Citibank debited the amounts of the chargebacks from Elavon and provided her a provisional credit. Concurrently, Elavon contacted Silvertown to ask that it respond to the chargeback.

88. Silvertown, as part of the scheme to shift D. Mering's debt to Citibank to Elavon, did not contest or respond to the chargebacks, eventually causing Citibank to make the provisional credit permanent.

89. As a result of the chargeback becoming permanent, Elavon incurred damages because, as planned, Silvertown did not have sufficient funds in its account to reimburse Elavon for the sums it forwarded to Citibank as part of the chargeback process.

*f.* *<u>Mordechai Kohn ("Kohn")</u>*

| Card No. | Issuer | Amount | Sale Date | Chargeback Date | Reason Code | Reason Code Description |
|---|---|---|---|---|---|---|
| x2549 | Chase | $2,500.00 | 05/26/15 | 8/29/15 | 30 | Services/Goods Not Rendered |
| x2549 | Chase | $6,500.00 | 05/26/15 | 8/29/15 | 30 | Services/Goods Not Rendered |

90. Kohn's representations to Chase on the dates listed above to support Reason Code 30 that Silvertown did not render services or goods to him was knowingly false because Kohn never ordered nor expected to receive any services or goods from Silvertown. Rather, Kohn made the false representations in order to obtain compensation, i.e., the elimination of his debt, to which he was not entitled.

91. Based on his knowledge of the Processing Rules, Kohn made the misrepresentations to Chase with the intention and knowledge that Chase would transmit the misrepresentations to Elavon because he knew that the Processing Rules required Elavon to be the entity issuing funds to Chase canceling out her debt.

92. Similarly, Kohn made the misrepresentations with the intention that Elavon would rely on them because he knew that Elavon's acceptance and processing of the chargebacks was necessary, pursuant to the Processing Rules, for him to achieve his goal of eliminating his debt to Chase.

93. Elavon justifiably relied on Kohn's misrepresentations because it had no reason to disbelieve or even doubt his claim that he truly did order services from Silvertown, and that Silvertown failed to deliver them, leading Kohn to resort to the chargeback process. Moreover, pursuant to the Processing Rules, Elavon had only thirty (30) days to respond to the chargebacks, a portion of which was spent awaiting Silvertown's responses thereto. It was impossible for Elavon to investigate the chargebacks and reach any final conclusion within the permitted thirty-day window.

94. Had Elavon suspected or known that Kohn's representations were false, it would have alerted Chase to this fact and asked it not to process the chargebacks or reverse them because they were predicated on a falsehood, or requested a compliance hearing from Visa, or sought equitable and/or declaratory relief. However, Elavon had no such suspicion or knowledge, and therefore justifiably relied on Kohn's misrepresentations.

95. Upon Kohn's initiation of the chargebacks, Chase debited the amounts of the chargebacks from Elavon and provided him a provisional credit. Concurrently, Elavon contacted Silvertown to ask that it respond to the chargeback.

96. Silvertown, as part of the scheme to shift Kohn's debt to Chase to Elavon, did not contest or respond to the chargebacks, eventually causing Chase to make the provisional credit permanent.

97. As a result of the chargeback becoming permanent, Elavon incurred damages because, as planned, Silvertown did not have sufficient funds in its account to reimburse Elavon for the sums it forwarded to Chase as part of the chargeback process.

g. *Mordechai Levy ("M. Levy")*

| Card No. | Issuer | Amount | Sale Date | Chargeback Date | Reason Code | Reason Code Description |
|---|---|---|---|---|---|---|
| x7877 | Chase | $8,000.00 | 07/05/15 | 9/21/15 | 85 | Credit Not Processed |

98. M. Levy's representations to Chase on the dates listed above to support Reason Code 85 that he was entitled to a credit was knowingly false because Reason Code 85 requires a preexisting order of goods or services, and M. Levy never ordered nor expected to receive any goods or services from Silvertown. Rather, M. Levy made the false representations in order to obtain compensation, i.e., the elimination of his debt, to which he was not entitled.

99. Based on his knowledge of the Processing Rules, M. Levy made the misrepresentations to Chase with the intention and knowledge that Chase would transmit the misrepresentations to Elavon because he knew that the Processing Rules required Elavon to be the entity issuing funds to Chase canceling out his debt.

100. Similarly, M. Levy made the misrepresentations with the intention that Elavon would rely on them because he knew that Elavon's acceptance and processing of the chargebacks was necessary, pursuant to the Processing Rules, for him to achieve his goal of eliminating his debt to Chase.

101. Elavon justifiably relied on M. Levy's misrepresentations because it had no reason to disbelieve or even doubt his claim that he truly did order services from Silvertown, and that Silvertown failed to deliver them, leading M. Levy to resort to the chargeback process. Moreover,

pursuant to the Processing Rules, Elavon had only thirty (30) days to respond to the chargebacks, a portion of which was spent awaiting Silvertown's responses thereto. It was impossible for Elavon to investigate the chargebacks and reach any final conclusion within the permitted thirty-day window.

102. Had Elavon suspected or known that M. Levy's representations were false, it would have alerted Chase to this fact and asked it not to process the chargebacks or reverse them because they were predicated on a falsehood, or requested a compliance hearing from Visa, or sought equitable and/or declaratory relief. However, Elavon had no such suspicion or knowledge, and therefore justifiably relied on M. Levy's misrepresentations.

103. Upon M. Levy's initiation of the chargebacks, Chase debited the amounts of the chargebacks from Elavon and provided him a provisional credit. Concurrently, Elavon contacted Silvertown to ask that it respond to the chargeback.

104. Silvertown, as part of the scheme to shift M. Levy's debt to Chase to Elavon, did not contest or respond to the chargebacks, eventually causing Chase to make the provisional credit permanent.

105. As a result of the chargeback becoming permanent, Elavon incurred damages because, as planned, Silvertown did not have sufficient funds in its account to reimburse Elavon for the sums it forwarded to Chase as part of the chargeback process.

*h. Naftuli Morgenstern ("Morgenstern")*

| Card No. | Issuer | Amount | Sale Date | Chargeback Date | Reason Code | Reason Code Description |
|---|---|---|---|---|---|---|
| x1009 | American Express | $1,499.00 | 03/18/15 | 2/5/16 | C08 | Merchandise Not Received |

106. Morgenstern's representations to American Express on the dates listed above to support Reason Code C08 that he did not receive merchandise was knowingly false because he never ordered nor expected to receive any merchandise from Silvertown. Rather, Morgenstern made the false representations in order to obtain compensation, i.e., the elimination of his debt, to which he was not entitled.

107. Based on his knowledge of the Processing Rules, Morgenstern made the misrepresentations to American Express with the intention and knowledge that American Express would transmit the misrepresentations to Elavon because he knew that the Processing Rules required Elavon to be the entity issuing funds to American Express canceling out his debt.

108. Similarly, Morgenstern made the misrepresentations with the intention that Elavon would rely on them because he knew that Elavon's acceptance and processing of the chargebacks was necessary, pursuant to the Processing Rules, for him to achieve his goal of eliminating his debt to American Express.

109. Elavon justifiably relied on Morgenstern's misrepresentations because it had no reason to disbelieve or even doubt his claim that he truly did order goods and/or services from Silvertown, and that Silvertown failed to deliver them, leading Morgenstern to resort to the chargeback process. Moreover, pursuant to the Processing Rules, Elavon had only thirty (30) days to respond to the chargebacks, a portion of which was spent awaiting Silvertown's responses thereto. It was impossible for Elavon to investigate the chargebacks and reach any final conclusion within the permitted thirty-day window.

110. Had Elavon suspected or known that Morgenstern's representations were false, it would have alerted American Express to this fact and asked it not to process the chargebacks or

reverse them because they were predicated on a falsehood, or sought equitable and/or declaratory relief. However, Elavon had no such suspicion or knowledge, and therefore justifiably relied on Morgenstern's misrepresentations.

111. Upon Morgenstern's initiation of the chargebacks, American Express debited the amounts of the chargebacks from Elavon and provided him a provisional credit. Concurrently, Elavon contacted Silvertown to ask that it respond to the chargeback.

112. Silvertown, as part of the scheme to shift Morgenstern's debt to American Express to Elavon, did not contest or respond to the chargebacks, eventually causing American Express to make the provisional credit permanent.

113. As a result of the chargeback becoming permanent, Elavon incurred damages because, as planned, Silvertown did not have sufficient funds in its account to reimburse Elavon for the sums it forwarded to American Express as part of the chargeback process.

*i.* *Sara Berger ("Sara Berger")*

| **Card No.** | **Issuer** | **Amount** | **Sale Date** | **Chargeback Date** | **Reason Code** | **Reason Code Description** |
|---|---|---|---|---|---|---|
| x1009 | American Express | $7,500.00 | 05/26/15 | 7/25/15 | C05 | Goods/Services Cancelled |
| x1009 | American Express | $800.00 | 04/22/15 | 7/25/15 | C05 | Goods/Services Cancelled |

114. Sara Berger's representations to American Express on the dates listed above to support Reason Code C05 that she canceled goods or services was knowingly false because she never ordered nor expected to receive any goods or services from Silvertown. Rather, Sara Berger made the false representations in order to obtain compensation, i.e., the elimination of her debt, to which she was not entitled.

115. Based on her knowledge of the Processing Rules, Sara Berger made the misrepresentations to American Express with the intention and knowledge that American Express would transmit the misrepresentations to Elavon because she knew that the Processing Rules required Elavon to be the entity issuing funds to American Express canceling out her debt.

116. Similarly, Sara Berger made the misrepresentations with the intention that Elavon would rely on them because she knew that Elavon's acceptance and processing of the chargebacks was necessary, pursuant to the Processing Rules, for her to achieve her goal of eliminating her debt to American Express.

117. Elavon justifiably relied on Sara Berger's misrepresentations because it had no reason to disbelieve or even doubt her claim that she truly did order goods and/or services from Silvertown, and that Silvertown failed to deliver them, leading Sara Berger to resort to the chargeback process. Moreover, pursuant to the Processing Rules, Elavon had only thirty (30) days to respond to the chargebacks, a portion of which was spent awaiting Silvertown's responses thereto. It was impossible for Elavon to investigate the chargebacks and reach any final conclusion within the permitted thirty-day window.

118. Had Elavon suspected or known that Sara Berger's representations were false, it would have alerted American Express to this fact and asked it not to process the chargebacks or reverse them because they were predicated on a falsehood, or sought equitable and/or declaratory relief. However, Elavon had no such suspicion or knowledge, and therefore justifiably relied on Sara Berger's misrepresentations.

119. Upon Sara Berger's initiation of the chargebacks, American Express debited the amounts of the chargebacks from Elavon and provided her a provisional credit. Concurrently, Elavon contacted Silvertown to ask that it respond to the chargeback.

120. Silvertown, as part of the scheme to shift Sara Berger's debt to American Express to Elavon, did not contest or respond to the chargebacks, eventually causing American Express to make the provisional credit permanent.

121. As a result of the chargeback becoming permanent, Elavon incurred damages because, as planned, Silvertown did not have sufficient funds in its account to reimburse Elavon for the sums it forwarded to American Express as part of the chargeback process.

*j. <u>Sarah T. Levi ("S. Levi")</u>*

| Card No. | Issuer | Amount | Sale Date | Chargeback Date | Reason Code | Reason Code Description |
|---|---|---|---|---|---|---|
| x5691 | Chase | $2,500.00 | 06/04/15 | 9/21/15 | 85 | Credit Not Processed |
| x5691 | Chase | $7,500.00 | 06/04/15 | 9/21/15 | 85 | Credit Not Processed |

122. S. Levi's representations to Chase on the dates listed above to support Reason Code 85 that she was entitled to a credit was knowingly false because Reason Code 85 requires a preexisting order of goods and/or services, and S. Levi never ordered nor expected to receive any goods or services from Silvertown. Rather, S. Levi made the false representations in order to obtain compensation, i.e., the elimination of her debt, to which she was not entitled.

123. Based on her knowledge of the Processing Rules, S. Levi made the misrepresentations to Chase with the intention and knowledge that Chase would transmit the misrepresentations to Elavon because she knew that the Processing Rules required Elavon to be the entity issuing funds to Chase canceling out her debt.

124. Similarly, S. Levi made the misrepresentations with the intention that Elavon would rely on them because she knew that Elavon's acceptance and processing of the chargebacks was necessary, pursuant to the Processing Rules, for her to achieve her goal of eliminating her debt to Chase.

125. Elavon justifiably relied on S. Levi's misrepresentations because it had no reason to disbelieve or even doubt her claim that she truly did order services from Silvertown, and that Silvertown failed to deliver them, leading S. Levi to resort to the chargeback process. Moreover, pursuant to the Processing Rules, Elavon had only thirty (30) days to respond to the chargebacks, a portion of which was spent awaiting Silvertown's responses thereto. It was impossible for Elavon to investigate the chargebacks and reach any final conclusion within the permitted thirty-day window.

126. Had Elavon suspected or known that S. Levi's representations were false, it would have alerted Chase to this fact and asked it not to process the chargebacks or reverse them because they were predicated on a falsehood, or requested a compliance hearing from Visa, or sought equitable and/or declaratory relief. However, Elavon had no such suspicion or knowledge, and therefore justifiably relied on S. Levi's misrepresentations.

127. Upon S. Levi's initiation of the chargebacks, Chase debited the amounts of the chargebacks from Elavon and provided her a provisional credit. Concurrently, Elavon contacted Silvertown to ask that it respond to the chargeback.

128. Silvertown, as part of the scheme to shift S. Levi's debt to Chase to Elavon, did not contest or respond to the chargebacks, eventually causing Chase to make the provisional credit permanent.

129. As a result of the chargeback becoming permanent, Elavon incurred damages because, as planned, Silvertown did not have sufficient funds in its account to reimburse Elavon for the sums it forwarded to Chase as part of the chargeback process.

*k.* *Shlomo Berger ("Shlomo Berger")*

| Card No. | Issuer | Amount | Sale Date | Chargeback Date | Reason Code | Reason Code Description |
|---|---|---|---|---|---|---|
| x3015 | American Express | $8,272.00 | 04/19/15 | 9/9/15 | C05 | Services Cancelled |
| x3015 | American Express | $8,472.00 | 04/17/15 | 9/9/15 | C05 | Services Cancelled |
| x3015 | American Express | $8,472.00 | 04/19/15 | 9/9/15 | C05 | Services Cancelled |
| x3015 | American Express | $8,700.00 | 04/20/15 | 9/9/15 | C05 | Services Cancelled |
| x3015 | American Express | $2,600.00 | 04/19/15 | 9/9/15 | C05 | Services Cancelled |
| x3015 | American Express | $8,700.00 | 04/16/15 | 9/9/15 | C05 | Services Cancelled |
| x3015 | American Express | $7,200.00 | 04/20/15 | 9/9/15 | C05 | Services Cancelled |
| x3015 | American Express | $8,400.00 | 04/18/15 | 9/9/15 | C05 | Services Cancelled |

130. Shlomo Berger's representations to American Express on the dates listed above to support Reason Code C05 that he canceled goods or services was knowingly false because he never ordered nor expected to receive any goods or services from Silvertown. Rather, Shlomo Berger made the false representations in order to obtain compensation, i.e., the elimination of his debt, to which he was not entitled.

131. Based on his knowledge of the Processing Rules, Shlomo Berger made the misrepresentations to American Express with the intention and knowledge that American Express would transmit the misrepresentations to Elavon because he knew that the Processing Rules required Elavon to be the entity issuing funds to American Express canceling out his debt.

132. Similarly, Shlomo Berger made the misrepresentations with the intention that Elavon would rely on them because he knew that Elavon's acceptance and processing of the

chargebacks was necessary, pursuant to the Processing Rules, for him to achieve his goal of eliminating his debt to American Express.

133. Elavon justifiably relied on Shlomo Berger's misrepresentations because it had no reason to disbelieve or even doubt his claim that he truly did order goods and/or services from Silvertown, and that Silvertown failed to deliver them, leading Shlomo Berger to resort to the chargeback process. Moreover, pursuant to the Processing Rules, Elavon had only thirty (30) days to respond to the chargebacks, a portion of which was spent awaiting Silvertown's responses thereto. It was impossible for Elavon to investigate the chargebacks and reach any final conclusion within the permitted thirty-day window.

134. Had Elavon suspected or known that Shlomo Berger's representations were false, it would have alerted American Express to this fact and asked it not to process the chargebacks or reverse them because they were predicated on a falsehood, or sought equitable and/or declaratory relief. However, Elavon had no such suspicion or knowledge, and therefore justifiably relied on Shlomo Berger's misrepresentations.

135. Upon Shlomo Berger's initiation of the chargebacks, American Express debited the amounts of the chargebacks from Elavon and provided him a provisional credit. Concurrently, Elavon contacted Silvertown to ask that it respond to the chargeback.

136. Silvertown, as part of the scheme to shift Shlomo Berger's debt to American Express to Elavon, did not contest or respond to the chargebacks, eventually causing American Express to make the provisional credit permanent.

137. As a result of the chargeback becoming permanent, Elavon incurred damages because, as planned, Silvertown did not have sufficient funds in its account to reimburse Elavon for the sums it forwarded to American Express as part of the chargeback process.

*l.* *Sussman Bleier ("Bleier")*

| Card No. | Issuer | Amount | Sale Date | Chargeback Date | Reason Code | Reason Code Description |
|---|---|---|---|---|---|---|
| x1003 | American Express | $10,000.00 | 06/15/15 | 9/3/15 | C05 | Services Cancelled |
| x1003 | American Express | $5,000.00 | 06/15/15 | 9/8/15 | C05 | Services Cancelled |
| x1003 | American Express | $5,000.00 | 06/15/15 | 9/8/15 | C05 | Services Cancelled |
| x1003 | American Express | $3,000.00 | 05/03/15 | 9/8/15 | C05 | Services Cancelled |
| x1003 | American Express | $5,000.00 | 06/15/15 | 9/8/15 | C05 | Services Cancelled |
| x1003 | American Express | $5,000.00 | 06/15/15 | 9/8/15 | C05 | Services Cancelled |
| x1005 | American Express | $5,000.00 | 05/28/15 | 9/3/15 | C05 | Services Cancelled |
| x1005 | American Express | $2,500.00 | 05/06/15 | 9/8/15 | C05 | Services Cancelled |
| x1005 | American Express | $3,000.00 | 05/03/15 | 9/8/15 | C05 | Services Cancelled |
| x4841 | Chase | $5,000.00 | 06/14/15 | 10/8/15 | 85 | Credit Not Processed |
| x1005 | American Express | $3,000.00 | 5/6/2015 | 9/3/15 | C05 | Services Cancelled |
| x1003 | American Express | $5,000.00 | 6/15/2015 | 9/8/15 | C05 | Services Cancelled |

138. Bleier's representations to American Express on the dates listed above to support Reason Code C05 that he canceled goods or services was knowingly false because he never ordered nor expected to receive any goods or services from Silvertown. Rather, Bleier made the false representations in order to obtain compensation, i.e., the elimination of his debt, to which he was not entitled.

139. Bleier's representations to Chase on the dates listed above to support Reason Code 85 that he was entitled to a credit was knowingly false because Reason Code 85 requires a preexisting order of goods and/or services, and Bleier never ordered nor expected to receive any goods or services from Silvertown. Rather, Bleier made the false representations in order to obtain compensation, i.e., the elimination of his debt, to which he was not entitled.

140. Based on his knowledge of the Processing Rules, Bleier made the misrepresentations to American Express and Chase with the intention and knowledge that American Express and Chase would transmit the misrepresentations to Elavon because he knew that the Processing Rules required Elavon to be the entity issuing funds to American Express and Chase canceling out his debt.

141. Similarly, Bleier made the misrepresentations with the intention that Elavon would rely on them because he knew that Elavon's acceptance and processing of the chargebacks was necessary, pursuant to the Processing Rules, for him to achieve his goal of eliminating his debt to American Express and Chase.

142. Elavon justifiably relied on Bleier's misrepresentations because it had no reason to disbelieve or even doubt his claim that he truly did order goods and/or services from Silvertown, and that Silvertown failed to deliver them, leading Bleier to resort to the chargeback process. Moreover, pursuant to the Processing Rules, Elavon had only thirty (30) days to respond to the chargebacks, a portion of which was spent awaiting Silvertown's responses thereto. It was impossible for Elavon to investigate the chargebacks and reach any final conclusion within the permitted thirty-day window.

143. Had Elavon suspected or known that Bleier's representations were false, it would have alerted American Express and Chase to this fact and asked it not to process the chargebacks or reverse them because they were predicated on a falsehood, or requested a compliance hearing, or sought equitable and/or declaratory relief. However, Elavon had no such suspicion or knowledge, and therefore justifiably relied on Bleier's misrepresentations.

144. Upon Bleier's initiation of the chargebacks, American Express and Chase debited the amounts of the chargebacks from Elavon and provided him a provisional credit. Concurrently, Elavon contacted Silvertown to ask that it respond to the chargeback.

145. Silvertown, as part of the scheme to shift Bleier's debt to American Express and Chase to Elavon, did not contest or respond to the chargebacks, eventually causing American Express and Chase to make the provisional credit permanent.

146. As a result of the chargeback becoming permanent, Elavon incurred damages because, as planned, Silvertown did not have sufficient funds in its account to reimburse Elavon for the sums it forwarded to American Express and Chase as part of the chargeback process.

*m. Asher Jungreisz ("Jungreisz")*

| Card No. | Issuer | Amount | Sale Date | Chargeback Date | Reason Code | Reason Code Description |
|---|---|---|---|---|---|---|
| x1000 | American Express | $9,500.00 | 06/24/15 | 8/28/15 | C05 | Services Cancelled |
| x1000 | American Express | $15,000.00 | 06/24/15 | 8/28/15 | C05 | Services Cancelled |
| x1000 | American Express | $3,600.00 | 06/24/15 | 9/5/15 | C05 | Services Cancelled |
| x1000 | American Express | $8,000.00 | 04/26/15 | 10/6/15 | C28 | Cancelled Recur. Bill. |

147. Jungreisz's representations to American Express on the dates listed above to support Reason Code C05 that he canceled goods or services was knowingly false because he never ordered nor expected to receive any goods or services from Silvertown. Rather, Jungreisz made the false representations in order to obtain compensation, i.e., the elimination of his debt, to which he was not entitled.

148. Jungreisz's representations to American Express on the dates listed above to support Reason Code C28 that he canceled a recurring charge for goods or services from Silvertown was knowingly false because he never ordered nor expected to receive any goods or

services from Silvertown, including any recurring goods or services. Rather, Jungreisz made the false representations in order to obtain compensation, i.e., the elimination of his debt, to which he was not entitled.

149. Based on his knowledge of the Processing Rules, Jungreisz made the misrepresentations to American Express with the intention and knowledge that American Express would transmit the misrepresentations to Elavon because he knew that the Processing Rules required Elavon to be the entity issuing funds to American Express canceling out his debt.

150. Similarly, Jungreisz made the misrepresentations with the intention that Elavon would rely on them because he knew that Elavon's acceptance and processing of the chargebacks was necessary, pursuant to the Processing Rules, for him to achieve his goal of eliminating his debt to American Express.

151. Elavon justifiably relied on Jungreisz's misrepresentations because it had no reason to disbelieve or even doubt his claim that he truly did order goods and/or services from Silvertown, and that Silvertown failed to deliver them, leading Jungreisz to resort to the chargeback process. Moreover, pursuant to the Processing Rules, Elavon had only thirty (30) days to respond to the chargebacks, a portion of which was spent awaiting Silvertown's responses thereto. It was impossible for Elavon to investigate the chargebacks and reach any final conclusion within the permitted thirty-day window.

152. Had Elavon suspected or known that Jungreisz's representations were false, it would have alerted American Express to this fact and asked it not to process the chargebacks or reverse them because they were predicated on a falsehood, or sought equitable and/or declaratory

relief. However, Elavon had no such suspicion or knowledge, and therefore justifiably relied on Jungreisz's misrepresentations.

153. Upon Jungreisz's initiation of the chargebacks, American Express debited the amounts of the chargebacks from Elavon and provided him a provisional credit. Concurrently, Elavon contacted Silvertown to ask that it respond to the chargeback.

154. Silvertown, as part of the scheme to shift Jungreisz's debt to American Express to Elavon, did not contest or respond to the chargebacks, eventually causing American Express to make the provisional credit permanent.

155. As a result of the chargeback becoming permanent, Elavon incurred damages because, as planned, Silvertown did not have sufficient funds in its account to reimburse Elavon for the sums it forwarded to American Express as part of the chargeback process.

*n.* *Solomon Levy ("Levy")*

| Card No. | Issuer | Amount | Sale Date | Chargeback Date | Reason Code | Reason Code Description |
|---|---|---|---|---|---|---|
| x1002 | American Express | $4,000.00 | 06/16/15 | 8/5/15 | 127 | Unrecognized Charge |

156. Levy's representations to American Express on the dates listed above to support Reason Code 127 that he did not recognize the charge from Silvertown was knowingly false because he did recognize the charge as one that he authorized Silvertown to make as part of the short-term lending scheme between him and Silvertown. Levy made the false representations in order to obtain compensation, i.e., the elimination of his debt, to which he was not entitled.

157. Based on his knowledge of the Processing Rules, Levy made the misrepresentations to American Express with the intention and knowledge that American Express would transmit the

misrepresentations to Elavon because he knew that the Processing Rules required Elavon to be the entity issuing funds to American Express canceling out his debt.

158. Similarly, Levy made the misrepresentations with the intention that Elavon would rely on them because he knew that Elavon's acceptance and processing of the chargebacks was necessary, pursuant to the Processing Rules, for him to achieve his goal of eliminating his debt to American Express.

159. Elavon justifiably relied on Levy's misrepresentations because it had no reason to disbelieve or even doubt his claim that he did not recognize the charge from Silvertown, leading Levy to resort to the chargeback process. Moreover, pursuant to the Processing Rules, Elavon had only thirty (30) days to respond to the chargebacks, a portion of which was spent awaiting Silvertown's responses thereto. It was impossible for Elavon to investigate the chargebacks and reach any final conclusion within the permitted thirty-day window.

160. Had Elavon suspected or known that Levy's representations were false, it would have alerted American Express to this fact and asked it not to process the chargebacks or reverse them because they were predicated on a falsehood, or sought equitable and/or declaratory relief. However, Elavon had no such suspicion or knowledge, and therefore justifiably relied on Levy's misrepresentations.

161. Upon Levy's initiation of the chargebacks, American Express debited the amounts of the chargebacks from Elavon and provided him a provisional credit. Concurrently, Elavon contacted Silvertown to ask that it respond to the chargeback.

162. Silvertown, as part of the scheme to shift Levy's debt to American Express to Elavon, did not contest or respond to the chargebacks, eventually causing American Express to make the provisional credit permanent.

163. As a result of the chargeback becoming permanent, Elavon incurred damages because, as planned, Silvertown did not have sufficient funds in its account to reimburse Elavon for the sums it forwarded to American Express as part of the chargeback process.

**COUNT ONE**
**Fraud Against The Defendants**

164. Elavon repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

165. On the dates set forth above, each of the Defendants contacted their card-issuing banks and misrepresented to them that they had ordered but not received goods or services from Silvertown. These statements were false because the Defendants permitted Silvertown to charge their credit cards for non-bona fide transactions and never expected to receive any goods or services from Silvertown.

166. The Defendants knew that their statements were false because they knew they never ordered any goods or services from Silvertown. Instead, they provided their credit cards to Silvertown so that Silvertown could charge amounts to them as a form of short-term lending.

167. The purpose of the false representations to the card-issuing banks was to obtain funds from Elavon pursuant to the chargeback process to which the Defendants were not entitled.

168. Based on their knowledge of the Processing Rules, the Defendants intended, knew and expected that the card-issuing banks would transmit their misrepresentations to Elavon.

169. The Defendants made their misrepresentations for the purpose of inducing Elavon's reliance on them because Elavon's reliance was necessary for it to process the chargebacks and issue refunds to the Defendants and their card-issuing banks.

170. Elavon justifiably relied on the Defendants' misrepresentations because it had no reason to doubt the veracity of their statements. Had Elavon known or suspected that the Defendants' bases for the chargebacks were false, it would have contacted, as appropriate, American Express, Visa, MasterCard or Discover, and notified it of the false premises upon which the chargebacks are based, requested compliance hearings, and/or sought equitable and/or declaratory relief.

171. As a result of Elavon's justifiable reliance, it reimbursed the Defendants' card-issuing banks the amounts of the chargebacks. In turn, the issuing banks credited the Defendants' accounts, which resulted in the issuing banks extinguishing those parties' debts arising from the Sham Transactions.

172. Elavon was injured by reason of the Defendants' misrepresentations because the misrepresentations caused Elavon to issue refunds to their card-issuing banks for which Elavon bore pecuniary responsibility.

173. The Defendants' fraudulent acts demonstrate a high degree of moral turpitude and wanton dishonesty that entitles Elavon to recover punitive damages.

WHEREFORE, Elavon prays for judgment against the Defendants for:

i. Compensatory damages;

ii. Punitive damages;

iii. Interest and costs of this action; and

iv. Such other and further relief as the Court may deem just and proper.

**COUNT TWO**
**Unjust Enrichment Against The Defendants**

174. Elavon repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

175. Elavon's reimbursement of the amounts of the chargebacks conferred a significant benefit upon the Defendants because the reimbursement extinguished the sizable debts to their card-issuing banks that the Defendants incurred as part of the lending scheme they were involved in with Silvertown.

176. The Defendants received a benefit to which they were not entitled. Specifically, Defendants permitted Silvertown to charge their credit cards significant amounts as part of a scheme to use their credit cards for lending purposes. Whether or not that was a permissible use of their credit cards, upon discovering that Silvertown would not repay its debt to them, Defendants certainly had no right to seek compensation from Elavon for the purpose of eliminating their resultant debt to their card-issuing banks.

177. The Defendants would be unjustly enriched if they are not obligated to compensate Elavon. It is against equity and good conscience to permit Defendants to retain the benefit of their scheme to shift their own liability to Elavon using false pretenses.

WHEREFORE, Elavon prays for judgment against the Defendants for:

i. Compensatory damages;

ii. Interest and costs of this action; and

iii. Such other and further relief as the Court may deem just and proper.

**COUNT THREE**
**Conspiracy Against The Defendants**

178. Elavon repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

179. As discussed above, Silvertown and Defendants' scheme required a constant flow of renewed credit to pay down the Defendants' previous debts to their card-issuing banks. The Defendants knowingly colluded and agreed to use each other's respective credit cards to pay down each other's recurring credit card debts.

180. Without the cooperation of all the Defendants and their continued permission to use their respective credit cards to further their efforts, the scheme would not have been possible.

181. Defendants committed numerous overt acts in support of and in furtherance of their scheme, namely permitting Silvertown to use one or more of each Defendant's credit cards in recurrent fashion to pay off debts of other Defendants.

182. In the absence of the conspiracy and collusion by and among the Defendants, Silvertown and Defendants would have been unable to perpetrate the scheme complained of and Elavon would have avoided all or a significant portion of the pecuniary damages it incurred as a result of the scheme described.

WHEREFORE, Elavon prays for judgment against the Defendants for:

i. Compensatory damages;

ii. Interest and costs of this action; and

iii. Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Elavon respectfully requests a trial by jury of all issues so triable.

Dated: July 10, 2021

**THE GINZBURG LAW FIRM, P.C.**

By: /s/ *Daniel Ginzburg*
Daniel Ginzburg (DG-2824)
Mailing Address
151 Highway 516, Unit 736
Old Bridge, New Jersey 08857
Tel: (732) 284-3841
daniel@ginzburglawfirm.com
*Counsel to Plaintiff Elavon, Inc.*

**JA-54**

Date: 07 - 22 - 2010 AWB # AWB1574827

| | | | | |
|---|---|---|---|---|
| ☒ New or ☐ Additional Location | Existing MID: | Chain #: | Short Name MS00NYMS05 | Location of |

# Merchant Application

**Merchant Information**

| | |
|---|---|
| DBA Name: SILVERTOWN | DBA Phone #: 718 851 5121 Ext. |
| Contact Name: Ester Werzberger | DBA Fax #: 718 851 5121 |
| Cell Phone # | Customer Service Phone #: 718 851 5121 |
| DBA Address: 4615 13th Ave | Email Address: |
| City: Brooklyn State: NY | Zip Code: 11219 - |
| Previous Processor: Year Established: 2009 | Length of Current Ownership: 0 years, 8 months |

**Corporate Information**

| | |
|---|---|
| Legal/Corporate Name: | Legal/Corporate Phone #: Ext. |
| Legal/Corporate Contact Name: | Legal/Corporate Fax #: |
| Legal/Corporate Address: | |
| City: | State: Zip Code: |

**Shipping Info**

| | |
|---|---|
| Shipping DBA Name: (Necessary only if different than DBA) | Shipping Phone #: Ext. |
| Shipping Contact Name: | Shipping Fax #: |
| Shipping Address (No PO Box): | |
| City: | State: Zip: |

**Principal Information 1 (Owner/Partner/Officer)**

☒ Owner/Partner: Percentage of Ownership 100% or ☐ Officer: Title

| | | |
|---|---|---|
| First Name: Esther | MI: | DOB: [redacted]1979 SSN: [redacted]8830 |
| Last Name: Werzberger | | Home Phone #: 732 942 8373 |
| Home Address: 605 W Kennedy Blvd | | Cell Phone #: |
| City: lakewood | State: NJ Zip Code: 08701 - | Email Address: |

**Principal Information 2 (Owner/Partner/Officer)**

☐ Owner/Partner: Percentage of Ownership % or ☐ Officer: Title

| | | |
|---|---|---|
| First Name: | MI: | DOB: SSN: |
| Last Name: | | Home Phone #: |
| Home Address: | | Cell Phone #: |
| City: | State: Zip Code: | Email Address: |

**Other Merchant Information**

Average Sale Amount: $ 500.00 Description of product or services offered: silver store

Total Monthly VISA®/MC/Discover Network® Sales: $ 25000.00 MCC: 5944

| | | |
|---|---|---|
| Card Present (swiped) | 90 % | For Card Present Transactions, when does the customer receive the product or service? |
| Card Present (not swiped) | 0 % | ☐ Same Day ☐ If not same day, # of Days (include shipping time frame) |
| Mail Order | 0 % | For Card Not Present Transactions, when does the customer receive the product or service? |
| Telephone Order | 10 % | ☐ Same Day ☐ If not same day, 0 # of Days (include shipping time frame) |
| Internet | 0 % | For Internet Transactions, list the product web site: |
| Total = | 100% | |

Do you use a fulfillment house or telemarketing company? ☐ Yes ☒ No

If yes, please provide name of company:

Address:

Phone #:

Do you operate seasonally: ☐ Yes ☒ No If yes, please check months closed:

☐ January ☐ February ☐ March ☐ April ☐ May ☐ June

☐ July ☐ August ☐ September ☐ October ☐ November ☐ December

**Bank Account**

(Checking Accounts only)

| | |
|---|---|
| Deposit Bank Name: JPMorgan Chase Bank, National | Tape ID: 3 |
| ABA/Routing #: 021000021 | DDA Account #: [redacted]0265 |
| Billing Bank Name (If different): | Tape ID: |
| ABA/Routing #: | DDA Account #: |

**JA-55**

# Merchant Application

**Card Accept**

**Please check each card you wish to accept.**
*Note: acceptance of card types not selected will result in discount downgrades.*

- ☒ All VISA®/MasterCard/Discover Cards (JCB, Diners, CUP)
- ☒ VISA® Credit ☒ MasterCard Credit
- ☒ Discover/JCB/Diners/CUP
- ☒ VISA® Debit ☒ MasterCard Debit

**Pricing Category**

| | | |
|---|---|---|
| ☒ Retail | ☐ Lodging | ☐ ARU |
| ☐ Restaurant | ☐ Supermarket | ☐ Auto Rental |
| ☐ MOTO | ☐ Pay at Pump | ☐ Internet |

**Pricing Information**

**Rates are for all card acceptance types selected above.**

| | VISA® | MasterCard | Discover |
|---|---|---|---|
| | Rate% + Per Item | Rate% + Per Item | Rate% + Per Item |
| Qualified | 1.79 %+$ 0 | 1.79 %+$ 0 | 1.79 %+$ 0 |
| Rewards Qual | 2.45 %+$ 0 | 2.45 %+$ 0 | 2.45 %+$ 0 |
| Mid-Qual | 3.25 %+$ 0 | 3.25 %+$ 0 | 3.25 %+$ 0 |
| Non-Qual | 3.25 %+$ 0 | 3.25 %+$ 0 | 3.25 %+$ 0 |
| Other Tier ☐ Debit ☐ Supermarket ☐ Quick Pay/Small Ticket | %+$ | %+$ | %+$ |
| Opt Comm Card Tier | 3.25 %+$ 0 | 3.25 %+$ 0 | 3.25 %+$ 0 |
| ☐ INT DIFF | VISA® Rate% + Per Item | MasterCard Rate% + Per Item | Discover Rate% + Per Item |
| Mark Up | %+$ | %+$ | %+$ |
| ☐ INT PLUS | VISA® Rate% + Per Item | MasterCard Rate% + Per Item | Discover Rate% + Per Item |
| Mark Up | %+$ | %+$ | %+$ |

**Fees**

| Fee Type | Amt. $ | Per Authorization $ | |
|---|---|---|---|
| Application Fee | | VISA® | 0.20 |
| Installation/Training | | MasterCard | 0.20 |
| Wireless Set-Up Fee | | Discover | 0.20 |
| Account Maintenance | 20.00 | American Express | 0.20 |
| Statement Fee (per mo.) | 10.00 | WEX | |
| Chargeback Fee (per occur.) | 15.00 | Voice Auth Touch Tone | 0.65 |
| Return Item Fee/NSF (per occur) | 20.00 | Voice - Operator Assisted | 0.95 |
| Internet | | Voice - With AVS | 2.20 |
| Annual Fee Start Month | | Voice - Bank Referral | 4.00 |
| Minimum Discount (per mo.) | 15.00 | Other | |
| Other Next Day Funding Fee | 5.00 | Other | |
| | | Other | |
| Other Discover | 0.20 | PCI Fee (Annual) IP Connect (Not to exceed): $175 Dial Connect (not to exceed): $55 | |
| Other | | *Other fees may apply see Merchant Processing Agreement* | |
| Other | | | |

**Debit Networks**

Debit Pricing: ☐ Pass through (Interchange + Markup – ICDIF) ☐ Pass through (Interchange + Markup - ICPLS) ☐ Surcharge (Flat rate)Debit
Authorization Pricing: ☐ Pass through (Interchange + Markup) ☐ Fixed (Flat rate)

| | | |
|---|---|---|
| ☐ ACCL (Accel) ___%+$ Auth $___ | ☐ AFFN ___%+$ Auth $___ | ☐ ALAS (Alaska) ___%+$ Auth $___ |
| ☐ MSTO (Maestro) ___%+$ Auth $___ | ☐ NETS ___%+$ Auth $___ | ☐ NYCE ___%+$ Auth $___ |
| ☐ INKL (Interlink) ___%+$ Auth $___ | ☐ ITS (Shazam) ___%+$ Auth $___ | ☐ CU24 ___%+$ Auth $___ |
| ☐ STAR (Explore) ___%+$ Auth $___ | ☐ PULSE ___%+$ Auth $___ | ☐ Other ___%+$ Auth $___ |

**VAR**

Service Provider Hosted: ___
VAR Distributed: ___ VAR Product: ___ VAR Version: ___
Gateway (Optional): ___ Aggregator: ___

**Point of Sale (Equipment or Software)**

| Qty | POS Description | Item Code | Training | Price Per Unit | Purchase | Existing | Exchange |
|---|---|---|---|---|---|---|---|
| 2 | HYPERCOM T7PLUS | T7PP | No Training | $ 0.00 | ☐ | ☒ | ☐ |
| | | | | $ | ☐ | ☐ | ☐ |
| | | | | $ | ☐ | ☐ | ☐ |
| | | | | $ | ☐ | ☐ | ☐ |

Training Contact Name: | Training Contact Phone#: | All applicable state and local taxes will be applied

☐ Saturday Delivery ☐ Next Day Air ☐ 2nd Day Air | ISO Does Not Bill - Elavon Bills

**Other Card Types Existing**

| | SE # | |
|---|---|---|
| Amex | ___ | (10 digits) |
| EBT | ___ | (5 digits) |
| Other ___ | ___ | |

**Other Card Types New**

American Express: ☐ ESA ☒ OnePoint CAP#___
Monthly Volume: $ 15000.00
☐ Amex Rate 2.89 % $ 0.00
CNP Downgrade 3.19 %
☐ Amex Flat Fee Option: $ ___
*(Annual Volume less than $5,000-ESA Only)*
☐ WEX ☐ Voyager

**DCC**

☐ DCC Rebate % Set Up Fee $

**JA-56**

| Reporting | ☐ MCP # Users ____ Monthly Fee $ ____ Set Up Type (check one) ☐ MID ☐ CHN ☐ ENT Set Up Fee $ ____<br>☐ ACS Remote ID ____ Set Up Fee $ ____ Monthly Fee $ ____<br>☐ OCM # Users ____ Set Up Fee $ ____ Monthly Fee $ ____ |
|---|---|
| Pricing Program | Monetary (5 digits) 1911 \| Authorization (5 digits) 49115 \| Equipment 59999 \| Miscellaneous 69999 |
| ECS Product Selection and Pricing | Processing Options: ☐ POP (Point of Purchase) ☐ ARC (Accounts Receivable Conversion) ☐ ECS Auth Only<br>1. ANNUAL check volume: $ 2. Average check amount: $ 3. Maximum check amount. $<br>ECS Monthly Minimum. $<br>☐ Conversion with Guarantee<br>Guarantee Rate: % Per Transaction' $ Sight Draft: $<br>☐ Conversion with Verification ☐ Collections<br>Per Transaction:$ Per Return Transaction: $ Sight Draft: $<br>☐ Conversion Only ☐ Collections<br>Per Transaction $ Per Return Transaction: $ Sight Draft: $ |
| Additional Service Options | Please check box for each additional service option<br>☐ Terminal prompts for Driver's License #, ST of License Issuance and Telephone # (If not selected, information must be obtained on check for Guarantee Service)<br>☐ NSF Service Fee Processing @ $2.00 per NSF item. Not applicable for POP Guarantee and all ARC products.<br>☐ EnQuire Reporting Access:<br># users. @ $ each per month<br>☐ Turn off return memo advices<br>☐ Cash Office Image |
| EGC Cards | Card Style: ☐ Basic ☐ Standard ☐ Custom — Card Quantity ____ ____ ____ — Price $ ____ $ ____ $ ____<br>Max Card Value $ ____ (Default $500) |
| EGC Pricing | ☐ Monthly Pricing: $ ____ per month (includes ____ transactions per location annually. Additional transaction billed $0.29 per transaction)<br>OR<br>☐ Transaction Pricing: $ ____ per transaction and $ ____ per month |
| Kits | ☐ Plexi Stand (Kit #1) $ ____ x ____<br>☐ Card Badges (25) (Kit#3) $ ____ x ____ |
| EGC Carriers | ☐ Card Carriers (enter total cards)<br># ____ of Style ____<br># ____ of Style ____ $ ____ X ____<br># ____ of Style ____<br>(Multiples of 100 only) |
| EGC Options | ☐ Monthly Online Admin - # ____ Users $ ____<br>☐ Graphic Design Service $ ____<br>☐ Custom Card Upgrade $ ____<br>☐ Misc Fee - ____ $ ____ |
| EGC Service Fees | ☐ Service Fee (Cardholder charged on unused balances)<br>• Custom Cards are required<br>• Service Fee per Transaction $ ____<br>• Apply same to all states? ☐ Y ☐ N (if no, complete for each state)<br>Fee Amount: $ ____<br>Applied: ☐ Monthly ☐ Quarterly ☐ Annually<br>Beginning: ____ Months<br>After: ☐ Activation ☐ Last Transaction Date<br>Lock Balances After: ____ Months of non use (default 72 months) |
| EGC Network | ☒ Elavon (Direct)<br>☐ Givex (Indirect) |
| VAR | Service Provider Hosted: ____<br>VAR Distributed: ____ VAR Product: ____ VAR Version: ____<br>Gateway (Optional): ____ Aggregator: ____ |
| EGC Standard Card Order Details | Card Style:<br>Text Color:<br>Justification: ☐ Left ☐ Center ☐ Right ☐ As submitted<br>Imprint: ☐ Logo (To avoid delay, please submit artwork to: EGCArtwork@Elavon.com<br>OR<br>☐ Text (Imprinting details MUST be entered below)<br>❖ Font (Select ONE): ☐ Arial ☐ Brush Script ☐ Times New Roman<br>❖ Text Case (Select ONE): ☐ Title Case ☐ UPPER CASE ☐ lower case ☐ As submitted |
| Money Manager | Money Manager ☐ Working Capital<br>Vendor: ____ |

JA-57

# Merchant Application: Sales Worksheet

**Account Designation**

| | | | |
|---|---|---|---|
| Portfolio Code: USB17 | FI: 0542 | Agent: 6142 | Client Group #: 00017 |
| Rep Name: Benjamin Weiser | | Rep Phone #: 612 973 9151 | Rep #: 11818 / Entity: 42780 |

**Mailing/Shipping**

Mail Statements: ☒ DBA or ☐ Corporate

Retrievals: ☐ Mail To: ☐ DBA ☐ Corporate or ☒ Fax To: ☐ DBA ☐ Corporate

Chargebacks: ☐ Mail To: ☐ DBA ☐ Corporate ☒ Fax To ☐ DBA ☐ Corporate

Auto Send: ☒ Yes ☐ No (Chain merchants only – must include chain set up form)

**Other**

Industry Type: ☒ Retail ☐ Restaurant ☐ MO/TO ☐ Lodging ☐ Internet ☐ Pay in Pump ☐ Supermarket ☐ ARU ☐ Auto Rental

Network: ☒ Elavon ☐ Other

Check Service Company: Name. Service #.

Primary Phone # Secondary Phone #: --

**Equipment Programming Requirements**

POS Desc: T7PP HYPERCOM T7PLUS Quantity: 2

Indicate Services required for this equipment: ☒ VISA®/MC ☒ American Express ☒ Discover (JCB, Diners, CUP) ☐ ECS ☐ EBT ☐ Amex Rvrs ☐ PIP/Split Dial ☐ Electronic Gift Cards ☐ Pin Based Debit ☐ DCC

Connection Type: ☐ IP ☒ Standard (Dial) ☐ Wireless

Environment

☒ Retail (Auto Close Default) ☐ Quick Close ☒ Terminal Auto Close ☐ Tip Function Waiter ☐ Tip Function Cashier ☐ Cash Back Pin Debit

☐ Restaurant (Quick Close Default) ☐ Server Prompt ☐ Tip Function Waiter ☐ Tip Function Cashier ☐ Fine Dining

☐ Card Not Present (Auto Close Default) ☐ Quick Close ☐ Terminal Auto Close

☐ Lodging (Quick Close Default)

Additional Prompts: (added during training) ☐ Invoice Prompt ☐ B to B (prompt all) ☐ Tab Function

☐ Multi-MID: Existing MID or DBA:

Phone Information: Access #: ☒ Dedicated Line ☐ Shared Line with Fax

**Single Level Chain Request**

☐ New Chain ☐ Addition to existing chain: Chain Number

Chain Name and Address: ☐ DBA ☐ Corporate ☐ Chain Address (below)

Chain Name: Chain Phone#:

Chain Address: Send Chain Summary Statement? ☐ Yes ☐ No Auto Send

City: State: Zip Code:

Send Chain Statement: ☐ DBA ☐ Corporate ☐ Chain Address

Merchant Segment: ☐ Retail ☐ Service ☐ T & E ☐ Business to Business

Chain Deposit Account: ☐ Default to MID ☐ Chain

Chain Deposit Bank Name: ABA/Routing #: DDA Account #:

Chain Billing Account (If different) ☐ Default to MID ☐ Chain

Chain Billing Bank Name: ABA/Routing #: DDA Account #:

**Special Instructions**

☐ Credit Underwriting Notes:

☐ Set Up/Training Instructions:

☐ Shipping/Deployment Instructions:

**On Site Inspection**

Have you physically been on site? ☒ Yes ☐ No

Is merchant name as it appears on signage? ☒ Yes ☐ No

Is the physical site inspected the same as the DBA address? ☒ Yes ☐ No

Is merchandise consistent with type of business? ☐ Yes ☐ No

Is this a retail location? ☒ Yes ☐ No

Is the adequate inventory Displayed? ☐ Yes ☐ No

URL Name:

Does the website meet all internet requirements? ☐ Yes ☒ No

Business located in: ☐ separate building ☐ private residence ☐ shopping center/mall ☐ office building ☐ kiosk ☐ other (describe):

I certify that the above information is true, complete and accurate: ______ (Signature of Rep)

Printed Name: aron gancfried Rep #: 11818 Date: 07 - 22 - 2010

| | | | |
|---|---|---|---|
| Business Type: ☐ Sole Proprietor ☐ Public Corp ☑ Closely Held Corp ☐ Sub S Corp ☐ Government ☐ General Partnership ☐ Limited Partnership ☐ Tax Exempt Organization ☐ Other ☐ Limited Liability Company | | | |
| Business Name: Silverwood NY Inc | | | |
| Address: 4415 13th Ave | | | TIN (Employer Identification #) or Social Security #: [redacted]845 |
| City: Brooklyn | State: NY | Zip Code: 11219 | |

[illegible]

| | | | |
|---|---|---|---|
| Signature: X [signature] | Printed Name: Ester Werzberger | Title: Pres. | Date: 7/22/2010 |
| Signature: X | Printed Name: | Title: | Date: |

[illegible]

| | | | |
|---|---|---|---|
| Signature: X [signature] | Printed Name: Ester Werzberger | SSN#: [redacted]8830 | Date: 7/22/2010 |
| Signature: X | Printed Name: | SSN#: | Date: |

[illegible]

| | | |
|---|---|---|
| Signature: X | Printed Name: | Title: |
| Signature: X | Printed Name: | Title: |

[illegible]

| | | | |
|---|---|---|---|
| Signature: X | Printed Name: | Title: | Date: |

[illegible]

| | | | |
|---|---|---|---|
| Sales Rep Signature: X [signature] | Printed Name: [illegible] | Rep Code: 11818 | Date: 7/22/2010 |
| Accepted by Elavon, Inc: [signature] | | | Date: 7/23/10 |
| Accepted by Member: | | | Date: |

**Substitute Form W-9**

Business Type: ☐ Sole Proprietor ☐ Public Corp ☐ Closely Held Corp ☐ Sub S Corp ☐ Government ☐ General Partnership
☐ Limited Partnership ☐ Tax Exempt Organization (include documents that support Exempt Status) ☐ Other (Assn/Estate/Trust)
☐ Limited Liability Company – Tax Classification (D=disregarded entity, C=corporation, P=partnership)

Business Name (as shown on your income tax return)

| Address | | | TIN (Employer Identification #) |
|---|---|---|---|
| City | State | Zip Code. | *or* TIN (Social Security #) |

**Merchant Representations and Certifications**

Merchant Representations and Certifications By signing below, the applicant merchant ("Merchant") and its representative(s) represent and warrant to Elavon, Inc ("Elavon"), with offices at 7300 Chapman Highway, Knoxville, TN 37920, and U S Bank National Association ("Member"), with offices at U S Bancorp Center, 800 Nicollet, Minneapolis, MN 55402, (collectively, "we" or "us") that (i) all information provided in this merchant application ("Merchant Application") is true and complete and properly reflects the business, financial condition, and principal partners, owners, or officers of Merchant, and (ii) the persons signing this Merchant Application are duly authorized to bind Merchant to all provisions of this Merchant Application and the Agreement The signature by an authorized representative of Merchant on the Merchant Application, or the transmission of a Transaction Receipt or other evidence of a Transaction to us, shall be the Merchant's acceptance of and agreement to the terms and conditions contained in the Agreement including, without limitation, this Merchant Application and the Terms of Service ("TOS") incorporated herein by this reference and located at our website https //www merchantconnect com/CWRWeb/pdf/TOS_2009_ENG pdf If Merchant does not have access to view the TOS at our website please contact our customer service center Notwithstanding any such non-receipt of the TOS, Merchant agrees to comply with the Agreement, and all applicable laws, rules, and regulations including the rules and regulations of the Payment Networks, and understands that failure to comply will result in termination of processing services Capitalized terms shall, unless otherwise defined in this Merchant Application, have the same meaning ascribed to them in the TOS

If Merchant terminates within one year of the date set forth below, Merchant will immediately pay Elavon, as liquidated damages, an early termination fee equal to $295, in addition to all other amounts owed If Merchant terminates at any time during the second or third year of the date set forth below, the Merchant will pay, as liquidated damages, a termination fee equal to $195, in addition to all other amounts owed Merchant agrees that the early termination fee is not a penalty, but rather is reasonable in light of the financial harm caused by Merchant's early termination Elavon will use best efforts to debit the Merchant's account in the amount of the applicable termination fee within sixty (60) days of receipt of Merchant's written notice of termination

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account This means we will ask for certain information and identifying documents to allow us to identify you Merchant and its representative(s) authorize us prior to our acceptance of this Merchant Application and from time to time thereafter, to investigate the individual and business history and background of Merchant, each such representative and any other officers, partners, proprietors, and/or owners of Merchant, and to obtain credit reports or other background investigation reports on each of them that we consider necessary to review the acceptance and continuation of this Merchant Application Merchant also authorizes any person or credit reporting agency to compile information to answer those credit inquiries and to furnish that information to us

Merchant further acknowledges and agrees that any information provided in connection with this Merchant Application and all other relevant information may be supplied by us to our affiliates This Merchant Application may be signed in one or more counterparts, each of which shall constitute an original and all of which, taken together, shall constitute one and the same Merchant Application Delivery of executed counterparts of this Merchant Application may be accomplished by a facsimile transmission, and a signed facsimile or copy of this Merchant Application shall constitute a signed original

Merchant understands that an authorization code is not a guarantee of acceptance or payment of a transaction Receipt of an authorization code does not mean that merchant will not receive a chargeback for that transaction

All merchants must comply with the requirements of the Payment Card Industry Data Security Standards ("PCI DSS") Elavon requires Level 4 merchants (determined based on transaction volume) to validate PCI DSS compliance on an annual basis, with initial validation to occur no later than ninety (90) days after account approval Merchant will be charged either the Annual PCI Fee or the Annual Administration Fee described below

Annual PCI Fee of up to $175, based on connectivity, number of merchant locations and then-current cost to Elavon of the services, will be charged to merchants that use the services of the qualified third party assessor with whom Elavon has partnered Elavon will waive this fee in year one, charging the fee in subsequent years on or about the anniversary date of account approval Annual Administration Fee of $85 will be charged to merchants that use the services of another qualified assessor and attest to PCI DSS validation on the website designated by Elavon Any merchant that has not validated PCI DSS compliance within ninety (90) days of account approval, or in subsequent years on or before the anniversary date of account approval, will be charged a monthly non-compliance fee of $25 until Elavon is provided with validation of compliance Merchant may be eligible for Data Breach Coverage following account approval and PCI DSS compliance validation See the PCI Compliance Program Overview for coverage details and conditions

**Under penalties of perjury, Merchant certifies that:**

**1 The number shown on this Merchant Application is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and**

**2 I am not subject to backup withholding because (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and**

**3 I am a U S citizen or other U S person For federal tax purposes, you are considered a U S person if you are: an individual who is a U S citizen, or U S resident alien, a partnership, corporation, company, or association created or organized in the United States or under the laws of the United States, an estate (other than a foreign estate), or a domestic trust (as defined in Regulations section 301 7701-7) ***

American Express Acceptance Agreement - By signing below, I represent that I have read and am authorized to sign and submit this application for the above entity which agrees to be bound by the American Express® Card Acceptance Agreement ("AXP Agreement"), and that all information provided herein is true, complete, and accurate I authorize Elavon and American Express Travel Related Services Company, Inc ("AXP") and AXP's agents and Affiliates, as defined in the AXP Agreement, to verify the information in this application and receive and exchange information about me personally, including by requesting reports from consumer reporting agencies, and disclosing such information to their agent, subcontractors, Affiliates and other parties for any purpose permitted by law I authorize and direct Elavon, AXP, AXP agents and Affiliates to inform me directly, or through the entity above, of reports about me that they have requested from consumer reporting agencies Such information will include the name and address of the agency furnishing the report I also authorize AXP to use the reports from consumer reporting agencies for marketing and administrative purposes I understand that upon AXP's approval of the application, the entity will be sent a copy of the AXP Agreement and materials welcoming it, either to AXP's program for Elavon to perform services for AXP or AXP's standard Card acceptance program which has different servicing terms (e g different speeds of pay) I understand that if the entity does not qualify for the Elavon servicing program that the entity may be enrolled in American Express's standard Card acceptance program, and the entity may terminate the AXP Agreement. By accepting the American Express Card for the purchase of goods and/or services, or otherwise indicating its intention to be bound, the entity agrees to be bound by the AXP Agreement

***The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding**

| | | | |
|---|---|---|---|
| **Signature: X** | *Printed Name* | *Title* | *Date* |
| **Signature: X** | Printed Name. | Title | Date |

**Personal Guaranty**

As a primary inducement to us to accept this Merchant Application, the undersigned Guarantor(s), by signing the Merchant Application, jointly and severally, unconditionally and irrevocably, guarantee the continuing full and faithful performance and payment by Merchant of each of its duties and obligations to us (including, without limitation, Chargebacks) pursuant to the Merchant Application and Agreement, as may be amended from time to time, with or without notice Guarantor(s) understand further that we may proceed directly against Guarantor(s) without first exhausting our remedies against any other person or entity responsible therefore to them or any security held by us or Merchant This guarantee will not be discharged or affected by the death of the Guarantors, will bind all heirs, administrators, representatives and assigns and may be enforced by or for the benefit of any of our successors Guarantor(s) understand that the inducement to us to accept this Merchant Application is consideration for the guaranty and that this guaranty remains in full force and effect even if the guarantor(s) receive no additional benefit from the guaranty

| | | | |
|---|---|---|---|
| **Signature: X** | *Printed Name* | SSN#: | Date: |
| **Signature: X** | Printed Name | SSN# | Date |

**Corporate Resolution**

I certify that I hold the office indicated below of Merchant and am the keeper of the records of that company, organized and existing under the laws of the state indicated below and that the following is a correct copy of certain resolutions adopted at a meeting of the board of directors/general partnership/manager or members of a limited liability company, as appropriate, in accordance with the by-laws or other governing document of the company held on the _____ day of _____ (month), _____ (year)

1 Resolved, that any one of the following officers of the company

| | | |
|---|---|---|
| **Signature: X** | Printed Name. | Title |
| **Signature: X** | Printed Name | Title |

is authorized to A) execute on behalf of this company a Merchant Application and any agreements or other necessary documents including any amendments,
B) execute any document requested from time to time be executed in furtherance of the Merchant Application or relationship resulting therefrom,
C) perform all acts that may be necessary to carry out the intent of the Merchant Application and this Corporate Resolution

2 Resolved, that the Merchant Application and the resulting relationship is ratified and approved,

3 Resolved, that the entities receiving this Merchant Application are authorized to rely upon this Corporate Resolution until advised in writing by a like certification of any changes and are authorized to rely on such changed certification

| | | | |
|---|---|---|---|
| Secretary / Officer / Non-Member Manager (LLC) / Member (LLC) / General Partner/Owner [circle one] | | State in which Merchant is organized | |
| **Signature: X** | Printed Name | Title, | Date |

**Submitted By**

To the best of my knowledge, I certify that the information provided in this Merchant Application was provided by the Merchant and is true, complete and accurate I further certify that the signatures were provided by the Merchant's owner(s) or officer(s), as appropriate

| | | | |
|---|---|---|---|
| **Sales Rep Signature: X** | Printed Name | Rep ID # | Date |

**Office Use**

| | |
|---|---|
| Accepted by Elavon, Inc | Date |
| *Accepted by Member* | Date |

JA-60

Elavon

# Terms of Service

July 2010

*Notes*

JA-62



## TABLE OF CONTENTS

**SECTION A – GENERAL PROVISIONS** 2
1. DEFINITIONS 2
2. RULES OF CONSTRUCTION 2
3. ACCEPTANCE OF PAYMENT DEVICES 2
4. TRANSACTIONS 2
5. DEMAND DEPOSIT ACCOUNT (DDA) 3
6. SECURITY INTERESTS; RESERVE ACCOUNT; RECOUPMENT AND SET-OFF 4
7. FEES; OTHER AMOUNTS OWED; TAXES 6
8. ACCURACY OF INFORMATION; INDEMNIFICATION; LIMITATION OF LIABILITY 7
9. REPRESENTATIONS AND WARRANTIES 7
10. AUDIT AND INFORMATION 9
11. FRAUD MONITORING 9
12. BUSINESS CONTINUITY 9
13. PERSONAL GUARANTY 10
14. THIRD PARTIES 10
15. TERM AND TERMINATION 11
16. COMPLIANCE WITH LAWS AND PAYMENT NETWORK REGULATIONS; MATCH™ AND CONSORTIUM MERCHANT NEGATIVE FILE 12
17. USE OF TRADEMARKS; CONFIDENTIALITY; PASSWORDS 14
18. MISCELLANEOUS PROVISIONS 15
19. PROVISIONS APPLICABLE TO MERCHANT'S ACCEPTANCE OF TRANSACTIONS IN CANADA 19
20. EQUIPMENT LEASING 21
**SECTION B – ELECTRONIC CHECK SERVICES** 28
**SECTION C – GLOSSARY** 30

JA-63



*Notes*

# TERMS OF SERVICE

These Terms of Service (TOS) and the other portions of the Agreement govern the Merchant's participation in the Program. The TOS is incorporated into and made part of the Agreement and the signature by an authorized representative of the Merchant on the Merchant Application, or the transmission of a Transaction Receipt or other evidence of a Transaction, shall be the Merchant's acceptance of and agreement to abide by the terms and conditions contained in the Agreement. No strikeover of the preprinted text of the TOS shall be effective. Merchant acknowledges that it has received, understands, and agrees to be bound by the Agreement.

# SECTION A - GENERAL PROVISIONS

1. **DEFINITIONS.** Definitions used within this TOS are listed alphabetically in the "Glossary" on page 30.

2. **RULES OF CONSTRUCTION.** Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement. Singular terms shall include the plural, and vice versa, unless the context otherwise requires. The words "hereof," "herein," and "hereunder," and words of similar import when used in the TOS shall refer to the TOS and not to any particular provision of the TOS. The word "day" shall mean "calendar day," unless specifically stated otherwise. In the event of a conflict between the terms of Section (A) – General Provisions, and any subsequent Section of the TOS, the terms of the subsequent Section shall prevail.

3. **ACCEPTANCE OF PAYMENT DEVICES.** Merchant shall determine in accordance with the Payment Network Regulations and the Agreement which types of Payment Devices it will agree to accept as a form of payment from its Customers. The terms and conditions for the acceptance of the applicable Payment Devices and Merchant's use of the Payment Device Processing Services are set forth in the Agreement and in the Merchant Operating Guide (the "MOG"), incorporated herein and located at our website https://www.merchantconnect.com/CWRWeb/pdf/MOG_Eng.pdf. Each schedule, exhibit, addendum or attachment to the Agreement shall be governed by the TOS and the applicable provisions of the MOG, as well as by the terms set forth in the Merchant Application.

4. **TRANSACTIONS.**

   a. **Merchant Compliance.** Merchant must comply with all the requirements under the Agreement. Merchant must also comply with the procedures set forth in the MOG and any other guides, manuals, or rules provided in writing to Merchant by Elavon from time to time.

   b. **Settlement of Transactions.**

      i. **Deposits.** Merchant agrees that the Agreement is a contract of financial accommodation within the meaning of the Bankruptcy Code, 11 U.S.C. Section 365, as amended from time to time. For purposes of Transactions in Canada, Merchant agrees that the Agreement is a contract for the advance of credit to Merchant within the meaning of Section 11.01(b) of the *Companies' Creditors Arrangement Act* (Canada) and within the meaning of Section 65.1(4)(b) of the *Bankruptcy and Insolvency Act* (Canada). Subject to this Section, Elavon and Member will deposit to the DDA all funds evidenced by Transaction Receipts complying with the terms of the Agreement and the Payment Network Regulations and will provide Merchant provisional credit for such funds (less recoupment of any Chargebacks, returns, adjustments, fees, fines, penalties, assessments from the Payment Networks, Leased Equipment payments and other payments due under the Agreement). Merchant acknowledges that its obligation to Elavon and Member for all amounts owed under the Agreement arises out of the same transaction as Elavon's and Member's obligation to deposit funds to the DDA and such amounts are owed in the ordinary course of business.

      ii. **Provisional Credit.** Merchant acknowledges that all credits for funds provided to it are provisional and subject to reversal in the event that Elavon and Member do not receive payment of corresponding settlement amounts from the Payment Networks. Merchant further acknowledges that all credits are subject to adjustments for inaccuracies and errors (including rejects) and Chargebacks in accordance with the Agreement and the Payment Network Regulations, whether or not a Transaction is charged back by the Issuer or Customer. Merchant authorizes Elavon or Member to initiate reversal or adjustment (debit or credit) entries and to initiate or suspend such

entries in accordance with the Agreement as may be necessary to grant or reverse provisional credit for any Transaction. Further, Elavon may delay Merchant-issued Customer credits for up to five (5) business days for accounting verification. Customer credits issued by Merchant to PIN-Debit Cards will not be subject to this delay. Member or Elavon may elect to grant conditional credit for individual or groups of Transaction Receipts. Final credit for Transaction Receipts will be granted within Member's and Elavon's sole discretion.

iii. **Original Transaction Receipts.** Under no circumstances will Elavon or Member be responsible for processing returns, refunds, or adjustments related to Transactions not originally processed by Elavon and Member.

c. **Processing Limits.** Elavon may impose a cap on the dollar amount of Transaction Receipts that it will process for Merchant as indicated on the Merchant Application as Merchant's annual volume or as otherwise established by Elavon. This limit may be changed by Elavon from time to time, without prior notice to Merchant. If Merchant exceeds the established limit, Elavon may suspend the processing of Transaction Receipts, and either return all Transaction Receipts evidencing funds over the cap to Merchant or hold those deposits in a separate account or Reserve Account.

d. **Chargebacks.** Merchant is fully liable to Elavon and Member for all Transactions returned to Elavon or Member for whatever reason including all Chargebacks. Merchant will pay Elavon and Member for all Chargebacks. Merchant agrees to accept for Chargeback, and will be liable to Elavon and Member in the amount of any Transaction for which the Customer or Issuer disputes the validity of the Transaction for any reason. Merchant authorizes Elavon and Member to offset from funds due Merchant for Transaction activity or to debit the DDA, the Reserve Account, or any other account held at Member or at another financial institution for the amount of all Chargebacks including, as applicable, any currency fluctuations. Merchant will fully cooperate with Elavon and Member in complying with the Payment Network Regulations regarding all Chargebacks. Guarantors are personally liable to Elavon and Member for all Chargebacks.

## 5. DEMAND DEPOSIT ACCOUNT (DDA).

a. **DDA and ACH Authorization.** Merchant will establish and maintain with Member (or with another ACH participating financial institution acceptable to Member) one or more DDAs to facilitate payment for Transactions. Merchant will maintain sufficient funds in the DDA to accommodate all Transactions contemplated by the Agreement and all Chargebacks, returns, adjustments, fees, fines, penalties, assessments from the Payment Networks, Leased Equipment payments and other payments due under the Agreement. Merchant irrevocably authorizes Elavon, Member, and their respective authorized vendors and agents who provide services under the Agreement, to initiate ACH debit and credit entries to the DDA, the Reserve Account or any other account maintained by Merchant at any institution that is a receiving member of the ACH network, in order to make payments to or collect payments from Merchant due under the Agreement. The foregoing authorizations will remain in effect after termination of the Agreement until all of Merchant's obligations to Elavon and Member have been paid in full. Merchant also authorizes Elavon's or Member's vendors or agents to debit the DDA for any fees due to such vendors or agents under the Agreement. Merchant must obtain prior consent from Member and Elavon to change the DDA. If Merchant does not get that consent, Elavon or Member may immediately and without notice terminate the Agreement and may take any other action either of them deems necessary in their discretion. Elavon and Member have the right to rely upon written instructions submitted by Merchant requesting changes to the DDA. In the event Merchant changes the DDA, the ACH debit and credit authorization established hereunder will apply to the new account and Merchant shall provide Elavon and Member such information regarding the new DDA as they deem necessary to effect payments to and from the new DDA. It may take Elavon up to ten (10) business days after Elavon's receipt of a written notice from

Merchant to reflect in its system any change to Merchant's DDA. Merchant may request from Elavon written confirmation of Elavon's and Member's consent to change the DDA. If the DDA is maintained with Member, Member will deposit all funds evidenced by Transaction Receipts to the DDA, subject to Section (A)(4) of the TOS. Elavon and Member have the right to delay, within their discretion, crediting the DDA with funds evidenced by submitted Transaction Receipts. To the extent required, Merchant authorizes Member or Elavon to initiate reversal or adjustment entries and initiate or suspend such entries as may be necessary to grant Merchant provisional credit for any entry. Member will make deposits to the DDA pursuant to the Agreement and the ACH authorization. To the extent required, Merchant authorizes and appoints Member to act as its agent to collect Transaction amounts from the Issuer, the Customer or the Customer's financial institution. Member, in its sole discretion or at Elavon's direction, may grant Merchant provisional credit for Transaction amounts in the process of collection, subject to receipt of final payment by Member and Elavon and subject to all Chargebacks, returns, adjustments, fees, fines, penalties, assessments from the Payment Networks, Leased Equipment payments and any other payments due under the Agreement.

b. **Asserted Errors.** It is the responsibility of Merchant to reconcile the statements regarding Transaction activity received from Elavon, any Payment Network, and any third party vendors with the statements Merchant receives for Merchant's DDA. Merchant must promptly examine all statements relating to the DDA and immediately notify Elavon and Member in writing of any errors in the statement Merchant received from Elavon. Merchant's written notice must include: (i) Merchant name and account number; (ii) the dollar amount of the asserted error; (iii) a description of the asserted error; and (iv) an explanation of why Merchant believes an error exists and the cause of it, if known. That written notice must be received by Elavon within forty-five (45) days after the month end date on the statement containing the asserted error. If Merchant fails to provide such notice to Elavon within said forty-five (45) days, Elavon and Member shall not be liable to Merchant for any errors Merchant asserts at a later date. Merchant may not make any claim against Member or Elavon for any loss or expense relating to any asserted error for sixty (60) days immediately following Elavon's receipt of Merchant's written notice. During that sixty (60) day period, Elavon will be entitled to investigate the asserted error, and Merchant shall not incur any cost or expense in connection with the asserted error without notifying Elavon.

c. **Depository Institution.** Merchant authorizes its depository institution to grant Elavon and/or Member access to any and all information or records regarding the DDA. Merchant authorizes Elavon and/or Member to direct the depository institution to hold funds in the DDA in an amount which Elavon and/or Member, in their respective discretion, either individually or collectively, deem sufficient to fully protect Elavon's and Member's rights under the Agreement or to block or restrict Merchant's or others' access to funds in the DDA (whether or not such funds are specifically related to any previous deposit for any Transaction Receipt). Merchant directs the depository institution to immediately comply with any such direction from Elavon or Member.

d. **Indemnity.** Merchant will indemnify and hold harmless Elavon and Member for any action they take against the DDA or Reserve Account pursuant to the Agreement. Merchant will also indemnify and hold harmless the depository institution at which it maintains its DDA for acting in accordance with any instruction from Elavon and/or Member regarding the DDA.

6. **SECURITY INTERESTS; RESERVE ACCOUNT; RECOUPMENT AND SET-OFF.**

a. **Security Interests.**

i. **Security Agreement.** The Agreement constitutes a security agreement under the Uniform Commercial Code. Merchant grants to Elavon and Member a security interest in and lien upon (and in Quebec, a hypothec on): (a) all funds at any time in the Reserve

Account or DDA, regardless of the source of such funds, and (b) all funds underlying present and future Transaction Receipts; and (c) any amount which may be due to Merchant under the Agreement, including, without limitation, all rights to receive any payments or credits under the Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to Elavon and Member, upon request, to secure its obligations under the Agreement. These security interests and liens (and hypothecs) will secure all of Merchant's obligations under the Agreement and any other agreements now existing or later entered into between Merchant and Elavon and/or Member including Merchant's obligation to pay any amounts due and owing to Member or Elavon. Elavon and Member may execute this security interest (and hypothecs), without notice or demand of any kind, by making an immediate withdrawal or by restricting Merchant's access to the Secured Assets.

ii. **Perfection**. Upon request of Elavon or Member, Merchant will execute one (1) or more control agreements or other documents to evidence or perfect this security interest (and hypothec). Merchant represents and warrants that no other person or entity has a security interest (or hypothec) in the Secured Assets. With respect to such security interests and liens (and hypothecs), Elavon and Member will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from Elavon and Member written consent prior to granting a security interest (or hypothec) of any kind in the Secured Assets to a third party. Merchant agrees that this is a contract of recoupment and Elavon and Member are not required to file a motion for relief from a bankruptcy action automatic stay to realize any of the Secured Assets. Nevertheless, Merchant agrees not to contest or object to any motion for relief from the automatic stay filed by Elavon or Member. Merchant authorizes and appoints Elavon as Merchant's attorney in fact to sign Merchant's name to any control agreement used for the perfection of any security interest or lien (or hypothec) granted hereunder.

b. **Reserve Account.**

i. **Establishment**. Elavon and/or Member may establish a Reserve Account at any time for the purpose of providing a source of funds to pay Member and Elavon for any and all amounts owed by Merchant. The Reserve Account shall be maintained with sums sufficient to satisfy Merchant's current and/or future obligations as determined by Member or Elavon. Member and Elavon shall have sole control of the Reserve Account. Member and/or Elavon may, at any time, require that the amount on deposit in the Reserve Account be increased.

ii. **Funding**. Member and Elavon may fund the Reserve Account by any one or more of the following means.

aa. Member and Elavon may require Merchant to deposit into the Reserve Account funds in an amount determined by Elavon;

bb. Member and Elavon may debit the DDA in any amount; or

cc. Member and Elavon may deposit into the Reserve Account funds they would otherwise be obligated to pay Merchant.

iii. **Use of Funds in Reserve Account**. Member or Elavon may, without notice to Merchant, apply funds in the Reserve Account against any outstanding amounts Merchant owes or future amounts Merchant will owe under the Agreement or any other agreement between Merchant and Member or Elavon. Also, Member or Elavon may debit the Reserve Account to exercise their rights under the Agreement including, without limitation, their rights of set-off and recoupment to collect any amounts due to Member or Elavon. Further, Merchant agrees that Elavon or Member may be required to send funds in a Reserve Account to a third party in response to a tax levy or other court order.

iv. **Termination of Reserve Account**. Funds held in the Reserve Account shall remain in

the Reserve Account until each of the following has occurred: (1) the Agreement has been terminated; and (2) Merchant has paid in full all amounts owing or that could ever be owed under the Agreement, including all Chargebacks, returns, adjustment, fees, fines, penalties, assessments from the Payment Networks, Leased Equipment payments and any other payments due under the Agreement. In no event shall Merchant be entitled to a return of any funds remaining in the Reserve Account before two-hundred-seventy (270) days following the effective date of termination of the Agreement.

c. **Recoupment and Set-off.** Member and Elavon have the right of recoupment and set-off. This means that they may offset any outstanding or uncollected amounts owed to them from: (i) any amounts they would otherwise be obligated to deposit into the DDA; and (ii) any other amounts they may owe Merchant under the Agreement or any other agreement. Merchant acknowledges that in the event of a Bankruptcy Proceeding, in order for Merchant to provide adequate protection under Bankruptcy Code Section 362 or applicable law to Elavon and Member, and in order to ensure that Elavon and Member do not and are not obliged to advance credit to Merchant, Merchant must create or maintain the Reserve Account as required by Elavon and/or Member and either of them shall have the right to offset against the Reserve Account for any and all obligations Merchant may owe to Elavon and Member, without regard to whether the obligations relate to Transaction Receipts initiated or created before or after the initiation of the Bankruptcy Proceeding or the filing of the petition, motion, request for stay or other proceeding in connection with a Bankruptcy Proceeding.

d. **Remedies Cumulative.** The rights conferred upon Member and Elavon in this Section are not intended to be exclusive of each other or of any other rights and remedies of Member and Elavon under the Agreement, at law or in equity. Rather, each and every right of Member and Elavon under the Agreement, at law or in equity is cumulative and concurrent and in addition to every other right.

7. **FEES; OTHER AMOUNTS OWED; TAXES.**

a. **Fees.** Merchant will pay Member and Elavon fees for services, supplies, and equipment in accordance with the Agreement and any additional application or setup form(s). Such fees will be calculated and debited from the DDA or the Reserve Account once each day or month for the previous day's or month's activity as applicable, or will be deducted from the funds due Merchant under the Agreement. In addition, Merchant will pay Elavon at its standard rates for research including, but not limited to, research required to respond to any third party or government subpoena, levy, or garnishment on Merchant's account. Elavon may adjust the fees in accordance with Section (A)(18)(p) below.

b. **Other Amounts Owed.** Merchant will immediately pay Elavon or Member any amount incurred by Elavon or Member attributable to the Agreement, including, without limitation, Chargebacks, returns, adjustments, fees, fines, penalties (including all fines and penalties assessed by the Payment Networks as a result of Merchant's Transaction processing), assessments from the Payment Networks, Leased Equipment payments and any other payments due under the Agreement. Elavon or Member may offset these amounts from funds otherwise owed by Elavon or Member to Merchant or may debit these amounts from Merchant's DDA or Reserve Account by ACH, and in the event such offset or ACH debit does not fully reimburse Elavon or Member for the amount owed, Merchant will immediately pay Elavon or Member such amount. Elavon will charge interest, as allowed by Law, on all uncollected items that are more than thirty (30) days past due.

c. **Taxes.** Merchant is also obligated to pay all taxes and other charges imposed by any governmental authority on the goods and services provided under the Agreement. If Merchant is a tax-exempt entity, Merchant will provide Elavon and Member with an appropriate certificate

of tax exemption.

8. **ACCURACY OF INFORMATION; INDEMNIFICATION; LIMITATION OF LIABILITY.**

a. **Accuracy of Information.** Merchant represents and warrants to Member and Elavon that all information provided to Elavon in the Merchant Application, in the bid process if applicable, or otherwise in the Agreement is correct and complete. Merchant must promptly notify Elavon in writing of any changes to such information, including, without limitation, any additional location or new business at which Merchant desires to accept Payment Devices, the identity of principals and/or owners, the form of business organization (i.e., sole proprietorship, partnership, etc.), type of goods and services provided, and how Transactions are completed (i.e., by telephone, mail, electronic commerce, or in person at Merchant's place of business). The notice must be received by Elavon at least ten (10) business days prior to the change. Merchant will provide any additional information requested by Elavon within a reasonable time. Merchant will defend, indemnify, and hold harmless Member and Elavon for all losses and expenses incurred by Member or Elavon arising out of any such change, whether or not reported to Elavon, or Merchant's failure to provide requested information. Elavon may immediately terminate the Agreement upon notification by Merchant of a change to the information in the Merchant Application. Merchant authorizes Elavon and Member to contact credit reporting agencies and Merchant's creditors to make inquiries and obtain reports regarding Merchant's credit standing upon Elavon's or Member's receipt of the Merchant Application.

b. **Indemnification.** Merchant will be liable for and indemnify, defend, and hold harmless Elavon, Member and their respective employees, officers, directors, and agents against all claims, including claims made by third parties, losses, damages, liabilities or expenses arising out of the Agreement and for all reasonable attorneys' fees and other costs and expenses paid or incurred by Member and/or Elavon in the enforcement of the Agreement, including those resulting from any Transaction processed under the Agreement or any breach by Merchant of the Agreement and those related to any Bankruptcy Proceeding.

c. **Limitation of Liability.** Merchant acknowledges that Elavon's and Member's fees for the Processing Services provided to Merchant by Elavon and Member are very small in relation to the funds advanced to Merchant for Transactions and consequently Elavon's and Member's willingness to provide these services is based on the liability limitations contained in the Agreement. Therefore, in addition to greater limitations on Elavon's or Member's liability that may be provided elsewhere, any liability of Elavon and Member under the Agreement, whether to Merchant or any other party, whatever the basis of the liability, will not exceed, in the aggregate, an amount equal to the fees paid by Merchant during the last three (3) months. In no event will Elavon, Member, or their agents, officers, directors, or employees be liable for indirect, exemplary, punitive, special, or consequential damages.

d. **Performance.** Elavon and Member will perform all services in accordance with the Agreement. Elavon makes no other warranty, express or implied, regarding the services, and nothing contained in the Agreement will constitute such a warranty. **Elavon and Member disclaim all implied warranties, including those of merchantability and fitness for a particular purpose.** Neither Elavon nor Member shall be liable for any failure or delay in its performance of the Agreement if such failure or delay arises for reasons beyond the control of Elavon or Member and without the fault or negligence of Elavon or Member.

9. **REPRESENTATIONS AND WARRANTIES.** Merchant represents and warrants to Elavon and Member as of the time the Agreement is effective, and reaffirm to Elavon and Member each time a Transaction is effected during the Initial Term or any Renewal Term of the Agreement, the following:

a. **Information.** Merchant is a corporation, company, limited liability company, unlimited liability

company, limited liability partnership, limited partnership, general partnership, business trust, association or sole proprietorship validly existing and organized in the United States, or validly existing and federally organized in Canada or in a province or territory of Canada, as applicable. All written information provided in the Merchant Application, in the bid process if applicable, or any other document submitted to Elavon is true and complete and properly reflects the business, financial condition and principal partners, owners, officers, or ownership of Merchant. Elavon has the right to rely upon written instructions submitted by Merchant to request changes to the Merchant's business information. Merchant may request written confirmation of Elavon's consent to the changes to the Merchant's business information. Merchant will not submit unlawful or illegal Transactions or Transactions for processing to Elavon or Member for any businesses, products, or methods of selling other than those set forth in the Merchant Application at the time Merchant applies for services without the prior written consent of Elavon.

b. **Corporate Power**. Merchant and the persons signing the Agreement have the power to execute and perform the Agreement. Merchant represents and warrants that the person executing the Agreement is duly authorized to bind Merchant and each affiliated entity identified in the Agreement to all provisions of the Agreement and that such person is authorized to execute any document and to take any action on behalf of Merchant which may be required by Elavon, now or in the future. Further, Merchant represents and warrants that signing and/or performing in accordance with the Agreement will not violate any Law, or conflict with any other agreement to which Merchant is subject.

c. **No Litigation**. There is no action, suit, or proceeding pending, or to Merchant's knowledge, threatened which if decided adversely would impair Merchant's ability to carry on Merchant's business substantially as now conducted or which would adversely affect Merchant's financial condition or operations. Merchant has never been placed on the MasterCard MATCH™ system (formerly known as the Combined Terminated Merchant File) or been named to the Consortium Merchant Negative File maintained by Discover, or, if Merchant has, Merchant has disclosed that fact to Elavon in writing.

d. **Transactions.** All Transactions are bona fide. No Transaction involves the use of a Payment Device for any purpose other than the purchase of goods or services from Merchant or a return or adjustment related to such purchase. Merchant will not submit unlawful or illegal Transactions. No Transaction involves a Customer obtaining cash from Merchant unless allowed by the Payment Network Regulations and agreed to in writing with Elavon.

e. **Compliance with Laws and Regulations.** Merchant will comply with all Laws and Payment Network Regulations.

f. **Business Use**. Merchant is obtaining and using the Processing Services from Elavon for business purposes only and to facilitate lawful business Transactions between Merchant and Merchant's Customers. Merchant will not submit Transactions for processing to Elavon or Member for any businesses, materially different products, or methods of selling other than those set forth in the Merchant Application without the prior written consent of Elavon. Merchant also acknowledges that the DDA into which debits and credits are made is being used for lawful business purposes only.

g. **Responsibility for Actions**. Merchant is responsible for any violations of the Agreement that result from the actions of or failure to act by Merchant's officers, directors, employees, agents, Value Added Servicers, business invitees, and those of any other Person who, with or without Merchant's consent or cooperation, obtains access to information related to Transactions from Merchant or access to systems under Merchant's control.

10. **AUDIT AND INFORMATION.**

a. **Audit.** Merchant authorizes Elavon and Member to perform an audit of its business to confirm compliance with the Agreement. Merchant will obtain and submit a copy of an audit from a third party acceptable to Elavon of the financial, physical security, information security, and operational facets of Merchant's business at its expense when requested by Elavon or Member. Further, Merchant acknowledges and agree that the Payment Networks have the right to audit Merchant's business to confirm compliance with the Payment Network Regulations.

b. **Information.**

i. **Authorizations.** Merchant authorizes Elavon and Member to make, from time to time, any business and personal credit or other inquiries they consider necessary to review the Merchant Application or continue to provide services under the Agreement. Merchant also authorizes any person or credit reporting agency to compile information to answer those credit inquiries and to furnish that information to Elavon.

ii. **Financial Information.** Upon the request of either Elavon or Member, Merchant will provide Elavon and Member audited financial statements prepared by an independent certified public accountant selected by Merchant. Merchant further agrees to provide to Elavon and Member such other information regarding Merchant's financial condition as Elavon and/or Member may request from time to time. Within one-hundred twenty (120) days after the end of each fiscal year, Merchant will furnish Elavon or Member, as requested, a financial statement of profit and loss for the fiscal year and a balance sheet as of the end of the fiscal year.

iii. **Merchant Information.** Merchant agrees that any information about Merchant or any of its principals, affiliates or agents that is provided to Elavon or Member on the Merchant Application or otherwise obtained by Elavon or Member in connection with the Agreement may be: (i) used by Elavon and Member, and their respective affiliates, agents and referral partners, (a) in order to provide the Processing Services and related functions to Merchant and to respond to any further application for services, or (b) for administrative purposes; (ii) disclosed and shared for reporting purposes to credit rating agencies, under the Payment Network Regulations, to Issuers and to the financial institution where the DDA is maintained; (iii) used or disclosed in the course of any actual or potential sale, reorganization or other change to Elavon's or Member's business; (iv) collected, used and disclosed as required or permitted by Law (e.g., for tax reporting or in response to a subpoena); and (v) retained for such periods of time as required by Elavon and Member to perform their obligations and exercise their rights under the Agreement.

c. **Customer Identification.** To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. Accordingly, Merchant must provide certain information and identifying documents to allow Elavon and Member to identify Merchant.

11. **FRAUD MONITORING.** Merchant is solely responsible for monitoring its Transactions and the actions of its officers, directors, employees, agents, business invitees, third party vendors, including Value Added Servicers, and those of any other Person who, with or without Merchant's consent or cooperation, obtains access to Merchant's Transactions, for fraudulent or other suspicious activity. Elavon and Member are under no duty to monitor Merchant's transactions for fraudulent or other suspicious activity.

12. **BUSINESS CONTINUITY.** Merchant is solely responsible for developing and maintaining a disaster recovery plan. Merchant should test the operation of such plan, or parts thereof, on a periodic basis to ensure its effectiveness in providing disaster recovery capability to Merchant. Merchant is solely responsible for all Transactions and Transaction Receipts until such time as the

Transaction Receipts have been received and validated by Elavon. Merchant will maintain sufficient "backup" information and data (e.g., Transaction Receipts or detailed reporting) with respect to Transactions in order to reconstruct any information or data loss due to any system malfunction. Neither Elavon nor Member has a duty to recreate lost Transactions.

13. **PERSONAL GUARANTY.** As a primary inducement to Elavon and Member to enter into the Agreement and in consideration of the services and accommodations of any kind given or continued at any time and from time to time by Elavon or Member to or for the benefit of Merchant, the designated Guarantor(s), jointly and severally, unconditionally and irrevocably, guarantee the continuing full and faithful performance by Merchant of each of its duties and obligations to Elavon and Member pursuant to the Agreement, as the same may be amended by either of them from time to time, with or without notice. No act or thing, except full payment and discharge of all of Merchant's duties and obligations to Elavon and Member, which but for this provision could act as a release or impairment of the liability of the Guarantor(s), shall in any way release, impair, or affect the liability of the Guarantor(s). The Guarantor(s) waives any and all defenses of Merchant pertaining to Merchant's duties and obligations to Elavon and Member, any evidence thereof, and any security therefore, except the defense of discharge by payment. Guarantor(s) understands further that Elavon and/or Member may proceed directly against Guarantor(s) without first exhausting their respective remedies against Merchant or any other person or entity responsible therefore or any security held by Elavon, Member, or Merchant. The Guarantor(s) waives: (i) notice of acceptance of this Personal Guaranty and of the creation and existence of the Merchant's duties and obligations to Elavon and Member; (ii) presentment, demand for payment, notice of dishonor, notice of non-payment, and protest of any instrument evidencing the Merchant's duties and obligations; (iii) all other demands and notices to the Guarantor(s) or any other person and all other actions to establish the liability of the Guarantor(s); and (iv) **the right to trial by jury in action in connection with this Personal Guaranty.** This Personal Guaranty will not be discharged or affected by the death of the Guarantor(s), will bind all heirs, administrators, representatives, and assigns, and may be enforced by or for the benefit of any successors in interest to Elavon or Member. Guarantor(s) understands that the inducement to Elavon and Member to enter into the Agreement and give or continue services and accommodations of any kind to or for the benefit of Merchant, is consideration for the Personal Guaranty and that each Personal Guaranty remains in full force and effect even if the Guarantor(s) receives no additional benefit from the Personal Guaranty.

14. **THIRD PARTIES.**

a. **Products or Services.** Merchant may desire to use a Value Added Servicer to assist Merchant with its Transactions. Merchant shall not utilize any such third parties unless Merchant has disclosed such use to Elavon previously in writing, and unless such Value Added Servicer is fully compliant with all Laws and Payment Network Regulations. Any Value Added Servicer used by Merchant must be registered with the Payment Networks prior to the performance of any contracted services on behalf of Merchant. Further, as between the parties to the Agreement, Merchant will be bound by the acts and omissions of any Value Added Servicer and Merchant will be responsible for compliance by such Value Added Servicer with all Laws and Payment Network Regulations. Merchant will indemnify and hold harmless Elavon and Member from and against any loss, cost, or expense incurred in connection with or by reason of Merchant's use of any third parties, including Value Added Servicers. Neither Elavon nor Member is responsible for any Value Added Servicer, nor are they responsible for any Transaction until Elavon receives data for the Transaction in the format required by Elavon.

b. **Use of POS Devices Provided by Others.** In addition to the foregoing, if Merchant uses a Value Added Servicer for the purposes of data capture and/or authorization, Merchant agrees: (i) that the Elavon and Member via a data processing system or network compatible with Elavon's; and (ii) to assume full responsibility and liability for any failure of that third party to comply with applicable Laws and the Payment Network Regulations or the Agreement. Neither Member nor Elavon will be responsible for any losses or additional fees incurred by Merchant as a result of any error by a third party agent or by a malfunction in a third party POS Device.

Neither Elavon nor Member is responsible for any Transaction until Elavon receives data for the Transaction in the format required by Elavon.

15. **TERM AND TERMINATION.**

a. **Term.** Unless terminated as set forth below, the Agreement will remain in effect for a period of three (3) years ("Initial Term") following the date of acceptance of the Merchant Application by Elavon and Member, which date shall be the date upon which the Agreement becomes effective. Thereafter, the Agreement will renew for successive two (2) year terms ("Renewal Term") unless terminated as set forth below. If Merchant processes Transactions beyond the Initial Term or Renewal Term, then the terms of the Agreement shall govern such Transaction processing.

b. **Termination.**

i. **Merchant.**

aa. The Agreement may be terminated by Merchant effective at the end of the Initial Term or any Renewal Term by providing written notice of an intent not to renew to Elavon at least thirty (30) days prior to the expiration of the then current term.

bb. The Agreement may be terminated by Merchant in the event of a material breach of the terms of the Agreement by Member or Elavon, provided Merchant gives Member and Elavon written notice of any alleged breach and such breach remains uncured for a period of thirty (30) days following receipt of written notice by the party Merchant claims to be in breach of the Agreement.

ii. **Elavon or Member.**

aa. The Agreement may be terminated by Elavon or Member at any time with or without cause during the Initial Term or any Renewal Term.

bb. Elavon's and Member's rights of termination under the Agreement are cumulative. A specific right of termination in this Section shall not limit any other right of Elavon or Member to terminate the Agreement expressed elsewhere.

iii. **Notice of Termination.** Notice of termination by Merchant, Elavon, or Member may be given orally or in writing, but if given orally, must be confirmed in writing as soon as practical. Merchant's termination request shall be completed on a form available from Elavon, but at a minimum, must include the name of the Merchant and Merchant Identification Number, and must be signed by the principal owner(s) of Merchant. Termination shall be effective on the date specified by the oral or written notice; provided, however Merchant agrees that closing Merchant's account with Elavon may take up to thirty (30) days following Elavon's receipt of written notice of termination. In those limited instances where Merchant's account is reinstated by Elavon following termination by either Merchant or Elavon in the Initial or any Renewal Term, all of Merchant's obligations under the Agreement are likewise reinstated and will renew for successive two (2) year Renewal Terms effective on the date of reinstatement.

c. **Action Upon Termination.**

i. **Accounts.** All Merchant's obligations regarding Transactions processed prior to termination will survive termination. Funds related to Transactions processed prior to termination may be placed in a Reserve Account until Merchant pays all amounts you owe Elavon or Member or amounts for which Merchant is liable under the Agreement. Merchant must maintain enough funds in the DDA following termination to cover all

Chargebacks, returns, adjustments, fees, fines, penalties, assessments from the Payment Networks and other amounts due under the Agreement for a reasonable time, but in any event, not less than one-hundred-eighty (180) days from termination. If a Reserve Account is established by Elavon, then any balance remaining after Chargeback rights have expired and all other amounts owed by Merchant has been paid will be disbursed to Merchant.

ii. **Leased Equipment**. If Merchant's equipment is leased, Merchant is obligated to honor the terms and conditions of Section (A)(20) below. If Merchant's Leased Equipment is owned by Elavon, Merchant must return all equipment owned by Elavon within ten (10) business days and immediately pay Elavon any amounts Merchant owes for such Leased Equipment.

iii. **Return to Elavon**. All promotional materials, advertising displays, emblems, Transaction Receipts, Credit Transaction Receipts, and other forms supplied to Merchant and not purchased by Merchant or consumed in use will remain the property of Elavon and must be returned to Elavon or destroyed within ten (10) business days after termination of the Agreement. Merchant will be fully liable for any and all loss, cost, and expense suffered or incurred by Elavon arising out of any failure to return or destroy such materials following termination.

**16. COMPLIANCE WITH LAWS AND PAYMENT NETWORK REGULATIONS; MATCH™ AND CONSORTIUM MERCHANT NEGATIVE FILE.**

a. **Compliance with Laws and Payment Network Regulations.** Merchant agrees to comply with the Payment Network Regulations, including all requirements applicable to obtaining authorization for ACH debits from a consumer account, and with any policies and procedures provided by Member or Elavon. The Payment Network Regulations are incorporated into the Agreement by reference as if they were fully set forth in the Agreement. Merchant further agrees to comply with all Laws, including without limitation, Laws related to: (i) Payment Devices; (ii) electronic funds transfers; (iii) confidential treatment of information; and (iv) the Fair and Accurate Credit Transactions Act of 2003 (FACTA), including its requirements relating to the content of Transaction Receipts provided to Customers. Merchant will assist Member and Elavon in complying in a complete and timely manner with all Laws and Payment Network Regulations now or hereafter applicable to any Transaction or the Agreement. Merchant will execute and deliver to Member and Elavon all documents they may from time to time reasonably deem necessary to verify Merchant's compliance with this provision.

b. **Privacy Laws in the United States (if applicable).** In addition to Section (A)(17)(b), Merchant must take all commercially reasonable steps to protect the confidentiality of Customer and Transaction information and shall establish and maintain physical, technical and administrative safeguards to prevent unauthorized access by third parties to such Customer and Transaction information and in a manner that complies with applicable Laws, including without limitation the federal Health Insurance Portability and Accountability Act, the federal Gramm-Leach-Bliley Act, FACTA or other applicable privacy laws.

c. **Privacy Laws in Canada (if applicable).** Merchant represents, covenants and agrees that it is in compliance with all applicable privacy laws, including without limitation the Personal Information Protection and Electronic Documents Act (Canada), and that any personal information of a Customer that may be communicated or disclosed to Elavon under or in connection with the Agreement or any services to be provided by Elavon to Merchant has been obtained in compliance with such laws and that Elavon will not be in breach of any such laws by receiving and using such information in connection with performing its obligations under or in connection with the Agreement or any services to be provided by Elavon to Merchant.

d. **MATCH™ and Consortium Merchant Negative File.** Merchant acknowledges that Member and/or Elavon is required to report Merchant's business name and the name of Merchant's

principals to the MATCH™ listing maintained by MasterCard and accessed and updated by Visa and American Express or to the Consortium Merchant Negative File maintained by Discover, if applicable, pursuant to the requirements of the Payment Network Regulations. Merchant specifically consents to the fulfillment of the obligations related to the listing by Elavon and Member, the listing itself and Merchant waives and holds harmless Elavon and Member from all claims and liabilities Merchant may have as a result of such reporting.

e. **Security Program Compliance**. Merchant must comply with the requirements of the Payment Card Industry Data Security Standard (PCI DSS) including the Cardholder Information Security Program (CISP) of Visa, the Site Data Protection Program (SDP) of MasterCard, the Data Security DISC Program and the PCI DSS regulations of Discover Network, and the security programs of any other Payment Network regarding which Merchant accepts a Payment Device, as applicable, and any modifications to, or replacements of such programs that may occur from time to time. Merchant also shall ensure that all third parties from whom Merchant procures a Value Added Servicer or third party POS Devices comply with the requirements of those programs. Upon request, Elavon will provide Merchant with the respective website links to obtain the current requirements of the Visa, MasterCard, and Discover Network Security Programs. Merchant is responsible for Merchant's own actions or inactions, those of Merchant's officers, directors, shareholders, employees and agents, including any Value Added Servicer (collectively, "Merchant's Agents"). Merchant shall indemnify and hold Elavon and Member harmless from any liability, loss, cost, or expense resulting from the violation of any of the Security Program requirements by any of Merchant's Agents. Should Merchant participates in a program with any other Credit Card Association or Issuer, or accept a Payment Device of any other Payment Network that has a security program in place, Merchant must comply therewith and ensure that Merchant's officers, directors, shareholders, employees, and agents, including Value Added Servicers or third party POS Devices also comply with the program requirements of such Payment Network.

f. **Data Compromise.**

i. **Notice and Investigation**. Merchant acknowledges and agrees that Cardholder Data and bank account information obtained by Merchant in connection with any Transaction is the property of the financial institution that issued the Payment Device or holds the Customer's account. Merchant must notify Elavon and Member within twenty-four (24) hours (and if notice is given orally, it must be confirmed in writing within the same twenty-four hour period), if Merchant knows or suspects that Cardholder Data, Customer information, or Transaction information has been accessed or used without authorization from Merchant, Merchant's Agents or systems within Merchant's or its agent's control (a "Data Incident"). The notice must include: (a) a detailed written statement about the Data Incident including the contributing circumstances; (b) the form, number and range of compromised account information; (c) specific account numbers compromised; and (d) details about the ensuing investigation and Merchant's security personnel who may be contacted in connection with the Data Incident. Merchant must fully cooperate with the Payment Networks, Elavon and Member in the forensic investigation of the Data Incident. Within seventy-two (72) hours of becoming aware of the Data Incident, Merchant must engage the services of a data security firm acceptable to the Payment Networks and/or to Elavon and Member to assess the vulnerability of the compromised data and related systems. Merchant must provide weekly written status reports to Elavon and Member until the forensic audit is complete. Merchant must promptly furnish updated lists of potential or known compromised account numbers and other documentation or information that the Payment Networks and/or Elavon and Member may request. In addition, Merchant must provide all audit reports to Elavon and Member, and such audits must be completed to the satisfaction of the Payment Networks and/or of Elavon and Member. If Merchant fails to supply the forensic audits or other information required by the Payment Networks and/or by Elavon and Member, Merchant will allow Elavon or Member to perform or have performed such audits at Merchant's expense.

ii. **Preservation of Records.** In the event of a Data Incident, Merchant must take immediate steps to preserve all business records, logs and electronic evidence relating to the Data Incident. Merchant shall cooperate with Elavon and Member to rectify, correct and resolve any issues that may result from the Data Incident, including providing Elavon and Member with (and obtaining any necessary waivers for) all relevant information to verify Merchant's ability to prevent future data incidents in a manner consistent with the Agreement.

iii. **Liability for Data Incident.** Without waiving any of Elavon's and Member's rights and remedies, Merchant is liable for all fraudulent transactions related to any Data Incident and all costs Elavon or Member incur as a result of such Data Incident, including any fees, fines, penalties, or assessments by the Payment Networks, claims from third parties, all costs related to the notification of Cardholders or Customers and cancellation, re-issuance of Payment Devices (including underlying accounts), forensic investigation, and PCI DSS review for a report of compliance.

**17. USE OF TRADEMARKS; CONFIDENTIALITY; PASSWORDS.**

a. **Use of Trademarks.** Merchant will prominently display the promotional materials provided by Elavon in Merchant's place of business. Merchant's use of Visa, MasterCard, and Discover Network marks, as well as marks of other Payment Networks, will fully comply with the Payment Network Regulations. Merchant's right to use all such marks will terminate upon termination of the Agreement. Merchant's use of promotional materials, provided by Visa, MasterCard, Discover Network, and/or other Payment Networks will not indicate, directly or indirectly, that Visa, MasterCard, Discover Network, or such other Payment Networks endorse any goods or services other than their own and Merchant may not refer to Visa, MasterCard, Discover Network, or any other Payment Networks in stating eligibility for Merchant's products or services.

b. **Confidentiality.**

i. **Customer and Transaction Information.** In accordance with Section (A)(16)(e), a Merchant shall immediately notify Elavon of any Customer or Transaction information compromise of which it becomes aware whether such compromise occurs at: (i) the Merchant; or (ii) a Value Added Servicer. Merchant shall, at all times protect the confidentiality of Customer and Transaction information in accordance with all applicable Laws and Payment Network Regulations. Merchant will not disclose Customer or Transaction information to any third party, except to an agent of Merchant assisting in completing a Transaction, or as required by Laws or the Payment Network Regulations. Merchant must maintain all systems and media containing Customer and Transaction information in a secure manner to prevent access by or disclosure to anyone other than Merchant's authorized personnel. Merchant must maintain Customer and Transaction information for such time periods as may be required by Laws and the Payment Network Regulations and thereafter destroy in a manner that will render the data unreadable all such media that Merchant no longer deems necessary or appropriate to maintain. Further, Merchant must take all steps reasonably necessary to ensure that Customer and Transaction information is not disclosed or otherwise misused. Merchant may not retain or store magnetic stripe or CVV2/CVC2/CID data after authorization for record keeping or additional authorization processing. After authorization, Merchant may only retain the Customer account number, name, and Card expiration date. Merchant may not print on any Transaction Receipt or other document, that is given to the Customer, retained by the Merchant, or transferred to a third party, the entire contents of the magnetic stripe or the CVV2/CVC2/CID data elements. In accordance with Section (A)(16)(e), Merchant shall immediately notify Elavon of any Customer or Transaction information

compromise of which it becomes aware whether such compromise occurred at: (i) the Merchant; (ii) a Value Added Servicer; (iii) Elavon or Member; or (iv) elsewhere.

ii. **Bankruptcy**. In the event of failure or other suspension of Merchant's business operations, including bankruptcy or insolvency, Merchant must not sell, transfer, or disclose any materials that contain Customer or Transaction information to third parties. Merchant must:

aa. Return this information to Elavon; or

bb. Provide acceptable proof of destruction of this information to the Elavon.

iii. **Elavon or Member Confidential Information**. Merchant shall at all times protect Elavon's and Member's Confidential Information. Merchant will not disclose any of Elavon's or Member's Confidential Information to any third party except as required by Laws or the Payment Network Regulations.

c. **Passwords**. If Merchant receives a password from Elavon to access any of Elavon's databases or services Merchant will: (i) keep the password confidential; (ii) not allow any other entity or person to use the password or gain access to Elavon's databases or services; (iii) be liable for all action taken by any user of the password; and (iv) promptly notify Elavon if Merchant believes the Elavon's databases or services or Merchant's information has been compromised by use of the password. If Merchant receives passwords from a third party, Merchant must protect such passwords in the manner required by such third party and indemnify, defend, and hold Elavon and Member harmless from any losses, costs, or expenses that arise from Merchant's use or misuse of such third party passwords.

d. **Proprietary Interest**. Merchant has no interest whatsoever, including, without limitation, copyright interests, franchise interests, license interests, patent rights, property rights, or other interest in any services, software, or hardware provided by Elavon. Nothing in the Agreement shall be construed as granting Merchant any patent rights or patent license in any patent which Elavon may obtain in respect to Elavon's services, software, or equipment. Merchant will make no attempt to duplicate or otherwise ascertain the components, circuit diagrams, logic diagrams, flow charts, source and object code, schematics or operation of, or otherwise attempt to reverse engineer any of Elavon's services, equipment, or software.

## 18. MISCELLANEOUS PROVISIONS.

a. **Entire Agreement**. The Agreement (including all attachments, exhibits, addenda and other documents incorporated by reference into the Agreement, attachments, exhibits or addenda), Payment Network Regulations, and any amendment or supplement to either, constitutes the entire agreement between the parties, and all prior or other representations, written or oral, are merged in and superseded by the Agreement; provided, however the Agreement shall not supersede any Personal Guaranty signed by a Guarantor, which Personal Guaranty shall be deemed to remain an agreement separate and distinct from the Agreement. In the event of a conflict between the documents comprising the Agreement, excluding any Personal Guaranty, the following order of priority will apply: (i) any amendment to the Agreement; (ii) the TOS; (iii) the Payment Network Regulations; (iv) the Merchant Application; (v) any Merchant Agreement or Merchant Processing Agreement; (vi) the Merchant Operating Guide; and (vii) any other guides or manuals provided to Merchant from time to time.

b. **Governing Law in the United States (if applicable)**. The Agreement will be governed by and construed in accordance with the Laws of the State of Georgia with respect to Transactions occurring in the United States, except that Section (A)(18)(g) shall be governed by the Federal Arbitration Act. The parties agree that all performances and Transactions under the Agreement will be deemed to have occurred in the State of Georgia and that Merchant's entry into and performance of the Agreement will be deemed to be the transaction of business within the State

of Georgia. Any challenge to the enforceability of the agreement to arbitrate contained in Section (A)(18)(g) of the Agreement, on any ground, shall be brought in either the Superior Court of Fulton County, Georgia or in the United States District Court for the Northern District of Georgia, and in no other court, and each of the parties to the Agreement consents to the exercise of personal jurisdiction by these courts and waives all objections based on a lack of personal jurisdiction, venue or the inconvenience of the forum. Merchant, hereby waives any and all right to trial by jury in any action or proceeding relating to the Agreement. Merchant represents that this waiver is knowingly, willingly and voluntarily given.

c. **Jurisdiction and Venue; Governing Law in Canada (if applicable).** All matters arising out of or related to the Agreement will be governed by and construed in accordance with the Laws of the Province of Ontario and the federal laws of Canada applicable in the Province of Ontario with respect to Transactions occurring in Canada. The parties agree that all performances and Transactions under the Agreement will be deemed to have occurred in the Province of Ontario and that Merchant's entry into and performance of the Agreement will be deemed to be the transaction of business within the Province of Ontario. Any action or proceeding relating to or arising from the Agreement (other than collection actions by Elavon or Member relating to amounts owed by Merchant under the Agreement) must be brought, held, or otherwise occur exclusively in Toronto, Canada, and the parties hereby attorn to the exclusive jurisdiction of the courts of Ontario. Merchant, Member and Elavon hereby jointly and severally waive any and all right to trial by jury in any action or proceeding relating to the Agreement. Merchant, Member and Elavon each represents to the other that this waiver is knowingly, willingly and voluntarily given.

d. **Exclusivity.** During the Initial Term and any Renewal Term of the Agreement, Merchant will not enter into an agreement with any other entity that provides processing services similar to those provided by Elavon and Member as contemplated by the Agreement without Elavon's written consent.

e. **Construction.** Any alteration or strikeover in the text of the Agreement will have no binding effect and will not be deemed to amend the Agreement. The headings used in the TOS are inserted for convenience only and will not affect the interpretation of any provision. The language used will be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction will be applied against any party.

f. **Assignability.** The Agreement may be assigned by Member or Elavon, but may not be assigned by Merchant, directly or by operation of law, without the prior written consent of Elavon. If Merchant, nevertheless, assigns the Agreement without Elavon's consent, the Agreement will be binding on the assignee as well as Merchant. If Merchant sells its business and the new owners incur Chargebacks, the original owner(s) and all original Guarantors will be held personally liable for all Chargebacks and any other liabilities of the new owners.

g. **Arbitration.** All claims or controversies, or other matters in question, between the parties arising out of or related to the Agreement or the relationship between the parties that are not otherwise settled by agreement of parties will be submitted to and decided by arbitration held in Atlanta, Georgia in accordance with the rules of the American Arbitration Association as modified by the Agreement. The arbitration proceeding shall be conducted before one (1) neutral arbitrator, who shall be a member of the bar of the State of Georgia, actively engaged in the practice of law for at least ten (10) years. The arbitrator will have the authority to award any remedy or relief that a court in Georgia could order or grant, including, without limitation, specific performance, issuance of an injunction or imposition of sanctions for abuse or frustration of the arbitration process. The arbitrator shall have no authority to decide claims on a class action basis. An arbitration can only decide our or Merchant's claim and may not consolidate or join the claims of other persons who may have similar claims. Merchant may not assert a claim in arbitration on behalf of any third party or represent any class of claimants in an arbitration brought pursuant to the Agreement. The parties agree that anything communicated, exchanged, said, done, or occurring in the course of the arbitration, including any private caucus

between the arbitrator and any party before or after any joint arbitration session, will be kept confidential. The parties agree that the underlying agreement between the parties involves interstate commerce and that, notwithstanding the choice of law provision in Section (A)(18)(b), any arbitration shall be governed by the Federal Arbitration Act.

h. **Notices.** Any written notice to the Merchant under the Agreement will be deemed received upon the earlier of: (i) actual receipt; or (ii) five (5) business days after being deposited in the United States mail, or with a nationally recognized overnight carrier, and addressed to the last address shown on the records of Elavon. Any written notice to Elavon, shall be sent by U.S. mail or a nationally recognized overnight carrier to: 7300 Chapman Highway, Knoxville, TN 37920, and shall be deemed received only upon actual receipt.

i. **Bankruptcy in the United States (if applicable).** Merchant will immediately notify Elavon of any Bankruptcy Proceeding, receivership, insolvency, or similar action or proceeding initiated by or against Merchant or any of its principals. Merchant will include Elavon on the list and matrix of creditors as filed with the Bankruptcy Court, whether or not a claim may exist at the time of filing. Failure to do so will be cause for immediate termination of the Agreement and shall allow the pursuit of any other action available to Elavon under applicable Payment Network Regulations or Laws. Merchant acknowledges that the Agreement constitutes a contract to extend credit or other financial accommodations to, or for the benefit of Merchant, and, as such, cannot be assumed or assigned in the event of Merchant's bankruptcy. Such financial accommodations include, but may not be limited to, the incurrence by Elavon from time to time of credit risk associated with funds transfers and Elavon's compliance with Payment Network Regulations relating to Chargebacks. Merchant further acknowledge that such financial accommodations constitute an integral part of the Agreement.

j. **Bankruptcy in Canada (if applicable).** Merchant will immediately notify Elavon of any Bankruptcy Proceeding, receivership, insolvency, or similar action or proceeding initiated by or against Merchant or any of its principals. Merchant will include Elavon on the list and matrix of creditors as filed with any bankruptcy, commercial or civil court, whether or not a claim may exist at the time of filing. Failure to do so will be cause for immediate termination of the Agreement and shall allow the pursuit of any other action available to Elavon under applicable Payment Network Regulations or Laws. Merchant agrees that the Agreement is a contract for the advance of credit to you within the meaning of Section 11.01(b) of the *Companies' Creditors Arrangement Act* (Canada) and within the meaning of Section 65.1(4)(b) of the *Bankruptcy and Insolvency Act* (Canada) and cannot be assigned by Merchant in the event of a Bankruptcy Proceeding relating to Merchant. Merchant hereby acknowledges but that for the agreement in the immediately preceding sentence, Member and Elavon would not have entered into the Agreement.

k. **Attorneys' Fees.** Merchant will be liable for and will indemnify and reimburse Member and Elavon for all reasonable attorneys' fees and other costs and expenses paid or incurred by Member or Elavon: (i) in the enforcement of the Agreement; (ii) in collecting any amounts due from Merchant to Member or Elavon; (iii) resulting from any breach by Merchant of the Agreement; or (iv) in defending against any claim or cause of action brought by Merchant against Elavon or Member arising out of the Agreement.

l. **Customer Contact.** Merchant authorizes Member and Elavon to contact its Customers or their Issuer if Member or Elavon determines that such contact is necessary to obtain information about any Transaction between Merchant and a Customer.

m. **Telephone Recording.** Merchant authorizes Elavon to monitor and record telephone conversations at any time without further notice to the parties to such conversations. The decision to record any conversation shall be solely in Elavon's discretion.

n. **Information Sharing.** Merchant understands and agrees that Elavon may disclose any information gathered by Elavon to (i) Elavon's "affiliates" (i.e., companies related to us by

common control or ownership) that offer financial products or services, including those identified in the Agreement and to Elavon's administrative or service units that perform such functions; (ii) to non-affiliated companies to assist Elavon in providing the products and services Merchant has requested; (iii) to credit rating agencies; and (iv) as required by the Payment Network Regulations or the Laws (e.g., for tax reporting purposes or in response to a subpoena).

o. **Communication with Merchant.** Merchant agrees that Elavon and Member may provide Merchant with information about their services including, without limitation, information about new products and/or services by telephone, electronic mail, and/or facsimile.

p. **Amendments.** Member and Elavon may propose amendments or additions to the Agreement. Member or Elavon will inform Merchant of a proposed change in a periodic statement or other notice. Merchant will be deemed to have agreed to the change if Merchant continues to present Transactions to Member and Elavon after thirty (30) days following the issuance of the notice. Notwithstanding the previous sentence, changes to fees authorized by the Agreement will be effective upon notice to Merchant, unless a later effective date is provided. Further, Elavon is entitled to pass through to Merchant any fee increases imposed upon Elavon by Visa, MasterCard, Discover Network, any other Payment Network, and any other third party including telecommunications vendors.

q. **Severability and Waiver.** If any provision of the Agreement is found to be illegal or otherwise unenforceable, the invalidity or unenforceability of that provision will not affect any of the remaining provisions and the Agreement will be construed as if the illegal or unenforceable provision is not contained in the Agreement. Neither the failure, the delay by Elavon or Member to exercise, nor the partial exercise of any right under the Agreement will operate as a waiver or estoppel of such right, nor shall such amend the Agreement. All waivers requested by Merchant must be signed by Elavon.

r. **Independent Contractors.** Elavon, Member, and Merchant will be deemed independent contractors and no one will be considered an agent, joint venturer, or partner of the other, unless and to the extent otherwise specifically provided herein. The Agreement has been entered into solely for the benefit of the parties hereto and is not intended to create an interest in any third party.

s. **Survival.** All of Merchant's obligations to Elavon and Member shall survive termination of the Agreement, including, without limitation, Sections (A)(4)(a)-(d), (A)(5)(a)-(d), (A)(6)(a)-(d), (A)(7)(a)-(c), (A)(8)(a)-(d), (A)(9)(g), (A)(13), (A)(14), (A)(15), (A)(17)(a)-(d), (A)(18)(b), (A)(18)(g), and (A)(18)(k) of the TOS.

t. **Counterparts; Facsimile Signatures; Delivery.** The Agreement may be signed in one or more counterparts, each of which shall constitute an original and all of which, taken together, shall constitute one and the same agreement. Delivery of the various documents and instruments comprising the Agreement may be accomplished by a facsimile transmission, and such a signed facsimile or copy shall constitute a signed original.

u. **Force Majeure.** None of the parties hereto shall be considered in default in performance of its obligations to the extent such performance is delayed by force majeure affecting the party's ability to so perform. Force majeure shall include, but not be limited to, hostilities, restraint of rulers or peoples, revolution, civil commotion or riots, strike, lockout, epidemic, accident, fire, flood, earthquake, windstorm, explosion, lack of or failure of telecommunication facilities, regulation or ordinance, demand or requirement of any government or governmental agency, or any court, tribunal or arbitrator(s), having or claiming to have jurisdiction over the subject matter of the Agreement or over the parties hereto, or any act of God or any act of government or any cause whether of the same or different nature existing now or in the future which is beyond the reasonable control of the parties hereto.

v. **Expenses.** Except as otherwise specifically provided in the Agreement, each party shall pay its

own costs and expenses in connection with the Agreement and the transactions contemplated hereby, including all attorneys' fees, accounting fees and other expenses.

w. **No Third Party Beneficiaries.** No provisions of the Agreement shall be construed to confer any rights or benefits on any Person not a party to the Agreement or a permitted assignee or successor of a party to the Agreement, unless such rights or benefits are expressly extended to third parties.

## 19. PROVISIONS APPLICABLE TO MERCHANT'S ACCEPTANCE OF TRANSACTIONS IN CANADA

a. **Pre-Authorized Debits (PADs).** Merchant authorizes Member, Elavon, and their respective vendors and agents to initiate debit and credit entries to the DDA, the Reserve Account, or any other account maintained by Merchant at any institution that is a member of the CPA, all in accordance with the Agreement. Merchant agrees that any withdrawal by Member, Elavon and their respective vendors and agents in accordance with the Agreement are PADs for business purposes, as defined under Rule H1 of the CPA. **Merchant hereby waives the right to receive advance notice from Member, Elavon and their respective vendors and agents of any and all such debits.** This authorization will remain in effect after termination of the Agreement and until all of Merchant's obligations to Elavon and Member have been paid in full. If Merchant changes the DDA, this PAD authorization will apply to the new account and Merchant shall provide Elavon and Member in writing such information regarding the new DDA as they deem necessary. It may take Elavon up to ten (10) business days after Elavon's receipt of a written notice from Merchant to reflect in its system any change to Merchant's DDA. If Merchant changes the DDA, Merchant agrees that it is responsible for all costs incurred by Member and/or Elavon in connection with Merchant's decision to change the DDA. Merchant may revoke the PAD authorization upon thirty (30) days' prior written notice to Elavon, but any such revocation shall constitute a material breach of the Agreement. Merchant may obtain a sample cancellation form, as well as further information on Merchant's right to cancel a PAD authorization by contacting Merchant's financial institution or by visiting www.cdnpay.ca. Merchant has certain recourse rights if any debit does not comply with the Agreement. For example, Merchant has the right to receive reimbursement for any debit that is not authorized or is not consistent with this PAD Agreement. To obtain more information on Merchant's recourse rights, Merchant may contact its financial institution or visit www.cdnpay.ca.

b. **Amendments.** This Section applies to Merchants in Canada in lieu of Section (A)(18)(p) above. Member and Elavon may propose amendments or additions to the Agreement. Member or Elavon will inform Merchant of a proposed change in a periodic statement or other notice. Merchant will be deemed to have agreed to the change if Merchant continues to present Transactions to Member and Elavon after thirty (30) days following the issuance of the notice. Notwithstanding the previous sentence, changes to fees authorized by the Agreement will be effective upon notice to Merchant, unless a later effective date is provided; provided, that, with respect to Credit Card and Debit Card Transactions, changes to fees or the introduction of new fees authorized by the Agreement will be effective upon ninety (90) days notice to Merchant, unless a later effective date is provided. Further, Elavon is entitled to pass through to Merchant any fee increases imposed upon Elavon by Visa, MasterCard, Discover Network, any other Payment Network, and any other third party including telecommunications vendors; provided, that, with respect to Credit Card and Debit Card Transactions, any such fee increases will be effective upon ninety (90) days notice to Merchant.

c. **Termination.** In addition to Merchant's other termination rights in the Agreement, the Agreement may be terminated by Merchant without penalty in the event that Elavon or Member notifies Merchant of a fee increase or the introduction of a new fee; provided that Merchants may not terminate the Agreement in connection with new fees or fee increases made in accordance with pre-determined fee schedules. Merchant must notify Elavon and Member of its intent to terminate the Agreement within ninety (90) days of receiving notice of the new fee or fee increases from Elavon or Member.

d. **Personal Guaranty**. As a primary inducement to Elavon and Member to enter into the Agreement and in consideration of the services and accommodations of any kind given or continued at any time and from time to time by Elavon or Member to or for the benefit of Merchant, the designated Guarantor(s), jointly and severally, and in Quebec solidarily, unconditionally and irrevocably, guarantee the continuing full and faithful payment and performance by Merchant of all duties, debts, liabilities and obligations of Merchant to Elavon or Member, whether present or future, direct or indirect, absolute or contingent, matured or not, at any time owing or remaining unpaid by Merchant to Elavon or Member in any currency, and wherever incurred, and all interest, fees, commissions and legal and other costs, charges and expenses owing or remaining unpaid by Merchant to Elavon or Member in any currency pursuant to the Agreement, as the same may be amended by either of them from time to time, with or without notice (collectively, the "Obligations"). The Guarantor(s) also unconditionally agrees that, if Merchant does not unconditionally and irrevocably pay any Obligations when due and those Obligations are not recoverable from the Guarantor(s) for any reason under the guarantee set forth above, the Guarantor(s) shall indemnify Elavon and Member immediately on demand against any cost, loss, damage, expense or liability suffered by Elavon or Member as a result of Merchant's failure to do so. The liability of the Guarantor(s) hereunder is unlimited. No act or thing, except the indefeasible and full payment and discharge in cash of all of the Obligations, which but for this provision could act as a release or impairment of the liability of the Guarantor(s), shall in any way release, impair, or affect the liability of the Guarantor(s). The Guarantor(s) waives any and all defenses of Merchant pertaining to the Obligations, any evidence thereof, and any security therefore, except the defense of discharge of the Obligations by full and indefeasible payment in cash. Guarantor's(s') liability to pay or perform the Obligations shall arise immediately after demand has been made in writing on Guarantor(s). Guarantor(s) understands further that Elavon and/or Member may proceed directly against Guarantor(s) without first exhausting their respective remedies against Merchant or any other person or entity responsible therefore or any security held by Elavon, Member, or Merchant. The Guarantor(s) waives: (i) notice of acceptance of this Personal Guarantee and of the creation and existence of the Obligations; (ii) presentment, demand for payment, notice of dishonor, notice of non-payment, and protest of any instrument evidencing the Obligations; (iii) all other demands and notices to the Guarantor(s) or any other person and all other actions to establish the liability of the Guarantor(s); (iv) without limiting in any way any other waivers of defenses set out herein, any and all defenses available at equity or common law to the fullest extent permitted under applicable law; and (v) **the right to trial by jury in action in connection with this Personal Guarantee.** Guarantor(s) agrees that this is a continuing guarantee and that Guarantor's(s') liability under this Personal Guarantee will not be discharged, affected or released by: (a) any variation, renewal, extension or replacement of the Agreement, other agreements or any security (including any other guarantees) held by Elavon or Member; (b) any extension of time or other indulgence given to Merchant or others under the Agreement or any security; (c) any delay or refusal by us to require or enforce payment of the Obligations or any security; (d) the taking, non-perfecting, or giving up of any security or by any dealings with Merchant or others respecting the Obligations, the Agreement or any security; (e) the death or legal incapacity of the Guarantor(s) or the dissolution, amalgamation, other fundamental change, death or legal incapacity, as the case may be, of Merchant; or (f) any event which results in Merchant not being under a legal obligation to make any payment or perform any obligation under the Agreement. Guarantor(s) renounces the benefit of discussion and division. This Personal Guarantee will bind all heirs, administrators, estate trustees, representatives, permitted successors, and assigns of Guarantor(s), and may be enforced by or for the benefit of any successors in interest to Elavon or Member. Guarantor(s) understands that the inducement to Elavon and Member to enter into the Agreement and give or continue services and accommodations of any kind to or for the benefit of Merchant, is consideration for the Personal Guarantee and that each Personal Guarantee remains in full force and effect even if the Guarantor(s) receives no additional benefit from the Personal Guarantee. **Guarantor hereby authorizes any credit reporting agency or bureau to furnish Elavon and Member upon request with a credit bureau report that relates to the Guarantor.** To the extent that any

limitation period applies to any claim for payment of obligations or remedy for enforcement of obligations under this Personal Guarantee, each Guarantor agrees that: (a) any limitation period is expressly excluded and waived entirely if permitted by applicable law; (b) if a complete exclusion and waiver of any limitation period is not permitted by applicable law, any limitation period is extended to the maximum length permitted by applicable law; (c) any limitation period applying to this Personal Guarantee expressed to be payable on demand shall not begin before an express demand for payment of the relevant obligations is made in writing by Elavon or Member to the Guarantor; (d) any applicable limitation period shall begin afresh upon any payment or other acknowledgment by the Guarantor of its obligations; and (e) each of this Personal Guarantee and the Agreement is a "business agreement" as defined in the *Limitations Act, 2002* (Ontario) if that Act applies to it. This Personal Guarantee has been negotiated by the Guarantor or reviewed by the Guarantor with the benefit of independent legal counsel and any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply to the construction or interpretation of this Personal Guarantee.

e. **Language.** The parties hereby acknowledge that they have required the Agreement and all related documents to be drawn up in the English language. Les parties reconnaissent avoir demandé que les présents contrats ainsi que les documents qui s'y rattachent soient rédigés en langue anglaise.

**20. EQUIPMENT LEASING**

If Merchant has elected to lease any Leased Equipment from Lessor, the following terms and conditions apply:

a. **Non-Cancellable Lease. THE LEASE CANNOT BE CANCELLED BY LESSEE DURING THE TERM.** Lessor, its successors and assigns, does hereby lease to Lessee and Lessee hereby rents from Lessor the Leased Equipment, on terms and conditions set forth in this Section.

b. **No Warranties by Lessor.** Lessee represents that Lessee has selected the Leased Equipment leased hereunder and Lessee acknowledges Lessor has made and makes no representations or warranties of any kind or nature, directly or indirectly, expressed or implied, as to any matter whatsoever, including the suitability of the Leased Equipment, its durability, its condition, and/or its quality and, as between Lessee and Lessor, or Lessor's assignee. Lessee leases the Leased Equipment "As-Is". Lessor also disclaims any warranty of merchantability or fitness for use or purpose whether arising by operation of law or otherwise. Lessor and Lessor's assignee shall not be liable to Lessee or others for any loss, damage or expense of any kind or nature caused directly or indirectly by any Leased Equipment however arising, or the use or maintenance thereof or the failure of operation thereof, or the repairs, service or adjustment thereto. No representation or warranty as to the Leased Equipment or any other matter by the Leased Equipment supplier ("Vendor") named in the Merchant Application, or elsewhere in the Agreement, or others shall be binding on the Lessor nor shall the breach of such relieve Lessee of, or in any way affect, any of Lessee's obligations to Lessor herein.

If the Leased Equipment is not satisfactory for any reason, Lessee shall make any claim on account thereof solely against the Vendor and Lessee shall nevertheless pay Lessor all rent payable under the lease. Lessor agrees to assign to Lessee, solely for the purpose of making and prosecuting any such claim, any rights it may have against the Vendor for breach of warranty or representation respecting the Leased Equipment.

Regardless of cause, Lessee will not assert any claim whatsoever against Lessor for loss of anticipatory profits or any other indirect, special, or consequential damages. Lessor makes no warranty as to the treatment of the lease for accounting or tax purposes. **NOTWITHSTANDING ANY FEES WHICH MAY BE PAID BY LESSOR TO VENDOR OR ANY AGENT OF VENDOR, LESSEE UNDERSTANDS AND AGREES THAT NEITHER VENDOR NOR ANY AGENT OF VENDOR IS AN AGENT OF LESSOR OR IS AUTHORIZED**

**TO WAIVE OR ALTER ANY TERM OR CONDITION OF THE LEASE.**

c. **Authorization for Automatic Withdrawal of Monthly Payments.** Lessee hereby authorizes Lessor, or its designee, successor or assign to withdraw any amounts, including any and all taxes now due or imposed, owed by Lessee in connection with the Leased Equipment, by initiating debit entries to the DDA indicated on the Merchant Application or the Agreement, or as such other DDA as the Lessee may from time to time use. In the event of default of Lessee's obligation hereunder, Lessee authorizes the debit of its DDA for the full amount due under the lease. Lessee agrees to contest transactions that might be invalid within ninety (90) days of the transaction date, or the transaction will be deemed valid. A rental payment (whether paid by debit or other means) that is not honored by Lessee's financial institution for any reason will be subject to a returned item service fee imposed by Lessor, the amount of which may be debited from Lessee's DDA. Should it be necessary to switch to statement billing, Lessor is authorized to add a $5.00 per month service charge to Lessee's monthly payment amount as reimbursement for the added service and processing expenses. In the event that Lessor withdraws funds erroneously from Lessee's DDA, Lessee authorizes Lessor to credit Lessee's DDA for an amount not to exceed the original amount of the debit. This authorization is to remain in full force and effect until Lessor and Lessee's financial institution have received written notice from Lessee of its termination in such time and in such manner as to afford Lessor and Lessee's financial institution a reasonable opportunity to act. **LESSEE REPRESENTS AND WARRANTS THAT ITS DDA HAS BEEN ESTABLISHED AS A BUSINESS-PURPOSE CHECKING ACCOUNT.**

d. **Finance Lease.** Lessor and Lessee agree that the lease is a "Finance Lease" as defined by Section 11-2A-103(g) of the GA UCC. Lessee acknowledges either (i) that Lessee has reviewed and approved any written "Supply Contract" as defined by GA UCC Section 11-2A-103(y) covering the Leased Equipment purchased from the "Supplier" as defined by GA UCC Section 11-2A-103(x) thereof for lease to Lessee or (ii) that Lessor has informed or advised Lessee, in writing, either previously or by the lease of the following: (1) the identity of the Supplier; (2) that the Lessee may have rights under the Supply Contract; and (3) that the Lessee may contact the Supplier for a description of any such rights Lessee may have under the Supply Contract.

e. **Ordering Equipment; Lessor's Right to Terminate.** Lessee requests Lessor to purchase the Leased Equipment from Vendor and arrange for delivery to Lessee at Lessee's expense. If within forty-five (45) days from the date Lessor orders the Leased Equipment, the same has not been delivered, installed and accepted by Lessee in form satisfactory to Lessor, Lessor may on ten (10) days written notice to Lessee terminate the Lease and its obligations to Lessee.

f. **Term and Rent.** The sum of all periodic installments of rent indicated in Merchant Application or the Agreement shall constitute the aggregate rent reserved under the lease. The lease term shall commence as of the date that the lease is accepted by Lessor, (the "Commencement Date"), and shall continue until the obligations of the Lessee under the lease shall have been fully performed. The installments of rent shall be payable monthly in advance as stated above or on a schedule, the first such payment being due on the Commencement Date, or such later date as Lessor designates in writing, and subsequent payments shall be due on the same day of each successive month thereafter until the balance of the rent and any additional rent or expenses chargeable to Lessee under the lease shall have been paid in full. All payments of rent shall be made to Lessor at the address set forth in the Merchant Application or the Agreement or such other address as Lessor may designate in writing. Lessee's obligation to pay such rentals shall be absolute and unconditional and is not subject to any abatement, set-off, defense or counterclaim for any reason whatsoever. Lessee hereby authorizes Lessor to insert into the lease the serial numbers and other identification data of the Leased Equipment when determined by Lessor and dates or other omitted factual matters and to correct any typographical or spelling errors. If a security deposit is indicated above, the same shall be held by Lessor to secure the faithful performance of the terms of the lease and returned or applied in accordance with Section (A)(20)(q)(iv) below.

g. **Assignment. (i) LESSOR MAY ASSIGN OR TRANSFER THE LEASE OR LESSOR'S INTEREST IN THE LEASED EQUIPMENT WITHOUT NOTICE TO LESSEE.** Any assignee of Lessor shall have all of the rights, but none of the obligations, of Lessor under the lease and Lessee agrees that it will not assert against any assignee of Lessor any defense, counterclaim or offset that Lessee may have against Lessor. Lessee acknowledges that any assignment or transfer by Lessor shall not materially change Lessee's duties or obligations under the lease nor materially increase the burdens or risks imposed on Lessee. Lessee agrees that Lessor may assign or transfer the lease or Lessor's interest in the Leased Equipment even if said assignment or transfer could be deemed to materially affect the interest of Lessee. (ii) **LESSEE SHALL NOT ASSIGN OR IN ANY WAY DISPOSE OF ALL OR ANY PART OF ITS RIGHTS OR OBLIGATIONS UNDER THE LEASE OR ENTER INTO ANY SUBLEASE OF ALL OR ANY PART OF THE LEASED EQUIPMENT WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR.** (iii) Lessee shall not create, incur, assume or suffer to exist any mortgage, lien, pledge or other encumbrance or attachment of any kind whatsoever upon, affecting or with respect to the Leased Equipment or the lease or any of Lessor's interests thereunder.

h. **Title; Quiet Enjoyment.** Lessor shall at all times retain title to the Leased Equipment. All documents of title and evidence of delivery shall be delivered to Lessor. Lessee hereby authorizes Lessor, at Lessee's expense, to cause the lease or any statement or other instrument in respect to the lease showing the interest of Lessor in the Leased Equipment including Uniform Commercial Code Financing Statements, to be filed or recorded and/or refiled and rerecorded, and grants Lessor the right to execute Lessee's name thereto. Lessee agrees to execute and deliver any statement or instrument requested by Lessor for such purpose, and agrees to pay or reimburse Lessor for any filing, recording or stamp fees or taxes arising from the filing or recording of any such instrument or statement. Lessee shall at its expense, protect and defend Lessor's title against all persons claiming against or through Lessee. at all times keep the Leased Equipment free from legal process or encumbrance whatsoever and, shall give Lessor immediate notice thereof and shall indemnify Lessor from any loss caused thereby. Lessee agrees to procure for Lessor, such estoppel certificates, landlord's or mortgagees' waiver or other similar documents as Lessor may reasonably request. Provided Lessee is not in default hereunder, Lessee shall quietly use and enjoy the Leased Equipment subject to the terms hereof.

i. **Care, Use and Location.** Lessee shall maintain the Leased Equipment in good operating condition, repair and appearance, and protect the same from deterioration other than normal wear and tear; shall use the Leased Equipment in the regular course of its business, within its normal operating capacity, without abuse, and shall comply with all laws, ordinances, regulations, requirements and rules with respect to the use, maintenance and operation of the Leased Equipment; shall use the Leased Equipment solely for business purposes; shall not make any modification, alteration or addition to the Leased Equipment, without the written consent of Lessor, which shall not be unreasonably withheld; shall not at any time so affix the Leased Equipment to realty as to change its nature to real equipment or to a fixture regardless of how attached or installed; shall keep the Leased Equipment at the location shown in the Merchant Application or the Agreement, and shall not remove the Leased Equipment without written consent of Lessor, which shall not be unreasonably withheld.

j. **Net Lease; Taxes.** Lessee intends the rental payments hereunder to be net to Lessor, and Lessee agrees to pay all sales, use, excise, personal equipment, stamp, documentary and ad valorem taxes, license and registration fees, assessment, fines, penalties and similar charges imposed on the ownership, possession or use of the Leased Equipment during the term of the lease; shall pay all taxes (except Lessor's federal or state net income taxes) imposed on Lessor or Lessee with respect to the rental payments hereunder or the ownership of the Leased Equipment; and, shall reimburse Lessor upon demand for any taxes paid by or advanced by Lessor. Lessee agrees that the reimbursement of equipment tax calculation is based on an average tax rate. Lessee agrees to pay Lessor an annual fee in an amount not to exceed $50.00 for the administration, billing and

tracking of said taxes and charges. Unless otherwise agreed to in writing, Lessee shall file personal equipment tax returns with respect to the Leased Equipment.

k. **Indemnity.** Lessee shall and does hereby agree to indemnify and save Lessor, its agents, servants, successors, and assigns harmless from any and all liability, damage or loss, including reasonable attorney's fees, arising out of the ownership, selection, possession, leasing, operation, control, use, condition (including but not limited to latent and other defects, whether or not discoverable by Lessee), maintenance, delivery and return of the Leased Equipment. The indemnities and obligations herein provided shall continue in full force and effect notwithstanding the termination of the lease.

l. **Insurance.** During the term of the lease, Lessee agrees to maintain, at Lessee's expense, "Special Form" property insurance protecting the Leased Equipment for its replacement value, naming Lessor as a loss payee on a "Lender's Loss Payable" endorsement; public liability insurance, in amounts acceptable to Lessor, naming Lessor as an additional insured (together "Required Insurance"). Lessee must provide Lessor satisfactory written evidence of Required Insurance within thirty (30) days of the Commencement Date or any subsequent written request. If Lessee does not do so, Lessor may obtain insurance from an insurer of Lessor's choosing in such forms and amounts as Lessor deems reasonable to protect Lessor's interests ("Lease Insurance"). Lease Insurance covers the Leased Equipment and the Lessor; it does not name the Lessee as an insured and may not cover all of the Lessee's interest in the Leased Equipment. Lessee agrees to pay Lessor periodic charges for Lease Insurance ("Insurance Charges") that include: a premium that may be higher than if the Lessee maintained the Required Insurance separately; a finance charge of up to 1.5% per month on any premium advances made by the Lessor or Lessor's agents; and billing and processing fees; each of which may generate a profit to Lessor and Lessor's agents. Unless Lessee provides satisfactory evidence of Required Insurance by the Insurance Charge due date, Lessor will pay such Insurance Charge by debiting Lessee's DDA under the withdrawal provision of the lease. Lessor shall discontinue billing Insurance Charges upon receipt of satisfactory evidence of Required Insurance. Lessee agrees to arbitrate any dispute with Lessor or Lessor's agents regarding Lease Insurance or Insurance Charges under the rules of the American Arbitration Association in Atlanta, Georgia; provided however, such agreement does not authorize class arbitration.

m. **Loss or Destruction of Leased Equipment.** Lessee shall bear the entire risk and be responsible for loss, theft, damage or destruction of the Leased Equipment from any cause whatsoever after taking possession of the Leased Equipment. Lessee shall notify Lessor immediately if the Leased Equipment is lost, destroyed, stolen or taken by any other person. In the event of loss, damage or destruction of any item of Leased Equipment, Lessee at its expense (except to the extent of any proceeds of insurance provided by Lessee which shall have been received by Lessor as a result of such loss, damage or destruction), and at Lessor's option, shall either (i) repair such item, returning it to its previous condition, unless damaged beyond repair; (ii) pay Lessor all accrued and unpaid rental payments and late charges, plus an amount (the "Loss Amount") equal to (1) the value of all rental payments to become due during the remaining term of the lease, plus (2) the amount of any purchase option or obligation with respect to the Leased Equipment or, if there is no such option or obligation, the fair market value of the Leased Equipment, as estimated by Lessor in its sole reasonable discretion; or (iii) replace such item with a like item acceptable to Lessor, in good condition and of equivalent value, which shall become equipment of Lessor, included within the term "Leased Equipment" as used herein, and leased from Lessor herewith for the balance of the full term of the lease.

n. **Loss or Destruction Waiver.** Lessor may waive Lessee's responsibility for loss or destruction of the Leased Equipment and for keeping the Leased Equipment fully insured during the lease term. For such waiver, Lessee shall pay Lessor the monthly amount shown in the Schedule of Payments section titled "Loss & Destruction Waiver" (unless the term "Included" is shown) of the Merchant Application or the Agreement. Should Lessee fail to provide proof of insurance, Lessor may invoke the Loss or Destruction Waiver and charge a monthly fee at current rates even if no amount is shown in the aforementioned section of the Schedule of Payments. In the event of loss or destruction of the Leased Equipment, Lessor shall provide for its replacement with Leased Equipment of comparable value at that time provided (i) Lessee took reasonable

care in preventing the loss or destruction of the Leased Equipment and (ii) Lessee has paid in a timely manner the required monthly amount for the Loss or Destruction Waiver. Lessee shall cooperate with Lessor in making any claim with respect to the Leased Equipment.

o. **Event of Default.** If any one of the following events (each an "Event of Default") shall occur, then to the extent permitted by applicable Law, Lessor shall have the right to exercise any one or more remedies set forth in Section (A)(20)(p) below: (i) Lessee fails to pay any rental or any other payment hereunder when due; (ii) Lessee fails to pay, when due, any indebtedness of Lessee to Lessor arising independently of the lease, and such default shall continue for five (5) days; (iii) Lessee fails to perform any of the terms, covenants, or conditions of the lease, other than as provided above, after ten (10) days written notice; (iv) Lessee becomes insolvent or makes an assignment for the benefit of creditors; (v) a receiver, trustee, conservator, or liquidator of Lessee, of all or a substantial part of its assets, is appointed with or without the application or consent of Lessee; or (vi) a petition is filed by or against Lessee under the Bankruptcy Code of 1978, as amended, or under any other insolvency law(s), providing for relief of debtors.

p. **Remedies.** If an event of default shall occur as described in Section (A)(20)(o) above, Lessor may, at its option, at any time (i) declare immediately due and payable and recover from Lessee, as liquidated damages for the loss of a bargain and not as a penalty, an amount equal to all accrued and unpaid rental payments and late charges, taxes, and other fees, plus the Loss Amount as set forth in Section (A)(20)(m) above; (ii) automatically charge any or all of Lessee's DDAs for all money amounts owed; (iii) to the extent permitted by applicable Law, without demand or legal process, enter into the premises where the Leased Equipment may be found and take possession of and remove the Leased Equipment, without liability for such retaking; (iv) Lessor may hold, sell or otherwise dispose of any such Leased Equipment at a private or public sale; or (v) any other remedies available under applicable Law. In the event Lessor takes possession of the Leased Equipment, Lessor shall give Lessee credit for any sums received by Lessor from the sale or rental of the Leased Equipment after deduction of the expenses of sale or rental and Lessee shall remain liable to Lessor for any deficiency. Notwithstanding the foregoing, to the extent the Leased Equipment is nontransferable or its transfer restricted (e.g., software), Lessee agrees that Lessor and/or licensor of the Leased Equipment shall have no duty to remarket such Leased Equipment or otherwise mitigate any damages relating to such Leased Equipment.

Lessee shall also be liable for and shall pay to Lessor (i) all expenses incurred by Lessor in connection with the enforcement of any of Lessor's remedies including all collection expenses, that includes, but is not limited to, charges for collection letters and collection calls, charges of collection agencies, sheriffs, etc.; and all expenses of repossessing, storing, shipping, repairing and selling the Leased Equipment; and (ii) reasonable attorney's fees and court costs. Lessor and Lessee acknowledge the difficulty in establishing a value for the unexpired lease term and, owing to such difficulty, agree that the provisions of this Section represent an agreed measure of damages and are not to be deemed a forfeiture or penalty. All remedies of Lessor hereunder are cumulative, are in addition to any other remedies provided for by Law, and may, to the extent permitted by Law, be exercised concurrently or separately. The exercise of any one remedy shall not be deemed to be an election of such remedy or to preclude the exercise of any other remedy. No failure on the part of the Lessor to exercise and no delay in exercising any right to remedy shall operate as a waiver thereof or modify the terms of the lease.

q. **END OF LEASE TERM. (i) UPON EXPIRATION OF THE LEASE TERM, LESSEE SHALL HAVE THE OPTION TO PURCHASE LEASED EQUIPMENT FOR ITS FAIR MARKET VALUE, SAID VALUE TO BE NOT LESS THAN 20% OF THE AGGREGATE LEASE PAYMENTS ON 12 MONTH LEASES, 15% OF AGGREGATE LEASE PAYMENTS ON 24 MONTH LEASES, 12% OF THE AGGREGATE PAYMENTS ON 36 MONTH LEASES, OR 10% OF THE AGGREGATE LEASE PAYMENTS ON 48 MONTH OR 60 MONTH LEASES. THE EXERCISE OF THIS**

**OPTION MUST BE COMMUNICATED TO LESSOR IN WRITING AT LEAST THIRTY (30) DAYS PRIOR TO THE EXPIRATION OF THE LEASE TERM. (ii) IN THE EVENT LESSEE DOES NOT ELECT TO PURCHASE THE LEASED EQUIPMENT, THEN UPON EXPIRATION OR EARLIER TERMINATION OF THE LEASE, LESSEE SHALL RETURN THE LEASED EQUIPMENT TO LESSOR IN GOOD OPERATING CONDITION AND REPAIR, SHIPPED BY PREPAID AND INSURED FREIGHT TO A LOCATION DESIGNATED BY LESSOR. IF, IN THE JUDGMENT OF LESSOR, THE LEASED EQUIPMENT IS RETURNED DAMAGED, INCOMPLETE, OR SHOWS SIGNS OF EXCESSIVE WEAR, LESSEE AGREES TO PAY THE REPLACEMENT COST AND/OR THE REPAIR AND REFURBISHING COST (INCLUDING CLEANING), FOR AN AMOUNT DESIGNATED BY LESSOR AND PAYABLE WITHIN TEN (10) DAYS OF LESSOR'S DEMAND. (iii) IF LESSEE DOES NOT ELECT TO PURCHASE OR RETURN THE LEASED EQUIPMENT UPON EXPIRATION OR TERMINATION OF THE LEASE AS PROVIDED IN (i) OR (ii) OF THIS SECTION, THE LEASED EQUIPMENT SHALL CONTINUE TO BE HELD AND LEASED HEREUNDER, AND THE LEASE SHALL BE EXTENDED INDEFINITELY AS TO TERM AT THE SAME MONTHLY RENTAL, SUBJECT TO THE RIGHT OF EITHER THE LESSEE OR THE LESSOR TO TERMINATE THE LEASE UPON THIRTY (30) DAYS WRITTEN NOTICE, WHEREUPON THE LESSEE SHALL FORTHWITH DELIVER THE LEASED EQUIPMENT TO LESSOR AS SET FORTH IN THIS SECTION. (iv) PROVIDED LESSEE HAS FULFILLED ALL OF ITS OBLIGATIONS TO LESSOR HEREUNDER, LESSEE'S SECURITY DEPOSIT, IF ANY, AS INDICATED HEREIN, (1) SHALL BE REFUNDED TO LESSEE AT THE EXPIRATION OF THE LEASE WITHOUT INTEREST OR (2) AT LESSEE'S DIRECTION, SUCH SECURITY DEPOSIT MAY BE APPLIED TO THE PURCHASE OF THE LEASED EQUIPMENT, IN WHICH EVENT THE LEASED EQUIPMENT NEED NOT BE RETURNED TO LESSOR.**

r. **Entire Agreement; Changes.** The lease contains the entire agreement between the parties and may not be altered, amended, modified, terminated or otherwise changed except in writing and signed by an executive officer of Lessor and by the Lessee.

s. **Miscellaneous.** If Lessee fails to pay any rent or other amount required herein to be paid to Lessor within five (5) days of when due, Lessee agrees to pay Lessor, in addition to the payment, a late charge of 15% of the amount past due (but at least $7.50) for each late payment. Each month the past due payment remains unpaid, an additional late fee in the amount defined will be assessed. Payments are applied to late fees and service charges first and then to the lease obligation. Amounts shall be payable in addition to all amounts payable by Lessee to Lessor as a result of exercise of any of the remedies herein provided. If Lessee requests any services not provided for herein, Lessee agrees to pay an applicable fee for delivery of such services. Lessee shall inform Lessor of any change in Lessee's name, address, billing address, telephone numbers, location of the Leased Equipment, or DDA. In the event Lessee fails to comply with any provision of the lease, Lessor shall have the right, but not be obligated, to affect such compliance on behalf of Lessee upon ten (10) days prior written notice to Lessee. In such event, all monies expended by, and all expenses of Lessor in effecting such compliance, shall be deemed to be additional rental, and shall be paid by Lessee at the time of the next monthly payment of rent. All notices under the lease shall be sufficient if given personally or mailed postage prepaid to the party intended at the respective address set forth herein, or at such other address as said party may provide in writing from time to time. The lease inures to the benefit of and is binding upon the personal representatives, successors and assigns of the parties hereto. Time is of the essence of the lease. Lessor and Lessee intend the lease to be a valid and subsisting legal instrument, and agree that no provision of the lease that may be deemed unenforceable shall in any way invalidate any other provision or provisions of the lease, all of which shall remain in full force and effect. The lease shall be binding when accepted in writing by Lessor and shall be governed by the laws of the State of Georgia, provided however, in the event the lease or any provision hereof is not enforceable under the laws of the State of Georgia

then the laws of the state where the Leased Equipment is located shall govern. Lessee consents and submits to the jurisdiction of the federal and state courts located in the State of Georgia and within Fulton County (the "Courts"), and expressly agree to such forum for the bringing of any suit, action or other proceeding arising out of the Lessee's obligations hereunder, and expressly waive any objection to venue in any such Courts and waive any right to a trial by jury so that trial shall be by and only to the Court. Lessee agrees that any process served for any court action or proceeding shall be valid if mailed by certified mail, return receipt requested.

t. **Important Information about Credit Reporting.** Lessor may report information about this account to credit bureaus. Late payments, missed payments, or other defaults on this account may be reflected in the credit report of Lessee and/or Guarantor.

# SECTION B – ELECTRONIC CHECK SERVICES

If Merchant has selected Electronic Check Services, Merchant shall be subject to this Section B in addition to the terms and conditions of Section A of this TOS. The terms and conditions for ECS are set forth in the Agreement and the ECS Merchant Operating Guide (the "ECS MOG"), incorporated herein and located at our website https://www.merchantconnect.com/CWRWeb/ElectronicCheckService.do. In the course of its acceptance and use of ECS, Merchant represents, warrants and covenants the following:

1. Merchant shall comply with and be bound by (a) the ECS Rules, including the ACH Rules, the ECS MOG and the ECS Primer, and (b) Laws, including, but not limited to, the Check Clearing for the 21st Century Act and Regulation CC, Article 3 and Article 4 of the Uniform Commercial Code as in effect in the applicable state(s), the Electronic Fund Transfer Act and Regulation E, and the Fair Credit Reporting Act as amended by the Fair and Accurate Credit Transactions Act.
2. Merchant shall pay the fees for ECS as set forth in the Merchant Application, and in any additional application and setup forms.
3. In the event Merchant accepts for ECS certain types of Customer payments that are ineligible as specified in the ECS MOG for any reason, such Transaction is subject to Chargeback. Merchant may be liable for the face value of the Transaction and any actual damages related to or arising out of processing a Transaction that has been charged back.
4. Merchant shall cause a Check Reader/Imager to be readily available for use at all Merchant locations where Merchant will accept Paper Checks for ECS processing.
5. Merchant must use commercially reasonable procedures to verify the identity of each Customer that submits a payment.
6. Merchant shall be solely responsible for providing Customers with notifications and disclosures in connection with ECS, including, but not limited to, posting all point of sale signage and distributing all Customer takeaways and all notices and disclosures required to be provided under the ECS Rules and Laws.
7. Merchant may use the ECS only in connection with the presentment and acceptance of certain types of Customer payments in payment for goods or services sold by Merchant, or in payment for an obligation owed to Merchant, and only in compliance with the ECS Rules. Merchant shall be the sole user of the ECS, and Merchant may not resell or otherwise transfer any portion of ECS (or any associated information) in whole or in part to any other Person.
8. Merchant represents and warrants, with respect to all ECS Transactions submitted for processing by Elavon, that (i) the Customer has duly authorized the debiting of the Customer's account for the amount of the ECS Transaction in accordance with Laws and ECS Rules, (ii) the Transaction represents an obligation of the Person who is submitting a Customer payment, and (iii) the ECS Transaction is for merchandise actually sold or rented, for services actually rendered, or for the actual amount due and owing from the Customer to Merchant, in each case for the actual price of such merchandise or services (including tax) or for the actual amount due and owing to Merchant. Merchant represents and warrants that no portion of any ECS Transaction involves any element of Merchant's extension of credit.
9. Merchant may not use ECS for merchandise returns or refunds, as ECS does not support this function. Merchandise returns or refunds must be handled outside ECS by direct negotiation between Merchant and the Customer.
10. Merchant is responsible to Elavon for any Transaction charged back by Elavon or its agent in accordance with the Agreement, including the ECS MOG, and for any fines, penalties or assessments incurred as a result of Merchant's non-compliance with Laws or the ECS Rules. Merchant agrees to immediately pay to Elavon or its agent (by means of debit or set-off initiated by Elavon or its agent, submission of payment by Merchant, or otherwise, at the sole option of Elavon),

an amount equal to the amount of any ECS Transaction that is stopped, not settled, or charged back, as well as any related fees and charges.

11. Merchant must fully cooperate with all parties in the resolution of Customer disputes, as well as Chargebacks, returns, adjustments, representments, and errors in accordance with the ECS Rules and Laws.

12. All of the representations and warranties made to Visa as a Merchant pursuant to the Visa POS Check Service Operating Regulations and all of the representations and warranties an Originating Depository Financial Institution or a third party sender is deemed to make on behalf of an Originator pursuant to the ACH Rules shall be deemed representations and warranties Merchant makes to Elavon and Member upon Merchant's submission of an Item or a Transaction for ECS processing.

   a. Merchant acknowledges Visa's right to terminate or limit its relationship with Member or to terminate the Visa POS Check Service at any time. Merchant further acknowledges that Visa may permanently prohibit Merchant's participation in the Visa POS Check Service in the event of (A) fraudulent activity, (B) presenting a Transaction that was not the result of an act between Merchant and a Customer, (C) presenting a Transaction as a Customer-present Transactions where the Customer was not present at the point of sale or Merchant accepts previously voided Paper Checks, (D) repeated violations of the Visa POS Check Service Operating Regulations, or (E) any other activity that may result in undue economic hardship or damages to the goodwill of the Visa POS Check Service.

   b. Merchant has satisfied all of the Merchant standards and obligations set forth in the Visa POS Check Service Operating Regulations and the Originator standards and obligations set forth in the ACH Rules as of the effective date of the Agreement and shall continue to satisfy such standards and obligations during the Initial Term and any Renewal Term, as applicable.

13. Merchant is responsible for and will ensure that all information, including MICR data and payment amounts, are accurately captured from a Paper Check in accordance with the applicable ECS Rules, and that all such information is accurately reflected in the related Item Merchant sends to Elavon for processing through ECS. Merchant will not submit for clearing or settlement any physical Paper Check unless and until Elavon and Member have processed and settled a Chargeback to Merchant with respect to any Items created from such Paper Check.

14. Merchant will not disclose to third parties any information related to ECS Transactions including, but not limited to, Customer DDA information, driver's license number, telephone number, or social security number except as specified in the Agreement, including the ECS MOG. Merchant shall keep all such information confidential and secure, in accordance with the Agreement and Laws.

15. Merchant does not have the right to use ECS data for any purpose other than to support the ECS itself.

16. Merchant must treat all ECS documents, including, but not limited to, the Agreement, including the ECS Rules, the ECS MOG and ECS collateral material or related guides, as confidential and proprietary information and must protect it with the same degree of care as Merchant would protect its own confidential and proprietary information and as further specified in the Agreement.

17. Merchant's Agreement and use of the ECS may be terminated immediately by Elavon for failure to comply with the terms of the TOS, the Agreement or Laws.

# SECTION C: GLOSSARY

**ABA Routing Number**: The ABA number that uniquely identifies the bank on which a check is drawn.

**ACH:** Automated Clearing House.

**Agreement:** The TOS, including the Merchant Application, the Merchant Operating Guide, the Electronic Check Service Merchant Operating Guide (if applicable), any Merchant Agreement or Merchant Processing Agreement, and any other guides or manuals provided to Merchant from time to time, and all additions to, amendments and modifications of, and all replacements to any of them, as applicable.

**American Express:** The American Express Company or Amex Bank of Canada and, to the extent applicable in Canada, The American Express Company.

**Automated Clearing House (ACH):** The funds transfer system governed by the rules of NACHA. ACH allows financial institutions to clear interbank entries electronically.

**Bankruptcy Proceeding:** With respect to a Person means (i) that the Person or any subsidiary of such Person shall: (a) commence a voluntary case under the Bankruptcy Code of 1978, as amended, or other federal bankruptcy laws (as now or hereafter in effect); (b) file a petition seeking to take advantage of any other applicable laws, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts or any other similar conservatorship or receivership proceeding instituted or administered by any regulatory agency or body; (c) consent to or fail to contest, in a timely and appropriate manner, any petition filed against it in an involuntary case under such bankruptcy laws or other applicable laws or consent to an Involuntary Bankruptcy Proceeding; (d) apply for or consent to, or fail to contest in a timely and appropriate manner, the appointment of, or the taking of possession by, a trustee, receiver, custodian, liquidator, or similar entity of such Person or of all or any substantial part of its assets, domestic or foreign; (e) admit in writing its inability to pay its debts as they become due; (f) make a general assignment for the benefit of creditors; (g) make a conveyance fraudulent as to creditors under any applicable law; or (h) take any action for the purpose of effecting any of the foregoing; or (ii) that a case or other proceeding shall be commenced against the Person or any subsidiary of such Person in any court of competent jurisdiction, or through any regulatory agency or body, seeking: (a) relief under the Bankruptcy Code of 1978, as amended, or other federal bankruptcy laws (as now or hereafter in effect) or under any other applicable laws, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding up or composition, or adjustment of debts; or (b) the appointment of a trustee, receiver, custodian, liquidator or the like of such Person or of all or any substantial part of the assets, domestic or foreign, of such Person or any other similar conservatorship or receivership proceeding instituted or administered by any regulatory agency or body.

**Canadian Payments Association (CPA):** The national association that establishes standards, rules, and procedures and maintains a funds transfer system to enable depository financial institutions to exchange electronic payments.

**Cardholder:** (i) The individual in whose name a Payment Device has been issued; and (ii) any individual who possesses and uses a Payment Device and who purports to be the person in whose name the Payment Device was issued or whose signature appears on the Payment Device as an authorized user.

**Cardholder Data:** One or more of the following data elements pertaining to a Cardholder's account: card number, Cardholder name (if applicable), card account activity, Cardholder account balance, and/or such other data applicable to the Merchant's card program.

**Cardholder Information Security Program (CISP):** Visa's data security regulations to protect Cardholder account data and other data security best practices. The exact requirements for CISP can be found at www.visa.com/cisp.

**Chargeback:** A Transaction disputed by a Customer or Issuer pursuant to the Payment Network Regulations. For purposes of Section B, "Chargeback" means (i) a sales Transaction disputed by a Customer or an Item not in compliance with Conversion with Guarantee warranty provisions or ECS Rules; (ii) for all Service Levels other than Conversion with Guarantee, the face amount of any Item that is returned by the Drawee Bank or an ECS Association to Elavon unpaid and that is ineligible for resubmission to the Drawee Bank or the ECS Association, including any Item returned for non-sufficient or uncollected funds after the third presentment; and (iii) for all Service Levels, an Item that is not in compliance with Merchant's obligations, representations and warranties under the Agreement or the TOS.

**Check Reader/Imager:** A device certified by Elavon that electronically captures the MICR line and/or an image of the Paper Check.

**Confidential Information:** All information or items proprietary to Elavon or Member, of which the Merchant obtains knowledge or access as a result of the Merchant's relationship with Elavon and Member, including, but not limited to, the following types of information and other information of a similar nature (whether or not reduced to writing): scientific, technical, or business information, product makeup lists, ideas, concepts, designs, drawings, techniques, plans, calculations, system designs, formulae, algorithms, programs, software (source and object code), hardware, manuals, test procedures and results, identity and description of computerized records, identity and description of suppliers, customer lists, processes, procedures, trade secrets, "know-how," marketing techniques and material, marketing and development plans, price lists, pricing policies, and all other financial information.

**Credit Card:** A card or device associated with a revolving line of credit that may be used to purchase goods and services from Merchant or to pay an amount due to Merchant or to obtain cash advances. A "Credit Card" includes any of the following cards or devices that are associated with a line of credit extended to the Person to whom the card or device is issued: (i) a Visa card or other card or device bearing the symbol(s) of Visa U.S.A., Inc. or Visa International, Inc. (including Visa Gold cards); (ii) a MasterCard card or other card or device bearing the symbol(s) of MasterCard International Incorporated (including MasterCard Gold cards); (iii) a Discover Network card or other card or device bearing the symbol(s) of Discover Network; or (iv) any card or device bearing the symbol of any other Credit Card Association.

**Credit Card Associations:** (i) Visa U.S.A., Inc.; (ii) MasterCard International Incorporated; (iii) American Express; (iv) Discover Network; (v) Diners; (vi) JCB; and (vii) any other organization or association that hereafter contracts with Elavon and/or Member to authorize, capture, and/or settle Transactions effected with Credit Cards issued or sponsored by such organization or association, and any successor organization or association to any of the foregoing.

**Credit Card Rules:** All applicable rules and operating regulations of the Credit Card Associations, and all rules, operating regulations, and guidelines for Credit Card Transactions issued by Elavon from time to time, including, without limitation, all amendments, changes and revisions made thereto from time to time.

**Customer:** A client of Merchant who elects to conduct a payment Transaction with Merchant through presentation of a Payment Device (including a Cardholder).

**Debit Card:** A card or device bearing the symbol(s) of one or more EFT Networks or Credit Card Associations, which may be used to purchase goods and services from Merchant or to pay an amount due to Merchant by an electronic debit to the Cardholder's designated deposit account. A "Debit Card" includes (i) a card or device that bears the symbol of a Credit Card Association and may be used to conduct signature-based, offline debit Transactions; and (ii) a card or device that bears the symbol of an EFT Network and can be used to conduct PIN-based, online debit Transactions.

**Debit Card Rules:** All applicable rules and operating regulations of the EFT Networks, and all rules, operating regulations, and guidelines for Debit Card Transactions issued by Elavon from time to time, including, without limitation, all amendments, changes, and revisions made thereto from time to time.

**Demand Deposit Account (DDA):** The commercial checking account at a financial institution acceptable to Elavon and Member designated by Merchant to facilitate payment for Transactions, Chargebacks,

returns, adjustments, fees, fines, penalties, assessments from the Payment Networks, Leased Equipment payments and other payments due under the Agreement. In the instance of a Debit Card or ATM Card, this refers to the Cardholder's deposit account.

**Diners:** Diners Club International Ltd.

**Discover:** DFS Services LLC.

**Discover Network:** Discover Network, Inc.

**Drawee Bank:** The financial institution where a Customer maintains a checking account on which a Paper Check that serves as the source document to generate an Item at the POS Device or payment for a Transaction is drawn.

**EFT Networks:** (i) Interlink Network Inc., Maestro U.S.A., Inc., STAR Networks, Inc., NYCE Payments Network, LLC, PULSE Network LLC, ACCEL/Exchange Network, Alaska Option Services Corporation, Armed Forces Financial Network, Credit Union 24, Inc., NETS, Inc., and SHAZAM, Inc.; (ii) (i) Interac and the Interac Direct Payment service; and (iii) any other organization or association that hereafter authorizes the Elavon and/or Member to authorize, capture, and/or settle Transactions effected with Debit Cards, and any successor organization or association to any of the foregoing.

**Elavon:** As applicable, Elavon, Inc., a Georgia corporation, Elavon Canada Company, a company validly existing and organized in Nova Scotia, and any affiliate or subsidiary of Elavon, Inc. that provides Processing Services to a Merchant related to Transactions. Elavon is a registered member service provider of each Member. Elavon may also be referred to as "Servicer" in the Agreement, the MOG or other documents provided to Merchant in connection with the Processing Services.

**Electronic Check Service (ECS) Association:** NACHA, any regional ACH association or network, and any other organization or association used by Elavon and/or Member in connection with the ECS that is hereafter designated as an ECS Association by Elavon from time to time.

**Electronic Check Service (ECS) Primer:** The detailed information relating to ECS processes and implementation provided by Elavon to Merchant, which must be used by Merchant in conjunction with the technical specifications and certification requirements provided by Elavon to promote integrated point of sale system connectivity and integration between Merchant and Elavon.

**Electronic Check Service Rules (ECS Rules):** All applicable rules and operating regulations of or applicable to the ECS Associations (including the ACH Rules) and the ECS MOG, in each case including without limitation, all amendments, changes, and revisions made thereto from time to time.

**Electronic Check Service (ECS) Transaction:** Any purchase, reversal/void, decline, Chargeback, or representment/resubmit pursuant to the Electronic Check Service Rules.

**Electronic Gift Cards (EGC):** A special card purchased by a Customer or provided by Merchant to a Customer that is redeemable for merchandise, services or other Transactions. A program that allows a Merchant to sell Electronic Gift Cards redeemable for in store merchandise or services.

**GA UCC:** Georgia Uniform Commercial Code.

**Guarantor:** A Person that executes a Personal Guaranty for the benefit of Elavon and Member.

**Interac:** Interac Association.

**Interac Direct Payment:** The service provided by Interac to permit Customers to pay for goods and services by debiting money directly from their accounts using a POS Device equipped with a PIN pad with PIN verification.

**Issuer:** The financial institution or other entity that issued the Credit Card or Debit Card to the Cardholder.

**JCB:** JCB International Co., Ltd.

**Laws:** All applicable local, state, and federal statutes, regulations, ordinances, rules, and other binding law in effect from time to time.

**Leased Equipment:** The equipment and/or software and related license agreement(s) described in the Merchant Application or the Agreement with all replacement parts, repairs, additions and accessories included therein and/or affixed thereto.

**Lessee:** Merchant, when applicable.

**Lessor:** Elavon dba LADCO Leasing.

**MasterCard:** MasterCard International Incorporated.

**MasterCard Merchant Agreement:** The Merchant Agreement that is a part of the Agreement and is between Merchant, the Member of MasterCard and Elavon, if as part of the Program Merchant has requested the ability to accept MasterCard Credit Cards. The Member of MasterCard is a party to the MasterCard Merchant Agreement for purposes of compliance with the MasterCard Credit Card Rules while Elavon is a member service provider of MasterCard and as such is also a party to the MasterCard Merchant Agreement. The Member of Visa is not a party to the MasterCard Merchant Agreement and shall have no liability with respect to any matters relating to or arising out of the MasterCard Merchant Agreement, including any actions of Elavon or the Member of MasterCard thereunder. The MasterCard Merchant Agreement is contained within the Agreement and is identical to the Visa Merchant Agreement except as set out herein

**Member:** A financial institution designated by Elavon that is a principal, sponsoring affiliate or other member of Visa, MasterCard or other member of the applicable Payment Network. References to "Member" in the MasterCard Merchant Agreement shall refer to the Member of MasterCard and references to "Member" in the Visa Merchant Agreement shall refer to the Member of Visa. For purposes of Transactions in Canada only, as of the date of distribution of the TOS, the Visa Member is U.S. Bank National Association, acting through its Canadian branch, and the MasterCard Member is Elavon Canada Company. The Member may be changed by Elavon at any time and the Merchant will be provided notice of same.

**Merchant (or you):** The business entity indicated on the Merchant Application that provides goods and/or services to Customers, or that accepts payments from Customers.

**Merchant Agreement (Merchant Processing Agreement):** Any agreement that Merchant has entered into for Processing Services, which agreement is either with Elavon or another entity that, directly or indirectly, transferred its rights under such agreement to Elavon.

**Merchant Application:** The Merchant Application and any additional document containing information regarding Merchant's business that is submitted to Elavon and Member in connection with Merchant's application for Processing Services, including any additional location form(s) and any documents submitted by Merchant as a part of the bid process, if applicable.

**Merchant Operating Guide (MOG):** The operating manual provided by Elavon to its Merchant that prescribes rules and procedures governing the Transactions. The Merchant Operating Guide may be amended from time to time by Elavon in its sole discretion, which amendments will be effective upon notice to Merchant.

**MICR:** The magnetic ink character read line encoded on a Paper Check that contains information about the Customer's checking account, including the ABA Routing Number and checking account number.

**NACHA – The Electronic Payments Association:** The national association that establishes standards, rules, business practices, and procedures governing the ACH Network, including the ACH Rules.

**Paper Check:** A Customer's paper check presented to Merchant for payment to the Merchant, which check will serve as the source document for Items.

**Payment Card Industry Data Security Standard (PCI DSS):** The data security regulations, including maintaining Cardholder account data in a secure environment, and other data security best practices endorsed by the major card associations including Visa, MasterCard and Discover, as such may be amended from time to time. Visa requires that Merchants and their agents comply with CISP, MasterCard requires that Merchants and their agents comply with SDP and the PCI DSS regulations of Discover Network.

**Payment Device:** Any device used for the purpose of obtaining credit or debiting a designated account including a Credit Card, Debit Card, and any other financial transaction device, including an Electronic Gift Card, check (whether converted into electronic form or used as a source document for an electronic fund transfer), EBT Card, stored value card, "smart" card, or other device created to be used for the purpose of obtaining credit or debiting a designated account, that is now or hereafter effected through Transactions with Merchants.

**Payment Network:** Any Credit Card Association, EFT Network, Electronic Check Service Association, governmental agency or authority, and any other entity or association that issues or sponsors a Payment Device.

**Payment Network Regulations:** Individually and collectively, as the context may dictate, the Credit Card Rules, the Debit Card Rules, and or the Electronic Check Service Rules.

**Person:** Any individual, firm, corporation, business trust, partnership, governmental agency or authority, or other entity and shall include any successor (by merger or otherwise) of such entity.

**Personal Guaranty:** Any written guaranty of Merchant's duties and obligations to Elavon and Member by a Person that is given in connection with the Agreement including, without limitation, as part of this TOS, the Merchant Application, any Merchant Agreement or Merchant Processing Agreement, or any other document signed by the Person in favor of Elavon and Member.

**PIN:** A number that must be entered by a Cardholder in order to complete certain types of Transactions (e.g., online debit, EBT).

**PIN Entry Device (PED):** A device used by the Cardholder to enter a PIN that identifies a Cardholder in an Authorization request originating at a terminal with electronic capability. PED's are used for Debit Card transactions to purchase goods or services and must comply with applicable standards administered by the Payment Card Industry Security Standards Council.

**POS Device:** A terminal, software, or other point-of-sale device, including a Third Party Terminal, at a Merchant location that conforms with the requirements established from time to time by Elavon and the applicable Payment Network. The requirements incorporate: (i) a Track 2 Magnetic Stripe Reader; (ii) communicates electronically, directly or indirectly, with the Elavon's Debit System; (iii) uses a receipt printer capable of providing a receipt conforming to the Debit Card Rules and Regulation E; (iv) uses a journal printer, journaling facility or terminal generated receipt; (v) uses an encrypted alphanumeric PIN Pad; and (vi) uses a keyboard that can perform actions, functions and data entry. POS Device also includes a Pin Entry Device (PED) that is used by the Cardholder to enter a PIN that identifies a Cardholder in an Authorization request originating at a terminal with electronic capability.

**Processing Services:** The Payment Device processing services and other related products and services received by Merchant pursuant to the Agreement.

**Program:** The Payment Device processing services and other related products and services received by Merchant pursuant to the Agreement.

**Reserve Account:** The account established pursuant to Section (A)(6).

**Servicer:** See "Elavon."

**Site Data Protection Program (SDP):** MasterCard's data security regulations to protect Cardholder account data and other data security best practices. The exact requirements for SDP can be found at https://sdp.mastercardintl.com.

**Terms of Service (TOS):** These Terms of Service and all additions to, amendments, and modifications of, and all replacements to the TOS, as applicable.

**Transaction:** Any action by a Customer using a Payment Device and a Merchant that results in activity on the Cardholder's account (e.g., payment, purchase, refund, return, or debit).

**Transaction Receipt:** The paper or electronic record evidencing the purchase of goods or services from, or payment to, a Merchant by a Customer using a Payment Device.

**Value Added Servicer:** Any entity that stores, processes, transmits or accesses Payment Device data or Transaction data on behalf of Merchant or that provides software to Merchant for transaction processing, storage, or transmission.

**Visa:** Visa U.S.A., Inc.

**Visa Merchant Agreement:** The Merchant Agreement that it a part of the Agreement and is between you, the Member of Visa and Elavon, if as part of the Program you have requested the ability to accept Visa Credit Cards. The Member of Visa is a party to the Visa Merchant Agreement for purposes of compliance with the Visa Credit Card Rules while Elavon is a registered independent sales organization of Visa and as such is also a party to the Visa Merchant Agreement. The Member of MasterCard is not a party to the Visa Merchant Agreement and shall have no liability with respect to any matters relating to or arising out of the Visa Merchant Agreement, including any actions of Elavon or the Member of Visa thereunder. The Visa Merchant Agreement is contained within the Agreement and is identical to the MasterCard Merchant Agreement except as set out herein.

**Visa POS Check Service Operating Regulations:** A set of specifications, guidelines, and principles defined by Visa that govern the operation and flow of information for transactions participating in the Visa POS Check Service.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELAVON, INC.<br><br>Plaintiff,<br><br>v.<br><br>ERWIN GANZFRIED, JOSEPH KATZ, JOSEPH MERING, SHLOMO KORNHAUSER, DEVORAH MERING, MORDECHAI KOHN, MORDECHAI LEVI, NAFTULI MORGENSTERN, JUDY BERGER, SARAH T. LEVI, SHLOMO BERGER, SOLOMON LEVY, SUSSMAN BLEIER and ASHER JUNGREISZ,<br><br>Defendants. | Civil Action No.: 1:20-cv-00908-MKB-RER<br><br>**CONSENT NOTICE OF ERRATA**<br>**AS TO THE AMENDED COMPLAINT** |

TO: THE HONORABLE MARGO K. BRODIE
CHIEF UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF NEW YORK

Daniel Ginzburg hereby submits the following Consent Notice of Errata:

1. My firm is counsel to plaintiff Elavon, Inc. in the above-captioned action. I submit this Consent Notice of Errata to correct misspelled names in the caption and body of Elavon's Amended Complaint. A copy of the Corrected Amended Complaint is annexed hereto as Exhibit 1.

2. Due to an inadvertent error brought to my attention by counsel for defendant Shlomo Berger, the defendant originally named "Sara Berger" ought to have been Shlomo Berger's spouse, Judy Berger. The mistake arose from an incorrect transposition of Elavon's records. Counsel has consented to "Sara Berger" being renamed "Judy Berger" in the caption and body of the Amended Complaint. No substantive allegations have been revised in connection with

this alteration. Judy Berger retains and expressly reserves any and all of her defenses to Elavon's allegations.

3. In connection with the foregoing revision, I also discovered that "Mordechai Levy" ought to have been spelled "Mordechai Levi." This was a scrivener's error due to the presence of another defendant, Solomon Levy. The correct spelling Mordechai Levi has been substituted into the caption and throughout the body of Amended Complaint. No substantive allegations have been revised in connection with this alteration. As of the date of this writing, Mordechai Levi has not appeared in the action by counsel or *pro se*, but presumably retains and expressly reserves any and all of his defenses to Elavon's allegations.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 11, 2021.

**THE GINZBURG LAW FIRM, P.C.**

By: *[/s/ Daniel Ginzburg]*

Daniel Ginzburg (DG-2824)
Mailing Address
151 Highway 516, Unit 736
Old Bridge, New Jersey 08857
Tel: (732) 284-3841
daniel@ginzburglawfirm.com
*Counsel to Plaintiff Elavon, Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELAVON, INC.<br><br>Plaintiff,<br><br>v.<br><br>ERWIN GANZFRIED, JOSEPH KATZ, JOSEPH MERING, SHLOMO KORNHAUSER, DEVORAH MERING, MORDECHAI KOHN, MORDECHAI LEVI, NAFTULI MORGENSTERN, JUDY BERGER, SARAH T. LEVI, SHLOMO BERGER, SOLOMON LEVY, SUSSMAN BLEIER and ASHER JUNGREISZ,<br><br>Defendants. | Civil Action No.: 1:20-cv-00908<br><br>**[CORRECTED] AMENDED COMPLAINT AND JURY DEMAND** |

Plaintiff Elavon, Inc. ("Elavon"), by and through its undersigned counsel, as and for its Complaint against defendants Erwin Ganzfried, Joseph Katz, Joseph Mering, Shlomo Kornhauser, Devorah Mering, Mordechai Kohn, Mordechai Levi, Naftuli Morgenstern, Judy Berger, Sarah T. Levi, Shlomo Berger, Solomon Levy, Sussman Bleier and Asher Jungreisz (together, the "Defendants") alleges as follows:

## NATURE OF THE ACTION

1. This is an action for damages arising from the Defendants' fraud and unjust enrichment, which caused Elavon to suffer over one million dollars in damages.

## THE PARTIES

2. At all relevant times herein, Elavon was, and remains, a corporation duly organized and existing pursuant to the laws of the State of Georgia and headquartered in Tennessee, and authorized to transact business within the State of New York.

3. At all relevant times herein, Elavon was, and remains, a wholly-owned subsidiary of U.S. Bank National Association, a federally-chartered banking institution.

4. Upon information and belief, each of the Defendants is a resident of the State of New York, and each is a resident of Kings County, with the exception of defendants Erwin Ganzfried and Mordechai Kohn, who are residents of Rockland County.

**SUBJECT MATTER JURISDICTION**

5. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Elavon and Defendants are each citizens of different States, namely Georgia and Tennessee (Elavon) and New York (Defendants), and the overall amount in controversy exceeds $75,000 exclusive of interest and costs.

6. Elavon's claims against several individual Defendants exceed $75,000 exclusive of interest and costs.

7. Elavon respectfully requests that the Court exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the claims against the other Defendants because they are so factually and legally related to the claims within the Court's original jurisdiction that they form part of the same case or controversy pursuant to Article III of the United States Constitution.

**VENUE**

8. Pursuant to 28 U.S.C. § 1391(b)(1), venue is proper in the Eastern District of New York because at least one Defendant resides in Kings County, New York, and all Defendants are residents of the State of New York.

9. Alternatively, venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL BACKGROUND

### A. Elavon And Silvertown Enter Into A Contract For Credit Card Processing

10. Non-party Silvertown of NY, Inc. ("Silvertown")[1] was a corporation formed pursuant to the laws of the State of New York on or about November 13, 2009.

11. Elavon and Silvertown entered into a written contract incorporating by reference a Terms of Service and a Merchant Operating Guide (collectively hereinafter, the "Contract"). Silvertown signed the Contract on July 22, 2010. A true and correct copy of the Contract is annexed hereto as Exhibit 1.

12. In the Contract, Silvertown represented to Elavon that it was operating a "silver store." (Exhibit 1 at 1).

13. The purpose of the Contract was to establish a relationship between Elavon and Silvertown pursuant to which Elavon would act as Silvertown's credit card processor. Elavon's services would permit Silvertown to accept credit cards as payment for the sale of its merchandise.

14. As required, Elavon provided Silvertown with merchant access into the VISA, MasterCard, American Express and Discover payment networks in exchange for compensation based primarily on a miniscule percentage of each processed credit card transaction.

[1] Silvertown was a former party to this litigation. However, the Court granted its motion to compel arbitration. (*See* ECF No. 41).

15. Pursuant to the terms of the Contract, Silvertown was obligated to reimburse Elavon for customer "chargebacks."

16. A "chargeback," more commonly known as a credit card "dispute," is a reversal of a transaction between a merchant and a customer credit cardholder. Chargebacks typically occur because of a customer's dissatisfaction with the goods or services provided by a merchant.

17. If substantiated, a chargeback results in a credit card processor, like Elavon, reimbursing the customer's credit card-issuing bank the amount of a disputed transaction. The card-issuing bank will then post a credit to the cardholder's balance.

18. Pursuant to VISA, MasterCard, American Express and Discover regulations, credit card processors like Elavon bear the responsibility of reimbursing credit cardholders for chargebacks regardless of whether the processors themselves are able to obtain reimbursement from their merchant customers.

**B. Silvertown and the Defendants Engaged In a Scheme to Use Credit Cards As a Form of Lending**

19. According to Silvertown's July 22, 2010 application to Elavon, it expected its monthly credit card sales to be approximately $25,000. (Exhibit 1).

20. By June 2015, however, Silvertown was processing $715,000 worth of transactions per month.

21. Many, if not all, of the credit card transactions Silvertown submitted to Elavon were fake in that they did not represent bona fide exchanges of payment for goods or services. In these transactions, Silvertown did not agree to provide any goods or services to "customers" presenting their credit cards to Silvertown for payment, and the "customers" did not expect Silvertown to provide them with any goods or services.

22. The non-bona fide transactions in which neither Silvertown nor the "customers" expected to provide or receive, respectively, goods or services are referred to herein as the "Sham Transactions," and the "customers" engaging in the Sham Transactions are referred to herein as "Sham Customers."

23. Each of the Defendants is a Sham Customer.

24. Without any goods or services involved, the Sham Transactions were in effect loans made by the Sham Customers to Silvertown.

25. Silvertown's charging of various amounts to the Sham Customers' credit cards resulted in monthly debts owed by the Sham Customers to their credit card-issuing banks.

26. As part of the lending scheme, Silvertown promised the Sham Customers that it would either repay their debts directly to their card-issuing banks or transfer funds to them so that they themselves could repay their card-issuing banks.

27. Silvertown did not have sufficient revenue from bona fide business transactions to reimburse the Sham Customers. As a result, it charged other credit cards belonging to the same or different Sham Customers to obtain sufficient funds for its reimbursement obligations.

28. Funds derived from later Sham Transactions were used to pay down the debt incurred through earlier Sham Transactions, so that a constant stream of increasing Sham Transactions was necessary to pay down the credit card debts.

### C. <u>The Lending Operation Ends and Defendants Shift Their Debt Onto Elavon</u>

29. This state of events was untenable because Silvertown would eventually have been required to process monthly charges exceeding $1 million just to keep up with its repayment obligations to the Sham Customers.

30. As a result, Silvertown informed the Sham Customers, including the Defendants, that it would no longer process credit card transactions and, therefore, be unable to repay their debts to the credit card-issuing banks and/or provide funds to them to pay down the obligations resulting from the lending scheme.

31. Without Silvertown's transfers of funds, the Defendants would be left with sizable debts due and owing to their credit card-issuing banks that they would be required to repay using their own funds.

32. Instead of using their own funds, however, Defendants, using suggestions by non-party TransMedia Payment Services, Ltd., sometimes trading as Intercept Advisory Firm, Ltd. ("TransMedia"), and with Silvertown's assistance and cooperation, worked to shift their debt onto Elavon.

33. TransMedia touts itself as "a credit card chargeback loss prevention firm that works with merchants, to help them win chargebacks." *See* TransMedia, http://tranmedia.com/ite/why-choose-us.htm (last accessed July 10, 2021). TransMedia's expertise is the rules and regulations promulgated by Visa, MasterCard, Discover and American Express concerning credit card processing and chargeback procedures (the "Processing Rules").

34. Owing to its expertise and understanding of the Processing Rules, TransMedia's instruction to Silvertown and the Defendants included an explanation of the overall chargeback cycle, the identities and roles of the participants in the chargeback cycle as it related to their particular intended chargebacks, and the prerequisites to commencing chargebacks and successfully concluding them.

35. The foregoing specific information was necessary for the Defendants to eliminate their debt to their card-issuing banks by taking all steps necessary to conclude their chargebacks successfully.

36. Pursuant to the Processing Rules, Elavon was required to refund card-issuing banks and the Defendants the amount of the chargebacks regardless of whether Silvertown maintained sufficient reserves for Elavon to recoup for itself the amount of the refunds.

37. The Processing Rules are publicly available, and with TransMedia's help, Silvertown and the Defendants were able to review and understand them in sufficient detail. Among Defendants' knowledge was that Elavon would ultimately be responsible for Defendants' debts upon initiation of a chargeback.

38. Between August 2015 and September 2016, Defendants presented Elavon with numerous chargebacks to Silvertown's account. The chargebacks resulted in Elavon reimbursing Defendants' card-issuing banks over $1 million. As intended, Silvertown did not have sufficient amounts in its account to compensate Elavon.

39. In turn, the card-issuing banks used Elavon's funds to satisfy the debts owed to them by the Defendants, resulting in elimination of any liability on the part of the Defendants. In effect, Elavon paid off the Defendants' debts to their card-issuing banks.

### D. The Defendants Engaged In A Fraudulent Scheme To Present Elavon Sham Transactions For Pecuniary Gain

40. Beginning on or about August 3, 2015 and continuing through September 21, 2016, Silvertown's account with Elavon became the subject of approximately 92 chargebacks of various amounts (the "Subject Chargebacks").

41. The Subject Chargebacks were all predicated on Sham Transactions.

42. The Processing Rules state that a credit card holder must initiate a chargeback by contacting his or her credit card-issuing bank and affirming non-receipt of the promised goods or services.

43. Upon receiving a report of a disputed transaction from its customer, the credit card-issuing bank will transmit the chargeback statement using either the Visa, MasterCard, Discover or American Express electronic communications system, as appropriate, to the merchant's credit card processor, which transmits it to the merchant for a response. At this point, the burden shifts to the merchant either to accept the chargeback or provide facts showing that the credit card holder did receive the goods and/or services paid for. Simultaneously, the credit card holder will receive a provisional credit for the amount of the chargeback.

44. In the event that the merchant accepts the chargeback, its defense to the credit card holder's dispute is found to be insufficient, or the merchant fails to respond, the chargeback will be confirmed and the formerly provisional credit to the card holder will become permanent. As described above, the Processing Rules dictate that the credit card processor bears pecuniary responsibility for the chargeback amount even if the amount exceeds the balance of a merchant's account with the credit card processor.

45. On or about the dates specified below, using their knowledge of the Processing Rules, the Defendants contacted their credit card-issuing banks and stated to them that Silvertown had failed to provide the goods or services purchased in Sham Transactions. These representations were false because the Defendants never intended to purchase goods or services from Silvertown. Nonetheless, the Defendants requested that the issuing banks initiate the Subject Chargebacks.

46. The Subject Chargebacks, organized by Defendant, are set forth below. The "Sale Date" column represents the date on which each transaction was originally processed; the "Chargeback Date" column represents the date on which the cardholder contacted the issuing bank and requested a chargeback based on false premises; and the "Reason Code" and "Reason Code Description" columns represent the issuing bank code and interpretation of the code, respectively, assigned to the chargeback based on the cardholder's misrepresentative description to the issuing bank of the purported dispute with Silvertown.

a. *Erwin Ganzfried ("Ganzfried")*

| Card No. | Issuer | Amount | Sale Date | Chargeback Date | Reason Code | Reason Code Description |
|---|---|---|---|---|---|---|
| x11008 | American Express | $18,360.00 | 07/06/15 | 8/1/15 | C05 | Goods/Services Canceled |
| x11008 | American Express | $7,272.00 | 07/08/15 | 8/1/15 | C05 | Goods/Services Canceled |
| x11008 | American Express | $13,360.00 | 07/07/15 | 8/1/15 | C05 | Goods/Services Canceled |
| x11008 | American Express | $18,720.00 | 07/02/15 | 8/1/15 | C05 | Goods/Services Canceled |
| x11008 | American Express | $7,272.00 | 07/02/15 | 8/4/15 | C05 | Goods/Services Canceled |
| x11008 | American Express | $18,180.00 | 06/09/15 | 8/4/15 | C05 | Goods/Services Canceled |
| x11008 | American Express | $12,540.00 | 06/14/15 | 8/5/15 | C05 | Goods/Services Canceled |
| x11008 | American Express | $9,972.00 | 06/08/15 | 8/8/15 | C05 | Goods/Services Canceled |
| x11008 | American Express | $11,720.00 | 06/11/15 | 8/8/15 | C05 | Goods/Services Canceled |
| x11008 | American Express | $10,000.00 | 06/02/15 | 8/8/15 | C05 | Goods/Services Canceled |
| x11008 | American Express | $15,540.00 | 05/21/15 | 8/8/15 | C05 | Goods/Services Canceled |
| x11008 | American Express | $18,650.00 | 05/18/15 | 8/8/15 | C05 | Goods/Services Canceled |
| x11008 | American Express | $15,000.00 | 05/31/15 | 8/8/15 | C05 | Goods/Services Canceled |
| x11008 | American Express | $13,500.00 | 04/29/15 | 8/12/15 | C05 | Goods/Services Canceled |
| x11024 | American Express | $10,000.00 | 05/07/15 | 8/8/15 | C05 | Goods/Services Canceled |
| x11024 | American Express | $15,000.00 | 04/20/15 | 8/12/15 | C05 | Goods/Services Canceled |
| x11024 | American Express | $5,000.00 | 04/12/15 | 8/12/15 | C05 | Goods/Services Canceled |
| x11024 | American Express | $27,000.00 | 5/17/15 | 8/14/15 | 154 | Cancellation Inquiry |
| x11008 | American Express | $42,360.00 | 7/5/15 | 8/14/15 | 154 | Cancellation Inquiry |
| x11008 | American Express | $26,720.00 | 7/7/15 | 8/14/15 | 154 | Cancellation Inquiry |
| x11008 | American Express | $24,736.00 | 7/5/15 | 8/14/15 | 154 | Cancellation Inquiry |
| x11008 | American Express | $36,072.00 | 7/6/15 | 8/14/15 | 154 | Cancellation Inquiry |

47. Ganzfried's representations to American Express on the dates listed above to support Reason Codes C05 and 154 that he cancelled previously ordered goods or services was knowingly false because he never ordered nor expected to receive any goods or services from Silvertown. Rather, Ganzfried made the false representations in order to obtain compensation, i.e., the elimination of his debt, to which he was not entitled.

48. Based on his knowledge of the Processing Rules, Ganzfried made the misrepresentations to American Express with the intention and knowledge that American Express would transmit the misrepresentations to Elavon because he knew that the Processing Rules required Elavon to be the entity issuing funds to American Express canceling out his debt.

49. Similarly, Ganzfried made the misrepresentations with the intention that Elavon would rely on them because he knew that Elavon's acceptance and processing of the chargebacks was necessary, pursuant to the Processing Rules, for him to achieve his goal of eliminating his debt to American Express.

50. Elavon justifiably relied on Ganzfried's misrepresentations because it had no reason to disbelieve or even doubt his claim that he truly did order goods and/or services from Silvertown, and that Silvertown failed to deliver them, leading Ganzfried to resort to the chargeback process. Moreover, pursuant to the Processing Rules, Elavon had only thirty (30) days to respond to the chargebacks, a portion of which was spent awaiting Silvertown's responses thereto. It was impossible for Elavon to investigate the chargebacks and reach any final conclusion within the permitted thirty-day window.

51. Had Elavon suspected or known that Ganzfried's representations were false, it would have alerted American Express to this fact and asked it not to process the chargebacks or

reverse them because they were predicated on a falsehood, or sought equitable and/or declaratory relief. However, Elavon had no such suspicion or knowledge, and therefore justifiably relied on Ganzfried's misrepresentations.

52. Upon Ganzfried's initiation of the chargebacks, American Express debited the amounts of the chargebacks from Elavon and provided him a provisional credit. Concurrently, Elavon contacted Silvertown to ask that it respond to the chargeback.

53. Silvertown, as part of the scheme to shift Ganzfried's debt to American Express to Elavon, did not contest or respond to the chargebacks, eventually causing American Express to make the provisional credit permanent.

54. As a result of the chargeback becoming permanent, Elavon incurred damages because, as planned, Silvertown did not have sufficient funds in its account to reimburse Elavon for the sums it forwarded to American Express as part of the chargeback process.

*b. Joseph Katz ("Katz")*

| Card No. | Issuer | Amount | Sale Date | Chargeback Date | Reason Code | Reason Code Description |
|---|---|---|---|---|---|---|
| x2763 | Discover | $9,954.00 | 4/13/15 | 8/8/15 | 8002-RN2 | Credit Not Processed |
| x2763 | Discover | $6,900.00 | 6/30/15 | 8/8/15 | 8002-RN2 | Credit Not Processed |

55. Katz's representations to Discover on the dates listed above to support Reason Code 8002-RN2 that he was entitled to a credit from Silvertown for undelivered silverware was knowingly false because that chargeback code requires a preexisting order of goods or services, and Katz never ordered nor expected to receive any goods or services from Silvertown.

56. Rather, Katz made the false representations in order to obtain compensation, i.e., the elimination of his debt, to which he was not entitled.

57. Based on his knowledge of the Processing Rules, Katz made the misrepresentations to Discover with the intention and knowledge that Discover would transmit the misrepresentations to Elavon because he knew that the Processing Rules required Elavon to be the entity issuing funds to Discover canceling out his debt.

58. Similarly, Katz made the misrepresentations with the intention that Elavon would rely on them because he knew that Elavon's acceptance and processing of the chargebacks was necessary, pursuant to the Processing Rules, for him to achieve his goal of eliminating his debt to American Express.

59. Elavon justifiably relied on Katz's misrepresentations because it had no reason to disbelieve or even doubt his claim that he truly did order goods and/or services from Silvertown, and that Silvertown failed to deliver them, leading Katz to resort to the chargeback process. Moreover, pursuant to the Processing Rules, Elavon had only thirty (30) days to respond to the chargebacks, a portion of which was spent awaiting Silvertown's responses thereto. It was impossible for Elavon to investigate the chargebacks and reach any final conclusion within the permitted thirty-day window.

60. Had Elavon suspected or known that Katz's representations were false, it would have alerted Discover to this fact and asked it not to process the chargebacks or reverse them because they were predicated on a falsehood, or sought equitable and/or declaratory relief. However, Elavon had no such suspicion or knowledge, and therefore justifiably relied on Katz's misrepresentations.

61. Upon Katz's initiation of the chargebacks, Discover debited the amounts of the chargebacks from Elavon and provided him a provisional credit. Concurrently, Elavon contacted Silvertown to ask that it respond to the chargeback.

62. Silvertown, as part of the scheme to shift Katz's debt to Discover to Elavon, did not contest or respond to the chargebacks, eventually causing Discover to make the provisional credit permanent.

63. As a result of the chargeback becoming permanent, Elavon incurred damages because, as planned, Silvertown did not have sufficient funds in its account to reimburse Elavon for the sums it forwarded to Discover as part of the chargeback process.

*c. Joseph Mering ("J. Mering")*

| Card No. | Issuer | Amount | Sale Date | Chargeback Date | Reason Code | Reason Code Description |
|---|---|---|---|---|---|---|
| x2004 | American Express | $15,455.40 | 06/07/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $28,540.00 | 06/11/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $25,000.00 | 06/21/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $3,600.00 | 05/10/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $28,000.00 | 06/15/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $10,000.00 | 05/18/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $45,000.00 | 06/21/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $22,360.00 | 06/08/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $10,000.00 | 06/14/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $20,000.00 | 06/02/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $15,000.00 | 05/07/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $5,000.00 | 05/26/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $7,000.00 | 05/19/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $12,720.00 | 06/10/15 | 9/15/15 | 154 | Goods/Services Cancelled |

| | | | | | | |
|---|---|---|---|---|---|---|
| x2004 | American Express | $20,000.00 | 05/10/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $20,000.00 | 05/31/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $40,000.00 | 06/17/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $3,572.00 | 06/03/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $20,360.00 | 06/09/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $15,000.00 | 06/01/15 | 9/15/15 | 154 | Goods/Services Cancelled |
| x2004 | American Express | $7,000.00 | 06/03/15 | 9/15/15 | 154 | Goods/Services Cancelled |

64. J. Mering's representations to American Express on the dates listed above to support Reason Code 154 that he cancelled previously ordered goods or services was knowingly false because he never ordered nor expected to receive any goods or services from Silvertown. Rather, J. Mering made the false representations in order to obtain compensation, i.e., the elimination of his debt, to which he was not entitled.

65. Based on his knowledge of the Processing Rules, J. Mering made the misrepresentations to American Express with the intention and knowledge that American Express would transmit the misrepresentations to Elavon because he knew that the Processing Rules required Elavon to be the entity issuing funds to American Express canceling out his debt.

66. Similarly, J. Mering made the misrepresentations with the intention that Elavon would rely on them because he knew that Elavon's acceptance and processing of the chargebacks was necessary, pursuant to the Processing Rules, for him to achieve his goal of eliminating his debt to American Express.

67. Elavon justifiably relied on J. Mering's misrepresentations because it had no reason to disbelieve or even doubt his claim that he truly did order goods and/or services from Silvertown, and that Silvertown failed to deliver them, leading J. Mering to resort to the chargeback process.

Moreover, pursuant to the Processing Rules, Elavon had only thirty (30) days to respond to the chargebacks, a portion of which was spent awaiting Silvertown's responses thereto. It was impossible for Elavon to investigate the chargebacks and reach any final conclusion within the permitted thirty-day window.

68. Had Elavon suspected or known that J. Mering's representations were false, it would have alerted American Express to this fact and asked it not to process the chargebacks or reverse them because they were predicated on a falsehood, or sought equitable and/or declaratory relief. However, Elavon had no such suspicion or knowledge, and therefore justifiably relied on J. Mering's misrepresentations.

69. Upon J. Mering's initiation of the chargebacks, American Express debited the amounts of the chargebacks from Elavon and provided him a provisional credit. Concurrently, Elavon contacted Silvertown to ask that it respond to the chargeback.

70. Silvertown, as part of the scheme to shift J. Mering's debt to American Express to Elavon, did not contest or respond to the chargebacks, eventually causing American Express to make the provisional credit permanent.

71. As a result of the chargeback becoming permanent, Elavon incurred damages because, as planned, Silvertown did not have sufficient funds in its account to reimburse Elavon for the sums it forwarded to American Express as part of the chargeback process.

*d.* *Shlomo Kornhauser ("Kornhauser")*

| Card No. | Issuer | Amount | Sale Date | Chargeback Date | Reason Code | Reason Code Description |
|---|---|---|---|---|---|---|
| x5816 | Citibank | $1,872.00 | 06/29/15 | 9/11/15 | 4860 | Credit Not Processed |

| | | | | | | |
|---|---|---|---|---|---|---|
| x5816 | Citibank | $1,872.00 | 04/29/15 | 9/11/15 | 4860 | Credit Not Processed |
| x5816 | Citibank | $9,754.00 | 06/29/15 | 10/8/15 | 4860 | Credit Not Processed |
| x5816 | Citibank | $7,854.00 | 06/25/15 | 10/8/15 | 4860 | Credit Not Processed |
| x5816 | Citibank | $9,236.00 | 06/25/15 | 10/8/15 | 4860 | Credit Not Processed |
| x5816 | Citibank | $9,727.20 | 06/25/15 | 10/8/15 | 4860 | Credit Not Processed |
| x5816 | Citibank | $9,218.00 | 06/25/15 | 10/8/15 | 4860 | Credit Not Processed |
| x5816 | Citibank | $9,720.00 | 04/29/15 | 10/8/15 | 4860 | Credit Not Processed |
| x5816 | Citibank | $8,817.00 | 06/25/15 | 10/8/15 | 4860 | Credit Not Processed |
| x5816 | Citibank | $9,772.00 | 06/29/15 | 10/8/15 | 4860 | Credit Not Processed |
| x5816 | Citibank | $8,540.00 | 06/25/15 | 10/8/15 | 4860 | Credit Not Processed |
| x5816 | Citibank | $9,854.00 | 6/29/2015 | 10/8/15 | 4860 | Credit Not Processed |

72. Kornhauser represented to Citibank on the dates listed above that he had purchased silverware from Silvertown, but heard that Silvertown was closing or being sold, and therefore requested and was denied a credit for those purchases. These representations were false because Kornhauser had never purchased anything from Silvertown.

73. Therefore, the statements he made to support Reason Code 4860 that he was entitled to a credit because was knowingly false because Reason Code 4860 requires a preexisting order of goods and/or services, and Kornhauser never ordered nor expected to receive any goods

or services from Silvertown. Rather, Kornhauser made the false representations in order to obtain compensation, i.e., the elimination of his debt, to which he was not entitled.

74. Based on his knowledge of the Processing Rules, Kornhauser made the misrepresentations to Citibank with the intention and knowledge that Citibank would transmit the misrepresentations to Elavon because he knew that the Processing Rules required Elavon to be the entity issuing funds to Citibank canceling out his debt.

75. Similarly, Kornhauser made the misrepresentations with the intention that Elavon would rely on them because he knew that Elavon's acceptance and processing of the chargebacks was necessary, pursuant to the Processing Rules, for him to achieve his goal of eliminating his debt to Citibank.

76. Elavon justifiably relied on Kornhauser misrepresentations because it had no reason to disbelieve or even doubt his claim that he truly did order goods and/or services from Silvertown, and that Silvertown failed to deliver them, leading Kornhauser to resort to the chargeback process. Moreover, pursuant to the Processing Rules, Elavon had only thirty (30) days to respond to the chargebacks, a portion of which was spent awaiting Silvertown's responses thereto. It was impossible for Elavon to investigate the chargebacks and reach any final conclusion within the permitted thirty-day window.

77. Had Elavon suspected or known that Kornhauser's representations were false, it would have alerted Citibank to this fact and asked it not to process the chargebacks or reverse them because they were predicated on a falsehood, or requested a compliance hearing from MasterCard, or sought equitable and/or declaratory relief. However, Elavon had no such suspicion or knowledge, and therefore justifiably relied on Kornhauser misrepresentations.

78. Upon Kornhauser's initiation of the chargebacks, Citibank debited the amounts of the chargebacks from Elavon and provided him a provisional credit. Concurrently, Elavon contacted Silvertown to ask that it respond to the chargeback.

79. Silvertown, as part of the scheme to shift Kornhauser's debt to Citibank to Elavon, did not contest or respond to the chargebacks, eventually causing Citibank to make the provisional credit permanent.

80. As a result of the chargeback becoming permanent, Elavon incurred damages because, as planned, Silvertown did not have sufficient funds in its account to reimburse Elavon for the sums it forwarded to Citibank as part of the chargeback process.

*e. Devorah Mering ("D. Mering")*

| Card No. | Issuer | Amount | Sale Date | Chargeback Date | Reason Code | Reason Code Description |
|---|---|---|---|---|---|---|
| x7951 | Citibank | $4,500.00 | 05/21/15 | 1/20/16 | 30 | Services/Goods Not Rendered |

81. On the date listed above, D. Mering represented to Citibank that she purchased silverware manufactured in China and shipped to Silvertown. This representation was false because D. Mering never purchased or intended to purchase anything from Silvertown.

82. D. Mering's representations to Citibank on the dates listed above to support Reason Code 30 that Silvertown did not render services/goods to her was knowingly false because D. Mering never ordered nor expected to receive any services or goods from Silvertown. Rather, D. Mering made the false representations in order to obtain compensation, i.e., the elimination of his debt, to which she was not entitled.

83. Based on her knowledge of the Processing Rules, D. Mering made the misrepresentations to Citibank with the intention and knowledge that Citibank would transmit the misrepresentations to Elavon because she knew that the Processing Rules required Elavon to be the entity issuing funds to Citibank canceling out her debt.

84. Similarly, D. Mering made the misrepresentations with the intention that Elavon would rely on them because she knew that Elavon's acceptance and processing of the chargebacks was necessary, pursuant to the Processing Rules, for her to achieve her goal of eliminating her debt to Citibank.

85. Elavon justifiably relied on D. Mering misrepresentations because it had no reason to disbelieve or even doubt her claim that she truly did order services from Silvertown, and that Silvertown failed to deliver them, leading D. Mering to resort to the chargeback process. Moreover, pursuant to the Processing Rules, Elavon had only thirty (30) days to respond to the chargebacks, a portion of which was spent awaiting Silvertown's responses thereto. It was impossible for Elavon to investigate the chargebacks and reach any final conclusion within the permitted thirty-day window.

86. Had Elavon suspected or known that D. Mering's representations were false, it would have alerted Citibank to this fact and asked it not to process the chargebacks or reverse them because they were predicated on a falsehood, or requested a compliance hearing from Visa, or sought equitable and/or declaratory relief. However, Elavon had no such suspicion or knowledge, and therefore justifiably relied on D. Mering's misrepresentations.

87. Upon D. Mering's initiation of the chargebacks, Citibank debited the amounts of the chargebacks from Elavon and provided her a provisional credit. Concurrently, Elavon contacted Silvertown to ask that it respond to the chargeback.

88. Silvertown, as part of the scheme to shift D. Mering's debt to Citibank to Elavon, did not contest or respond to the chargebacks, eventually causing Citibank to make the provisional credit permanent.

89. As a result of the chargeback becoming permanent, Elavon incurred damages because, as planned, Silvertown did not have sufficient funds in its account to reimburse Elavon for the sums it forwarded to Citibank as part of the chargeback process.

*f. <u>Mordechai Kohn ("Kohn")</u>*

| Card No. | Issuer | Amount | Sale Date | Chargeback Date | Reason Code | Reason Code Description |
|---|---|---|---|---|---|---|
| x2549 | Chase | $2,500.00 | 05/26/15 | 8/29/15 | 30 | Services/Goods Not Rendered |
| x2549 | Chase | $6,500.00 | 05/26/15 | 8/29/15 | 30 | Services/Goods Not Rendered |

90. Kohn's representations to Chase on the dates listed above to support Reason Code 30 that Silvertown did not render services or goods to him was knowingly false because Kohn never ordered nor expected to receive any services or goods from Silvertown. Rather, Kohn made the false representations in order to obtain compensation, i.e., the elimination of his debt, to which he was not entitled.

91. Based on his knowledge of the Processing Rules, Kohn made the misrepresentations to Chase with the intention and knowledge that Chase would transmit the misrepresentations to Elavon because he knew that the Processing Rules required Elavon to be the entity issuing funds to Chase canceling out her debt.

92. Similarly, Kohn made the misrepresentations with the intention that Elavon would rely on them because he knew that Elavon's acceptance and processing of the chargebacks was necessary, pursuant to the Processing Rules, for him to achieve his goal of eliminating his debt to Chase.

93. Elavon justifiably relied on Kohn's misrepresentations because it had no reason to disbelieve or even doubt his claim that he truly did order services from Silvertown, and that Silvertown failed to deliver them, leading Kohn to resort to the chargeback process. Moreover, pursuant to the Processing Rules, Elavon had only thirty (30) days to respond to the chargebacks, a portion of which was spent awaiting Silvertown's responses thereto. It was impossible for Elavon to investigate the chargebacks and reach any final conclusion within the permitted thirty-day window.

94. Had Elavon suspected or known that Kohn's representations were false, it would have alerted Chase to this fact and asked it not to process the chargebacks or reverse them because they were predicated on a falsehood, or requested a compliance hearing from Visa, or sought equitable and/or declaratory relief. However, Elavon had no such suspicion or knowledge, and therefore justifiably relied on Kohn's misrepresentations.

95. Upon Kohn's initiation of the chargebacks, Chase debited the amounts of the chargebacks from Elavon and provided him a provisional credit. Concurrently, Elavon contacted Silvertown to ask that it respond to the chargeback.

96. Silvertown, as part of the scheme to shift Kohn's debt to Chase to Elavon, did not contest or respond to the chargebacks, eventually causing Chase to make the provisional credit permanent.

97. As a result of the chargeback becoming permanent, Elavon incurred damages because, as planned, Silvertown did not have sufficient funds in its account to reimburse Elavon for the sums it forwarded to Chase as part of the chargeback process.

g. *Mordechai Levi ("M. Levi")*

| Card No. | Issuer | Amount | Sale Date | Chargeback Date | Reason Code | Reason Code Description |
|---|---|---|---|---|---|---|
| x7877 | Chase | $8,000.00 | 07/05/15 | 9/21/15 | 85 | Credit Not Processed |

98. M. Levi's representations to Chase on the dates listed above to support Reason Code 85 that he was entitled to a credit was knowingly false because Reason Code 85 requires a preexisting order of goods or services, and M. Levi never ordered nor expected to receive any goods or services from Silvertown. Rather, M. Levi made the false representations in order to obtain compensation, i.e., the elimination of his debt, to which he was not entitled.

99. Based on his knowledge of the Processing Rules, M. Levi made the misrepresentations to Chase with the intention and knowledge that Chase would transmit the misrepresentations to Elavon because he knew that the Processing Rules required Elavon to be the entity issuing funds to Chase canceling out his debt.

100. Similarly, M. Levi made the misrepresentations with the intention that Elavon would rely on them because he knew that Elavon's acceptance and processing of the chargebacks was necessary, pursuant to the Processing Rules, for him to achieve his goal of eliminating his debt to Chase.

101. Elavon justifiably relied on M. Levi's misrepresentations because it had no reason to disbelieve or even doubt his claim that he truly did order services from Silvertown, and that Silvertown failed to deliver them, leading M. Levi to resort to the chargeback process. Moreover,

pursuant to the Processing Rules, Elavon had only thirty (30) days to respond to the chargebacks, a portion of which was spent awaiting Silvertown's responses thereto. It was impossible for Elavon to investigate the chargebacks and reach any final conclusion within the permitted thirty-day window.

102. Had Elavon suspected or known that M. Levi's representations were false, it would have alerted Chase to this fact and asked it not to process the chargebacks or reverse them because they were predicated on a falsehood, or requested a compliance hearing from Visa, or sought equitable and/or declaratory relief. However, Elavon had no such suspicion or knowledge, and therefore justifiably relied on M. Levi's misrepresentations.

103. Upon M. Levi's initiation of the chargebacks, Chase debited the amounts of the chargebacks from Elavon and provided him a provisional credit. Concurrently, Elavon contacted Silvertown to ask that it respond to the chargeback.

104. Silvertown, as part of the scheme to shift M. Levi's debt to Chase to Elavon, did not contest or respond to the chargebacks, eventually causing Chase to make the provisional credit permanent.

105. As a result of the chargeback becoming permanent, Elavon incurred damages because, as planned, Silvertown did not have sufficient funds in its account to reimburse Elavon for the sums it forwarded to Chase as part of the chargeback process.

*h. <u>Naftuli Morgenstern ("Morgenstern")</u>*

| Card No. | Issuer | Amount | Sale Date | Chargeback Date | Reason Code | Reason Code Description |
|---|---|---|---|---|---|---|
| x1009 | American Express | $1,499.00 | 03/18/15 | 2/5/16 | C08 | Merchandise Not Received |

106. Morgenstern's representations to American Express on the dates listed above to support Reason Code C08 that he did not receive merchandise was knowingly false because he never ordered nor expected to receive any merchandise from Silvertown. Rather, Morgenstern made the false representations in order to obtain compensation, i.e., the elimination of his debt, to which he was not entitled.

107. Based on his knowledge of the Processing Rules, Morgenstern made the misrepresentations to American Express with the intention and knowledge that American Express would transmit the misrepresentations to Elavon because he knew that the Processing Rules required Elavon to be the entity issuing funds to American Express canceling out his debt.

108. Similarly, Morgenstern made the misrepresentations with the intention that Elavon would rely on them because he knew that Elavon's acceptance and processing of the chargebacks was necessary, pursuant to the Processing Rules, for him to achieve his goal of eliminating his debt to American Express.

109. Elavon justifiably relied on Morgenstern's misrepresentations because it had no reason to disbelieve or even doubt his claim that he truly did order goods and/or services from Silvertown, and that Silvertown failed to deliver them, leading Morgenstern to resort to the chargeback process. Moreover, pursuant to the Processing Rules, Elavon had only thirty (30) days to respond to the chargebacks, a portion of which was spent awaiting Silvertown's responses thereto. It was impossible for Elavon to investigate the chargebacks and reach any final conclusion within the permitted thirty-day window.

110. Had Elavon suspected or known that Morgenstern's representations were false, it would have alerted American Express to this fact and asked it not to process the chargebacks or

reverse them because they were predicated on a falsehood, or sought equitable and/or declaratory relief. However, Elavon had no such suspicion or knowledge, and therefore justifiably relied on Morgenstern's misrepresentations.

111. Upon Morgenstern's initiation of the chargebacks, American Express debited the amounts of the chargebacks from Elavon and provided him a provisional credit. Concurrently, Elavon contacted Silvertown to ask that it respond to the chargeback.

112. Silvertown, as part of the scheme to shift Morgenstern's debt to American Express to Elavon, did not contest or respond to the chargebacks, eventually causing American Express to make the provisional credit permanent.

113. As a result of the chargeback becoming permanent, Elavon incurred damages because, as planned, Silvertown did not have sufficient funds in its account to reimburse Elavon for the sums it forwarded to American Express as part of the chargeback process.

*i.* *Judy Berger ("Judy Berger")*

| Card No. | Issuer | Amount | Sale Date | Chargeback Date | Reason Code | Reason Code Description |
|---|---|---|---|---|---|---|
| x1009 | American Express | $7,500.00 | 05/26/15 | 7/25/15 | C05 | Goods/Services Cancelled |
| x1009 | American Express | $800.00 | 04/22/15 | 7/25/15 | C05 | Goods/Services Cancelled |

114. Judy Berger's representations to American Express on the dates listed above to support Reason Code C05 that she canceled goods or services was knowingly false because she never ordered nor expected to receive any goods or services from Silvertown. Rather, Judy Berger made the false representations in order to obtain compensation, i.e., the elimination of her debt, to which she was not entitled.

115. Based on her knowledge of the Processing Rules, Judy Berger made the misrepresentations to American Express with the intention and knowledge that American Express would transmit the misrepresentations to Elavon because she knew that the Processing Rules required Elavon to be the entity issuing funds to American Express canceling out her debt.

116. Similarly, Judy Berger made the misrepresentations with the intention that Elavon would rely on them because she knew that Elavon's acceptance and processing of the chargebacks was necessary, pursuant to the Processing Rules, for her to achieve her goal of eliminating her debt to American Express.

117. Elavon justifiably relied on Judy Berger's misrepresentations because it had no reason to disbelieve or even doubt her claim that she truly did order goods and/or services from Silvertown, and that Silvertown failed to deliver them, leading Judy Berger to resort to the chargeback process. Moreover, pursuant to the Processing Rules, Elavon had only thirty (30) days to respond to the chargebacks, a portion of which was spent awaiting Silvertown's responses thereto. It was impossible for Elavon to investigate the chargebacks and reach any final conclusion within the permitted thirty-day window.

118. Had Elavon suspected or known that Judy Berger's representations were false, it would have alerted American Express to this fact and asked it not to process the chargebacks or reverse them because they were predicated on a falsehood, or sought equitable and/or declaratory relief. However, Elavon had no such suspicion or knowledge, and therefore justifiably relied on Judy Berger's misrepresentations.

119. Upon Judy Berger's initiation of the chargebacks, American Express debited the amounts of the chargebacks from Elavon and provided her a provisional credit. Concurrently, Elavon contacted Silvertown to ask that it respond to the chargeback.

120. Silvertown, as part of the scheme to shift Judy Berger's debt to American Express to Elavon, did not contest or respond to the chargebacks, eventually causing American Express to make the provisional credit permanent.

121. As a result of the chargeback becoming permanent, Elavon incurred damages because, as planned, Silvertown did not have sufficient funds in its account to reimburse Elavon for the sums it forwarded to American Express as part of the chargeback process.

*j. Sarah T. Levi ("S. Levi")*

| Card No. | Issuer | Amount | Sale Date | Chargeback Date | Reason Code | Reason Code Description |
|---|---|---|---|---|---|---|
| x5691 | Chase | $2,500.00 | 06/04/15 | 9/21/15 | 85 | Credit Not Processed |
| x5691 | Chase | $7,500.00 | 06/04/15 | 9/21/15 | 85 | Credit Not Processed |

122. S. Levi's representations to Chase on the dates listed above to support Reason Code 85 that she was entitled to a credit was knowingly false because Reason Code 85 requires a preexisting order of goods and/or services, and S. Levi never ordered nor expected to receive any goods or services from Silvertown. Rather, S. Levi made the false representations in order to obtain compensation, i.e., the elimination of her debt, to which she was not entitled.

123. Based on her knowledge of the Processing Rules, S. Levi made the misrepresentations to Chase with the intention and knowledge that Chase would transmit the misrepresentations to Elavon because she knew that the Processing Rules required Elavon to be the entity issuing funds to Chase canceling out her debt.

124. Similarly, S. Levi made the misrepresentations with the intention that Elavon would rely on them because she knew that Elavon's acceptance and processing of the chargebacks was necessary, pursuant to the Processing Rules, for her to achieve her goal of eliminating her debt to Chase.

125. Elavon justifiably relied on S. Levi's misrepresentations because it had no reason to disbelieve or even doubt her claim that she truly did order services from Silvertown, and that Silvertown failed to deliver them, leading S. Levi to resort to the chargeback process. Moreover, pursuant to the Processing Rules, Elavon had only thirty (30) days to respond to the chargebacks, a portion of which was spent awaiting Silvertown's responses thereto. It was impossible for Elavon to investigate the chargebacks and reach any final conclusion within the permitted thirty-day window.

126. Had Elavon suspected or known that S. Levi's representations were false, it would have alerted Chase to this fact and asked it not to process the chargebacks or reverse them because they were predicated on a falsehood, or requested a compliance hearing from Visa, or sought equitable and/or declaratory relief. However, Elavon had no such suspicion or knowledge, and therefore justifiably relied on S. Levi's misrepresentations.

127. Upon S. Levi's initiation of the chargebacks, Chase debited the amounts of the chargebacks from Elavon and provided her a provisional credit. Concurrently, Elavon contacted Silvertown to ask that it respond to the chargeback.

128. Silvertown, as part of the scheme to shift S. Levi's debt to Chase to Elavon, did not contest or respond to the chargebacks, eventually causing Chase to make the provisional credit permanent.

129. As a result of the chargeback becoming permanent, Elavon incurred damages because, as planned, Silvertown did not have sufficient funds in its account to reimburse Elavon for the sums it forwarded to Chase as part of the chargeback process.

*k.* *<u>Shlomo Berger (“Shlomo Berger”)</u>*

| Card No. | Issuer | Amount | Sale Date | Chargeback Date | Reason Code | Reason Code Description |
|---|---|---|---|---|---|---|
| x3015 | American Express | $8,272.00 | 04/19/15 | 9/9/15 | C05 | Services Cancelled |
| x3015 | American Express | $8,472.00 | 04/17/15 | 9/9/15 | C05 | Services Cancelled |
| x3015 | American Express | $8,472.00 | 04/19/15 | 9/9/15 | C05 | Services Cancelled |
| x3015 | American Express | $8,700.00 | 04/20/15 | 9/9/15 | C05 | Services Cancelled |
| x3015 | American Express | $2,600.00 | 04/19/15 | 9/9/15 | C05 | Services Cancelled |
| x3015 | American Express | $8,700.00 | 04/16/15 | 9/9/15 | C05 | Services Cancelled |
| x3015 | American Express | $7,200.00 | 04/20/15 | 9/9/15 | C05 | Services Cancelled |
| x3015 | American Express | $8,400.00 | 04/18/15 | 9/9/15 | C05 | Services Cancelled |

130. Shlomo Berger’s representations to American Express on the dates listed above to support Reason Code C05 that he canceled goods or services was knowingly false because he never ordered nor expected to receive any goods or services from Silvertown. Rather, Shlomo Berger made the false representations in order to obtain compensation, i.e., the elimination of his debt, to which he was not entitled.

131. Based on his knowledge of the Processing Rules, Shlomo Berger made the misrepresentations to American Express with the intention and knowledge that American Express would transmit the misrepresentations to Elavon because he knew that the Processing Rules required Elavon to be the entity issuing funds to American Express canceling out his debt.

132. Similarly, Shlomo Berger made the misrepresentations with the intention that Elavon would rely on them because he knew that Elavon’s acceptance and processing of the

chargebacks was necessary, pursuant to the Processing Rules, for him to achieve his goal of eliminating his debt to American Express.

133. Elavon justifiably relied on Shlomo Berger's misrepresentations because it had no reason to disbelieve or even doubt his claim that he truly did order goods and/or services from Silvertown, and that Silvertown failed to deliver them, leading Shlomo Berger to resort to the chargeback process. Moreover, pursuant to the Processing Rules, Elavon had only thirty (30) days to respond to the chargebacks, a portion of which was spent awaiting Silvertown's responses thereto. It was impossible for Elavon to investigate the chargebacks and reach any final conclusion within the permitted thirty-day window.

134. Had Elavon suspected or known that Shlomo Berger's representations were false, it would have alerted American Express to this fact and asked it not to process the chargebacks or reverse them because they were predicated on a falsehood, or sought equitable and/or declaratory relief. However, Elavon had no such suspicion or knowledge, and therefore justifiably relied on Shlomo Berger's misrepresentations.

135. Upon Shlomo Berger's initiation of the chargebacks, American Express debited the amounts of the chargebacks from Elavon and provided him a provisional credit. Concurrently, Elavon contacted Silvertown to ask that it respond to the chargeback.

136. Silvertown, as part of the scheme to shift Shlomo Berger's debt to American Express to Elavon, did not contest or respond to the chargebacks, eventually causing American Express to make the provisional credit permanent.

137. As a result of the chargeback becoming permanent, Elavon incurred damages because, as planned, Silvertown did not have sufficient funds in its account to reimburse Elavon for the sums it forwarded to American Express as part of the chargeback process.

*l.* *Sussman Bleier ("Bleier")*

| Card No. | Issuer | Amount | Sale Date | Chargeback Date | Reason Code | Reason Code Description |
|---|---|---|---|---|---|---|
| x1003 | American Express | $10,000.00 | 06/15/15 | 9/3/15 | C05 | Services Cancelled |
| x1003 | American Express | $5,000.00 | 06/15/15 | 9/8/15 | C05 | Services Cancelled |
| x1003 | American Express | $5,000.00 | 06/15/15 | 9/8/15 | C05 | Services Cancelled |
| x1003 | American Express | $3,000.00 | 05/03/15 | 9/8/15 | C05 | Services Cancelled |
| x1003 | American Express | $5,000.00 | 06/15/15 | 9/8/15 | C05 | Services Cancelled |
| x1003 | American Express | $5,000.00 | 06/15/15 | 9/8/15 | C05 | Services Cancelled |
| x1005 | American Express | $5,000.00 | 05/28/15 | 9/3/15 | C05 | Services Cancelled |
| x1005 | American Express | $2,500.00 | 05/06/15 | 9/8/15 | C05 | Services Cancelled |
| x1005 | American Express | $3,000.00 | 05/03/15 | 9/8/15 | C05 | Services Cancelled |
| x4841 | Chase | $5,000.00 | 06/14/15 | 10/8/15 | 85 | Credit Not Processed |
| x1005 | American Express | $3,000.00 | 5/6/2015 | 9/3/15 | C05 | Services Cancelled |
| x1003 | American Express | $5,000.00 | 6/15/2015 | 9/8/15 | C05 | Services Cancelled |

138. Bleier's representations to American Express on the dates listed above to support Reason Code C05 that he canceled goods or services was knowingly false because he never ordered nor expected to receive any goods or services from Silvertown. Rather, Bleier made the false representations in order to obtain compensation, i.e., the elimination of his debt, to which he was not entitled.

139. Bleier's representations to Chase on the dates listed above to support Reason Code 85 that he was entitled to a credit was knowingly false because Reason Code 85 requires a preexisting order of goods and/or services, and Bleier never ordered nor expected to receive any goods or services from Silvertown. Rather, Bleier made the false representations in order to obtain compensation, i.e., the elimination of his debt, to which he was not entitled.

140. Based on his knowledge of the Processing Rules, Bleier made the misrepresentations to American Express and Chase with the intention and knowledge that American Express and Chase would transmit the misrepresentations to Elavon because he knew that the Processing Rules required Elavon to be the entity issuing funds to American Express and Chase canceling out his debt.

141. Similarly, Bleier made the misrepresentations with the intention that Elavon would rely on them because he knew that Elavon's acceptance and processing of the chargebacks was necessary, pursuant to the Processing Rules, for him to achieve his goal of eliminating his debt to American Express and Chase.

142. Elavon justifiably relied on Bleier's misrepresentations because it had no reason to disbelieve or even doubt his claim that he truly did order goods and/or services from Silvertown, and that Silvertown failed to deliver them, leading Bleier to resort to the chargeback process. Moreover, pursuant to the Processing Rules, Elavon had only thirty (30) days to respond to the chargebacks, a portion of which was spent awaiting Silvertown's responses thereto. It was impossible for Elavon to investigate the chargebacks and reach any final conclusion within the permitted thirty-day window.

143. Had Elavon suspected or known that Bleier's representations were false, it would have alerted American Express and Chase to this fact and asked it not to process the chargebacks or reverse them because they were predicated on a falsehood, or requested a compliance hearing, or sought equitable and/or declaratory relief. However, Elavon had no such suspicion or knowledge, and therefore justifiably relied on Bleier's misrepresentations.

144. Upon Bleier's initiation of the chargebacks, American Express and Chase debited the amounts of the chargebacks from Elavon and provided him a provisional credit. Concurrently, Elavon contacted Silvertown to ask that it respond to the chargeback.

145. Silvertown, as part of the scheme to shift Bleier's debt to American Express and Chase to Elavon, did not contest or respond to the chargebacks, eventually causing American Express and Chase to make the provisional credit permanent.

146. As a result of the chargeback becoming permanent, Elavon incurred damages because, as planned, Silvertown did not have sufficient funds in its account to reimburse Elavon for the sums it forwarded to American Express and Chase as part of the chargeback process.

*m.* *Asher Jungreisz ("Jungreisz")*

| Card No. | Issuer | Amount | Sale Date | Chargeback Date | Reason Code | Reason Code Description |
|---|---|---|---|---|---|---|
| x1000 | American Express | $9,500.00 | 06/24/15 | 8/28/15 | C05 | Services Cancelled |
| x1000 | American Express | $15,000.00 | 06/24/15 | 8/28/15 | C05 | Services Cancelled |
| x1000 | American Express | $3,600.00 | 06/24/15 | 9/5/15 | C05 | Services Cancelled |
| x1000 | American Express | $8,000.00 | 04/26/15 | 10/6/15 | C28 | Cancelled Recur. Bill. |

147. Jungreisz's representations to American Express on the dates listed above to support Reason Code C05 that he canceled goods or services was knowingly false because he never ordered nor expected to receive any goods or services from Silvertown. Rather, Jungreisz made the false representations in order to obtain compensation, i.e., the elimination of his debt, to which he was not entitled.

148. Jungreisz's representations to American Express on the dates listed above to support Reason Code C28 that he canceled a recurring charge for goods or services from Silvertown was knowingly false because he never ordered nor expected to receive any goods or

services from Silvertown, including any recurring goods or services. Rather, Jungreisz made the false representations in order to obtain compensation, i.e., the elimination of his debt, to which he was not entitled.

149. Based on his knowledge of the Processing Rules, Jungreisz made the misrepresentations to American Express with the intention and knowledge that American Express would transmit the misrepresentations to Elavon because he knew that the Processing Rules required Elavon to be the entity issuing funds to American Express canceling out his debt.

150. Similarly, Jungreisz made the misrepresentations with the intention that Elavon would rely on them because he knew that Elavon's acceptance and processing of the chargebacks was necessary, pursuant to the Processing Rules, for him to achieve his goal of eliminating his debt to American Express.

151. Elavon justifiably relied on Jungreisz's misrepresentations because it had no reason to disbelieve or even doubt his claim that he truly did order goods and/or services from Silvertown, and that Silvertown failed to deliver them, leading Jungreisz to resort to the chargeback process. Moreover, pursuant to the Processing Rules, Elavon had only thirty (30) days to respond to the chargebacks, a portion of which was spent awaiting Silvertown's responses thereto. It was impossible for Elavon to investigate the chargebacks and reach any final conclusion within the permitted thirty-day window.

152. Had Elavon suspected or known that Jungreisz's representations were false, it would have alerted American Express to this fact and asked it not to process the chargebacks or reverse them because they were predicated on a falsehood, or sought equitable and/or declaratory

relief. However, Elavon had no such suspicion or knowledge, and therefore justifiably relied on Jungreisz's misrepresentations.

153. Upon Jungreisz's initiation of the chargebacks, American Express debited the amounts of the chargebacks from Elavon and provided him a provisional credit. Concurrently, Elavon contacted Silvertown to ask that it respond to the chargeback.

154. Silvertown, as part of the scheme to shift Jungreisz's debt to American Express to Elavon, did not contest or respond to the chargebacks, eventually causing American Express to make the provisional credit permanent.

155. As a result of the chargeback becoming permanent, Elavon incurred damages because, as planned, Silvertown did not have sufficient funds in its account to reimburse Elavon for the sums it forwarded to American Express as part of the chargeback process.

*n. Solomon Levy ("Levy")*

| Card No. | Issuer | Amount | Sale Date | Chargeback Date | Reason Code | Reason Code Description |
|---|---|---|---|---|---|---|
| x1002 | American Express | $4,000.00 | 06/16/15 | 8/5/15 | 127 | Unrecognized Charge |

156. Levy's representations to American Express on the dates listed above to support Reason Code 127 that he did not recognize the charge from Silvertown was knowingly false because he did recognize the charge as one that he authorized Silvertown to make as part of the short-term lending scheme between him and Silvertown. Levy made the false representations in order to obtain compensation, i.e., the elimination of his debt, to which he was not entitled.

157. Based on his knowledge of the Processing Rules, Levy made the misrepresentations to American Express with the intention and knowledge that American Express would transmit the

misrepresentations to Elavon because he knew that the Processing Rules required Elavon to be the entity issuing funds to American Express canceling out his debt.

158. Similarly, Levy made the misrepresentations with the intention that Elavon would rely on them because he knew that Elavon's acceptance and processing of the chargebacks was necessary, pursuant to the Processing Rules, for him to achieve his goal of eliminating his debt to American Express.

159. Elavon justifiably relied on Levy's misrepresentations because it had no reason to disbelieve or even doubt his claim that he did not recognize the charge from Silvertown, leading Levy to resort to the chargeback process. Moreover, pursuant to the Processing Rules, Elavon had only thirty (30) days to respond to the chargebacks, a portion of which was spent awaiting Silvertown's responses thereto. It was impossible for Elavon to investigate the chargebacks and reach any final conclusion within the permitted thirty-day window.

160. Had Elavon suspected or known that Levy's representations were false, it would have alerted American Express to this fact and asked it not to process the chargebacks or reverse them because they were predicated on a falsehood, or sought equitable and/or declaratory relief. However, Elavon had no such suspicion or knowledge, and therefore justifiably relied on Levy's misrepresentations.

161. Upon Levy's initiation of the chargebacks, American Express debited the amounts of the chargebacks from Elavon and provided him a provisional credit. Concurrently, Elavon contacted Silvertown to ask that it respond to the chargeback.

162. Silvertown, as part of the scheme to shift Levy's debt to American Express to Elavon, did not contest or respond to the chargebacks, eventually causing American Express to make the provisional credit permanent.

163. As a result of the chargeback becoming permanent, Elavon incurred damages because, as planned, Silvertown did not have sufficient funds in its account to reimburse Elavon for the sums it forwarded to American Express as part of the chargeback process.

**COUNT ONE**
**Fraud Against The Defendants**

164. Elavon repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

165. On the dates set forth above, each of the Defendants contacted their card-issuing banks and misrepresented to them that they had ordered but not received goods or services from Silvertown. These statements were false because the Defendants permitted Silvertown to charge their credit cards for non-bona fide transactions and never expected to receive any goods or services from Silvertown.

166. The Defendants knew that their statements were false because they knew they never ordered any goods or services from Silvertown. Instead, they provided their credit cards to Silvertown so that Silvertown could charge amounts to them as a form of short-term lending.

167. The purpose of the false representations to the card-issuing banks was to obtain funds from Elavon pursuant to the chargeback process to which the Defendants were not entitled.

168. Based on their knowledge of the Processing Rules, the Defendants intended, knew and expected that the card-issuing banks would transmit their misrepresentations to Elavon.

169. The Defendants made their misrepresentations for the purpose of inducing Elavon's reliance on them because Elavon's reliance was necessary for it to process the chargebacks and issue refunds to the Defendants and their card-issuing banks.

170. Elavon justifiably relied on the Defendants' misrepresentations because it had no reason to doubt the veracity of their statements. Had Elavon known or suspected that the Defendants' bases for the chargebacks were false, it would have contacted, as appropriate, American Express, Visa, MasterCard or Discover, and notified it of the false premises upon which the chargebacks are based, requested compliance hearings, and/or sought equitable and/or declaratory relief.

171. As a result of Elavon's justifiable reliance, it reimbursed the Defendants' card-issuing banks the amounts of the chargebacks. In turn, the issuing banks credited the Defendants' accounts, which resulted in the issuing banks extinguishing those parties' debts arising from the Sham Transactions.

172. Elavon was injured by reason of the Defendants' misrepresentations because the misrepresentations caused Elavon to issue refunds to their card-issuing banks for which Elavon bore pecuniary responsibility.

173. The Defendants' fraudulent acts demonstrate a high degree of moral turpitude and wanton dishonesty that entitles Elavon to recover punitive damages.

WHEREFORE, Elavon prays for judgment against the Defendants for:

i. Compensatory damages;

ii. Punitive damages;

iii. Interest and costs of this action; and

iv. Such other and further relief as the Court may deem just and proper.

**COUNT TWO**
**Unjust Enrichment Against The Defendants**

174. Elavon repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

175. Elavon's reimbursement of the amounts of the chargebacks conferred a significant benefit upon the Defendants because the reimbursement extinguished the sizable debts to their card-issuing banks that the Defendants incurred as part of the lending scheme they were involved in with Silvertown.

176. The Defendants received a benefit to which they were not entitled. Specifically, Defendants permitted Silvertown to charge their credit cards significant amounts as part of a scheme to use their credit cards for lending purposes. Whether or not that was a permissible use of their credit cards, upon discovering that Silvertown would not repay its debt to them, Defendants certainly had no right to seek compensation from Elavon for the purpose of eliminating their resultant debt to their card-issuing banks.

177. The Defendants would be unjustly enriched if they are not obligated to compensate Elavon. It is against equity and good conscience to permit Defendants to retain the benefit of their scheme to shift their own liability to Elavon using false pretenses.

WHEREFORE, Elavon prays for judgment against the Defendants for:

i. Compensatory damages;

ii. Interest and costs of this action; and

iii. Such other and further relief as the Court may deem just and proper.

**COUNT THREE**
**Conspiracy Against The Defendants**

178. Elavon repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

179. As discussed above, Silvertown and Defendants' scheme required a constant flow of renewed credit to pay down the Defendants' previous debts to their card-issuing banks. The Defendants knowingly colluded and agreed to use each other's respective credit cards to pay down each other's recurring credit card debts.

180. Without the cooperation of all the Defendants and their continued permission to use their respective credit cards to further their efforts, the scheme would not have been possible.

181. Defendants committed numerous overt acts in support of and in furtherance of their scheme, namely permitting Silvertown to use one or more of each Defendant's credit cards in recurrent fashion to pay off debts of other Defendants.

182. In the absence of the conspiracy and collusion by and among the Defendants, Silvertown and Defendants would have been unable to perpetrate the scheme complained of and Elavon would have avoided all or a significant portion of the pecuniary damages it incurred as a result of the scheme described.

WHEREFORE, Elavon prays for judgment against the Defendants for:

i. Compensatory damages;

ii. Interest and costs of this action; and

iii. Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Elavon respectfully requests a trial by jury of all issues so triable.

Dated: October 11, 2021

**THE GINZBURG LAW FIRM, P.C.**

By: /s/ *Daniel Ginzburg*
Daniel Ginzburg (DG-2824)
Mailing Address
151 Highway 516, Unit 736
Old Bridge, New Jersey 08857
Tel: (732) 284-3841
daniel@ginzburglawfirm.com
*Counsel to Plaintiff Elavon, Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELAVON, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ERWIN GANZFRIED, JOSEPH KATZ, JOSEPH MERING, SHLOMO KORNHAUSER, DEVORAH MERING, MORDECHAI KOHN, MORDECHAI LEVY, NAFTULI MORGENSTERN, SARA BERGER, SARAH T. LEVI, SHLOMO BERGER, SOLOMON LEVY, SUSSMAN BLEIER and ASHER JUNGREISZ,<br><br>Defendants. | Civil Action No.: 1:20-cv-0908-MKB-RER |

**DECLARATION OF HOLLY FRANKLIN IN SUPPORT OF**
**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Holly Franklin, an individual over the age of eighteen, declares as follows under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I am the Vice President of Risk Assessment Management of plaintiff Elavon, Inc. ("Elavon"). As such, I have personal knowledge as to Elavon's business practices.

2. Elavon is a corporation organized pursuant to the laws of the State of Georgia with its headquarters in the State of Tennessee.

3. Elavon is a wholly-owned subsidiary of U.S. Bank National Association ("U.S. Bank"), which is headquartered in Minnesota.

4. Elavon does not report its own financials. Instead, Elavon's financial results are "rolled up" into U.S. Bank and reported by U.S. Bank as part of its financials in accordance with all applicable SEC and bank regulatory requirements. Therefore, Elavon's profits and losses are attributed to U.S. Bank.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 22, 2021.

HOLLY FRANKLIN

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ELAVON, INC.,

Plaintiff,

v.

ERWIN GANZFRIED, JOSEPH KATZ, JOSEPH MERING, SHLOMO KORNHAUSER, DEVORAH MERING, MORDECHAI KOHN, MORDECHAI LEVI, NAFTULI MORGENSTERN, JUDY BERGER, SARAH T. LEVI, SHLOMO BERGER, SOLOMON LEVY, SUSSMAN BLEIER, and ASHER JUNGREISZ,

Defendants.

---

**MEMORANDUM & ORDER**
20-CV-908 (MKB)

MARGO K. BRODIE, United States District Judge:

Plaintiff Elavon, Inc., commenced the above-captioned action against Defendants Silvertown of NY, Inc. ("Silvertown"), Ester Werzberger, Chan Friedman, John Does 1–10, and ABC Companies 1–10 on February 20, 2020, and filed an Amended Complaint on October 11, 2021, against Defendants Erwin Ganzfried, Joseph Katz, Joseph Mering, Shlomo Kornhauser, Devorah Mering, Mordechai Kohn, Mordechai Levi, Naftuli Morgenstern, Judy Berger, Sarah T. Levi, Shlomo Berger, Solomon Levy, Sussman Bleier, and Asher Jungreisz.[1] (Compl., Docket

---

[1] Plaintiff initially filed an Amended Complaint on July 10, 2021, in which Plaintiff mistakenly named Defendant Judy Berger as "Sara Berger" and misspelled "Mordechai Levi" as "Mordechai Levy." (Am. Compl., Docket Entry No. 42.) Plaintiff refiled the Amended Complaint on July 16, 2021, adding allegations against previously named Defendant Solomon Levy. (First Corrected Am. Compl. ¶¶ 98–104, 156–63, Docket Entry No. 45.) Plaintiff refiled the Amended Complaint a third time on October 11, 2021, renaming Defendant Sarah Berger as "Judy Berger" with consent of counsel and changing "Mordechai Levy" to "Mordechai Levi" in the caption and body of the pleading. (Consent Notice of Errata as to the Am. Compl., Docket Entry No. 61; Second Corrected Am. Compl., Docket Entry No. 61-1.) For purposes of this

Entry No. 1; Second Corrected Am. Compl. ("Am. Compl."), Docket Entry No. 61-1.) Plaintiff alleges that Defendants participated in a short-term lending scheme by allowing Silvertown to charge their credit cards without providing goods or services and making misrepresentations to their credit card issuing banks in order to receive reimbursements from Plaintiff, thereby committing fraud, (Am. Compl. ¶¶ 164–73), unjust enrichment, (*id.* ¶¶ 174–77), and conspiracy, (*id.* ¶¶ 178–82). Defendants Joseph Katz, Joseph Mering, Schlomo Kornhauser, Devorah Mering, Mordechai Kohn, Mordechai Levi, Naftuli Morgenstern, Judy Berger, Sarah Levi, and Shlomo Berger (collectively, the "Moving Defendants") move to dismiss the Amended Complaint against them for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, as time-barred under the applicable statutes of limitation, and for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure; Plaintiff opposes the motion.[2]

For the reasons set forth below, the Court grants the Moving Defendants' motion.

## I. Background

The Court assumes the truth of the factual allegations in the Amended Complaint for the purpose of deciding the Moving Defendants' motion.

### a. Plaintiff's contract for credit card processing

Plaintiff is a corporation organized and existing under Georgia law and headquartered in Tennessee. (Am. Compl. ¶ 2.) On July 22, 2010, Plaintiff entered into a contract with non-party

---

Memorandum and Order, the Court relies on the Second Corrected Amended Complaint ("Am. Compl.").

[2] (Defs.' Mot. to Dismiss ("Defs.' Mot."), Docket Entry No. 68; Defs.' Mem. in Supp. of Defs.' Mot. ("Defs.' Mem."), annexed to Defs.' Mot., Docket Entry No. 68-1; Pl.'s Mem. in Opp'n to Def.'s Mot. ("Pl.'s Opp'n"), Docket Entry No. 70; Defs.' Reply Mem. in Supp. of Defs.' Mot. ("Defs.' Reply"), Docket Entry No. 69.)

Silvertown, a silver store, by which Plaintiff "would act as Silvertown's credit card processor," which would allow Silvertown "to accept credit cards as payment for the sale of its merchandise." (*Id.* ¶¶ 11–13.) Under the Contract, Silvertown was obligated to reimburse Plaintiff for customer "chargebacks," which are "reversal[s] of a transaction between a merchant and a customer" that "typically occur because of a customer's dissatisfaction with the goods or services provided by a merchant." (*Id.* ¶¶ 15–16.) However, pursuant to "the rules and regulations promulgated by Visa, Mastercard, Discover[,] and American Express concerning credit card processing and chargeback procedures" (the "Processing Rules"), "credit card processors like [Plaintiff] bear the responsibility of reimbursing credit cardholders for chargebacks regardless of whether the processors themselves are able to obtain reimbursement from their merchant customers" like Silvertown. (*Id.* ¶¶ 33, 18.)

**b. Scheme to use credit cards as a form of lending**

"According to Silvertown's July 22, 2010 application to [Plaintiff], it expected its monthly credit card sales to be approximately $25,000." (*Id.* ¶ 19.) However, by June of 2015, "Silvertown was processing $715,000 worth of transactions per month." (*Id.* ¶ 20.) Plaintiff alleges that many, if not all, of the credit card transactions were "sham transactions" in that they "did not represent bona fide exchanges of payments for goods or services." (*Id.* ¶¶ 21–22.) Under the scheme, Silvertown charged various amounts to Defendants' credit cards, resulting in Defendants owing debts to their credit card issuing banks, (*id.* ¶¶ 23, 25), and promised Defendants it would either repay the debts directly to their card-issuing banks or transfer funds to Defendants so that they could pay the debts themselves, (*id.* ¶ 26). In effect, these transactions were "loans" made by Defendants to Silvertown, (*id.* ¶ 24), but Silvertown "did not have sufficient revenue" to reimburse Defendants, and, therefore, "charged other credit cards

belonging to the same or different [Defendants] to obtain sufficient funds for its reimbursement obligations," (*id.* ¶ 27). "Funds derived from later [s]ham [t]ransactions were used to pay down the debt incurred through earlier [s]ham [t]ransactions, so that a constant stream of increasing [s]ham [t]ransactions was necessary to pay down the credit card debts." (*Id.* ¶ 28.) However, "[t]his state of events was untenable." (*Id.* ¶ 29.)

**c. The end of the lending scheme and shift of the debt to Plaintiff**

Eventually, "Silvertown informed the [s]ham [c]ustomers, including . . . Defendants, that it would no longer process credit card transactions and, therefore, [would] be unable to repay their debts" or "provide funds to them." (*Id.* ¶ 30.) "Without Silvertown's transfers of funds," Defendants would be "left with sizable debts due and owing to their credit card-issuing banks that they would be required to repay using their own funds." (*Id.* ¶ 31.) But "[i]nstead of using their own funds," Defendants and Silvertown "worked to shift their debt" onto Plaintiff with the help of non-party TransMedia Payment Services, Ltd. ("TransMedia"), which "touts itself as 'a credit card chargeback loss prevention firm that works with merchants, to help them win chargebacks.'" (*Id.* ¶¶ 32–33.) "[W]ith TransMedia's help, Silvertown and the Defendants were able to review and understand [the publicly available Processing Rules] in sufficient detail," and Plaintiff was ultimately required to "reimburs[e] Defendants' card-issuing banks over $1 million." (*Id.* ¶¶ 37–38.) "In turn, the card-issuing banks used [Plaintiff's] funds to satisfy the debts" Defendants owed them, and "Silvertown did not have sufficient amounts in its account to compensate [Plaintiff]." (*Id.* ¶¶ 39, 38.)

**d. Fraudulent scheme to present Plaintiff sham transactions for pecuniary gain**

"Beginning on or about August 3, 2015 and continuing through September 21, 2016, Silvertown's account with [Plaintiff] became the subject of approximately [ninety-two]

chargebacks of various amounts" (the "Subject Chargebacks") "predicated on [s]ham [t]ransactions." (*Id.* ¶¶ 40–41.) "The Processing Rules state that a credit card holder must initiate a chargeback by contacting his or her credit card-issuing bank and affirming non-receipt of the promised goods or services." (*Id.* ¶ 42.) "Upon receiving a report of a disputed transaction from its customer, the credit card-issuing bank will transmit the chargeback statement . . . to the merchant's credit card processor, which transmits it to the merchant for a response," at which point "the burden shifts to the merchant either to accept the chargeback or provide facts showing that the credit card holder did receive the goods and/or services paid for." (*Id.* ¶ 43.) At the same time, "the credit card holder will receive a provisional credit for the amount of the chargeback." (*Id.*) "In the event that the merchant accepts the chargeback, its defense to the credit card holder's dispute is found to be insufficient, or the merchant fails to respond, the chargeback will be confirmed and the formerly provisional credit to the card holder will become permanent." (*Id.* ¶ 44.) The Processing Rules "dictate that the credit card processor bears pecuniary responsibility for the chargeback amount even if the amount exceeds the balance of a merchant's account with the credit card processor." (*Id.*)

"[U]sing their knowledge of the Processing Rules, the Defendants contacted their credit card-issuing banks and stated to them that Silvertown had failed to provide the goods or services purchased in [s]ham [t]ransactions." (*Id.* ¶ 45.) However, "[t]hese representations were false because the Defendants never intended to purchase goods or services from Silvertown," (*id.*), but "Defendants requested that the issuing banks initiate the [s]ubject [c]hargebacks," (*id.*; *see also id.* ¶¶ 46–163 (setting forth allegations as to each Defendant).) Plaintiff brings claims of fraud, (*id.* ¶¶ 164–73), unjust enrichment, (*id.* ¶¶ 174–77), and conspiracy against Defendants, (*id.* ¶¶ 178–82), based on Plaintiff having to reimburse Defendants' card-issuing banks over $1 million,

and seeks compensatory damages, punitive damages, and interest and costs of this action, (*id.* ¶¶ 173, 177, 182).

## II. Discussion

### a. Standards of review

#### i. Rule 12(b)(1)

A district court may dismiss an action for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure when the court "lacks the statutory or constitutional power to adjudicate it." *Huntress v. United States*, 810 F. App'x 74, 75 (2d Cir. 2020) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)); *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.À.R.L.*, 790 F.3d 411, 416–17 (2d Cir. 2015) (quoting *Makarova*, 201 F.3d at 113); *Shabaj v. Holder*, 718 F.3d 48, 50 (2d Cir. 2013) (quoting *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005)). "'[C]ourt[s] must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of [the] plaintiff,' but 'jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.'" *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation omitted) (first quoting *Nat. Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006); and then quoting *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003)), *aff'd*, 561 U.S. 247 (2010). Ultimately, "the party asserting subject matter jurisdiction 'has the burden of proving by a preponderance of the evidence that it exists.'" *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (quoting *Makarova*, 201 F.3d at 113); *see also Suarez v. Mosaic Sales Sols. US Operating Co.*, 720 F. App'x 52, 53 (2d Cir. 2018) (citing *Morrison*, 547 F.3d at 170); *Clayton v. United States*, No. 18-CV-5867, 2020 WL 1545542, at *3 (E.D.N.Y. Mar. 31, 2020) (quoting *Tandon*, 752 F.3d

at 243); *Fed. Deposit Ins. Corp. v. Bank of N.Y. Mellon*, 369 F. Supp. 3d 547, 552 (S.D.N.Y. 2019) (quoting *Tandon*, 752 F.3d at 243).

**ii. Rule 12(b)(6)**

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must construe the complaint liberally, "accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor." *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021); *Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Bacon v. Phelps*, 961 F.3d 533, 540 (2d Cir. 2020) (quoting *Twombly*, 550 U.S. at 570). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 165 (2d Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678; *Vaughn*, 957 F.3d at 145 (same).

**b. The Court has subject matter jurisdiction over the claims against the Moving Defendants**

The Moving Defendants argue that the Court lacks subject matter jurisdiction over the claims against eight of the Moving Defendants — namely, Joseph Katz, Devorah Mering, Mordechai Kohn, Mordechai Levi, Naftuli Morgenstern, Judy Berger, Sarah Levi, and Shlomo Berger, but not Joseph Mering and Shlomo Kornhauser[3] — "because the amount in controversy

[3] The Moving Defendants' counsel notes that while it "does not currently represent Sussman Bleier, Asher Jungreisz, or Solomon Levy" and "is making no motion on their behalf,"

with respect to each of those claims is less than the $75,000 required under 28 U.S.C. § 1332." (Defs.' Mem. 5.) In support, the Moving Defendants argue that "[i]t is blackletter law that a plaintiff's claims against multiple separate defendants cannot be aggregated for purposes of the jurisdictional amount in controversy if the defendants' liability is several, not joint," and Plaintiff's allegations "against each individual Defendant are independent of one another and in no way give rise to any joint liability." (*Id.* at 6.)

Plaintiff argues that (1) the Court has diversity jurisdiction over the claims against Erwin Ganzfried, Joseph Mering, and Shlomo Kornhauser and should exercise supplemental jurisdiction over the claims against the remaining Defendants because they "are so factually and legally related to the claims within the Court's original jurisdiction that they form part of the same case or controversy," (Pl.'s Opp'n 4–6); and (2) even if the Court chooses not to exercise supplemental jurisdiction, "it may aggregate the claims against the eleven [Moving Defendants] with less than $75,000 in chargebacks because [Plaintiff's] claims seek to establish joint and several liability," (*id.* at 6–8).

Federal courts are courts of limited jurisdiction and may not hear cases if they lack subject matter jurisdiction over the issues presented. *Lyndonville Sav. Bank & Tr. Co. v. Lussier*, 211 F.3d 697, 700–01 (2d Cir. 2000). "In 28 U.S.C. §§ 1331 and 1332(a), Congress granted federal courts jurisdiction over two general types of cases: cases that 'aris[e] under' federal law, § 1331, and cases in which the amount in controversy exceeds $75,000 and there is diversity of citizenship among the parties, § 1332(a)." *Home Depot U.S.A., Inc. v. Jackson*, 587 U.S. ---, ---, 139 S. Ct. 1743, 1746 (2019) (alteration in original). Under the diversity jurisdiction statute, all

---

there is no subject matter jurisdiction over the claims against these non-moving Defendants for the same reasons. (Def.'s Mem. 8 n.2.)

plaintiffs and all defendants must be of diverse citizenship. 28 U.S.C. § 1332(a); *see also Bartlett v. Honeywell Int'l Inc.*, 737 F. App'x 543, 547 (2d Cir. 2018) ("Diversity jurisdiction is present when there is complete diversity between the parties . . . ." (citing 28 U.S.C. § 1332(a))); *Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 117–18 (2d Cir. 2014) ("Subject matter jurisdiction is based on 28 U.S.C. § 1332, which requires 'complete diversity,' *i.e.*[,] all plaintiffs must be citizens of states diverse from those of all defendants." (footnote omitted) (quoting *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 553 (2005))). In addition, "[f]ederal diversity jurisdiction requires an amount in controversy of at least $75,000 . . . [and] this amount is measured as of the time that a complaint is filed," *Lapaglia v. Transamerica Cas. Ins. Co.*, 155 F. Supp. 3d 153, 154–55 (D. Conn. 2016) (first citing 28 U.S.C. § 1332(a); and then citing *Hall v. EarthLink Network, Inc.*, 396 F.3d 500, 506 (2d Cir. 2005)), "and it is established by the face of the complaint and the dollar amount actually claimed," *id.* at 155 (first citing *Horton v. Liberty Mut. Ins. Co.*, 367 U.S. 348, 353 (1961); and then citing *Scherer v. Equitable Life Assurance Soc'y of U.S.*, 347 F.3d 394, 397 (2d Cir. 2003)); *see also Hall*, 396 F.3d at 506 (noting that "[g]enerally, for purposes of diversity jurisdiction, the amount in controversy is established as of the date of the complaint and is not reevaluated based on post-filing events"). "[T]he party asserting subject matter jurisdiction[] has the burden of proving that it exists by a preponderance of the evidence." *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 443 (2d Cir. 2019) (citing *Makarova*, 201 F.3d at 113); *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 769 F.3d 807, 814 n.5 (2d Cir. 2014) ("A party invoking the jurisdiction of the federal court has the burden of proving that it appears to a reasonable probability that the claim is in excess of the statutory jurisdictional amount." (quoting *Scherer*, 347 F.3d at 397)); *see also Kruglov v. Copart of Conn., Inc.*, 771 F. App'x 117, 118 (2d Cir. 2019) (same). The amount in

controversy must be non-speculative in order to satisfy the statute, and conclusory allegations that the amount-in-controversy requirement is satisfied are insufficient. *See Valente v. Garrison from Harrison LLC*, No. 15-CV-6522, 2016 WL 126375, at *2 (E.D.N.Y. Jan. 11, 2016) ("[B]oilerplate pleadings do not suffice to establish that [an] action involves an amount in controversy adequate to support federal diversity jurisdiction.").

"A plaintiff may satisfy th[e] jurisdictional minimum by aggregating claims against multiple defendants . . . when their liability is common, undivided, or joint." *Rubin v. Mangan*, No. 21-CV-1401, 2021 WL 5281347, at *3 (E.D.N.Y. Nov. 12, 2021) (quoting *Nastasi v. Lari*, No. 15-CV-6066, 2017 WL 943935, at *3 (E.D.N.Y. Mar. 9, 2017)); *Esmilla v. Cosmopolitan Club*, No. 09-CV-10169, 2011 WL 814007, at *4 (S.D.N.Y. Mar. 3, 2011) (citing *E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.*, 160 F.3d 925, 933–35 (2d Cir. 1998)). "Aggregation to achieve diversity jurisdiction is barred," however, "when the liability of the defendants is several and not joint." *E.R. Squibb & Sons, Inc.*, 160 F.3d at 933; *see also Nastasi*, 2017 WL 943935, at *3 ("By contrast, when [the] defendants' liabilities are several and distinct, the amount in controversy threshold must be met with respect to each and every individual defendant regardless of whether the claims are temporally proximate or factually interrelated."); *K. Bells & Assocs., Inc. v. Lloyd's Underwriters*, No. 92-CV-5249, 1998 WL 274346, at *5 (S.D.N.Y. 1998) ("It is well-established that aggregation of a plaintiff's claims against multiple defendants is impermissible unless [the] defendants' liability is joint, rather than several." (citing *Sovereign Camp, W.O.W. v. O'Neil*, 266 U.S. 292, 295 (1924))); *Chase Manhattan Bank, N.A. v. Aldridge*, 906 F. Supp. 870, 874 (S.D.N.Y. 1995) ("When liability among defendants is several, a plaintiff cannot aggregate its claims against individual defendants in order to satisfy the jurisdictional amount in controversy requirement of 28 U.S.C. § 1332. It must satisfy the

jurisdictional amount with respect to each defendant.”). “As a result, each and every severally liable defendant must, in the normal course of things, meet the amount in controversy.” *E.R. Squibb & Sons, Inc.*, 160 F.3d at 933. “A claim alleging ‘joint and several liability’ is one where any defendant can be liable to the plaintiff in two ways: (1) regardless of whether any other defendant is liable (‘several’ or individual liability) or (2) where the defendant acted in concert with each and every defendant (‘joint’ liability).” *Umala v. Skylight Holdings*, No. 20-CV-1176, 2021 WL 7908033, at *2 (E.D.N.Y. Feb. 3, 2021).

Allegations of civil conspiracy may provide the basis for joint liability. *See Grove Press, Inc. v. Angleton*, 649 F.2d 121, 123 (2d Cir. 1981) (“A conspiracy is alleged for the purpose of showing that a wrong was committed jointly by the conspirators and that, because of their common purpose and interest, the acts of one may be imputed to the others. The allegation ‘is merely the string whereby the plaintiff seeks to tie together those who, acting in concert, may be held responsible in damages for any overt act or acts.’” (citation omitted) (quoting *Rutkin v. Reinfeld*, 229 F.2d 248, 252 (2d Cir. 1956))); *Wells Fargo Bank, N.A. v. Nat’l Gasoline, Inc.*, No. 10-CV-1762, 2013 WL 168079, at *3 (E.D.N.Y. Jan. 16, 2013). “To state a claim for civil conspiracy under New York law, a plaintiff, in addition to alleging an underlying tort, must plead facts sufficient to support an inference of the following elements: ‘(1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties’ intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury.’” *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 176 (2d Cir. 2012) (quoting *Abacus Fed. Sav. Bank v. Lim*, 905 N.Y.S.2d 585, 588 (App. Div. 2010)). “Proof of a civil conspiracy under New York law ‘connect[s] a defendant with the transaction and . . . charge[s] him with the acts and declarations of his co-conspirators,’ and exposes that defendant to joint and several liability for the victim’s

losses." *Kashi v. Gratsos*, 790 F.2d 1050, 1054 (2d Cir. 1986) (alteration in original) (quoting *Green v. Davies*, 182 N.Y. 499, 504 (1905)); *R.B. Dev., Co., Ltd. v. Tutis Cap. LLC*, 2018 U.S. Dist. LEXIS 196105, at *35 (E.D.N.Y. Nov. 14, 2018) ("Co-defendants found liable for civil conspiracy . . . are subject to joint and several liability for the underlying tort."), *report and recommendation adopted*, 2019 U.S. Dist. LEXIS 20909 (E.D.N.Y. Feb. 7, 2019).

The Court has subject matter jurisdiction over Defendants Joseph Katz, Devorah Mering, Mordechai Kohn, Mordechai Levi, Naftuli Morgenstern, Judy Berger, Sarah Levi, and Shlomo Berger. Plaintiff alleges that each of these Defendants initiated chargebacks that were less than $75,000. (Am. Compl. ¶ 55 (Joseph Katz, $16,854), ¶ 81 (Devorah Mering, $4,500), ¶ 90 (Mordechai Kohn, $9,000), ¶ 98 (Mordechai Levi, $8,000), ¶ 106 (Naftuli Morgenstern, $1,499), ¶ 114 (Judy Berger, $8,300), ¶ 122 (Sarah Levi, $10,000), ¶ 130 (Shlomo Berger, $60,816).) Plaintiff argues that Defendants are jointly and severally liable, and thus the claims against them may be aggregated to meet the amount in controversy requirement, because their participation in the lending scheme "involved them using each other's credit cards in *seriatim* fashion to keep the scheme afloat"; absent that cooperation, "the scheme could not have been possible"; and when the lending scheme came to an end, Defendants each relied on TransMedia's advice and made fraudulent statements to their credit card issuing banks to eliminate their debts resulting from the scheme. (Pl.'s Opp'n 7.) In support, Plaintiff points to its allegations that Silvertown charged additional customers' credit cards so that Silvertown could pay off other customers' debts. (*Id.* (citing Am. Compl. ¶¶ 27–28).) Plaintiff also alleges that "Defendants knowingly colluded and agreed to use each other's respective credit cards to pay down each other's recurring credit card debts," and that "[w]ithout the cooperation of all the Defendants and their continued permission

to use their respective credit cards to further their efforts, the scheme would not have been possible." (Am. Compl. ¶¶ 179–80.)

Plaintiff's conspiracy allegations are sufficient to establish joint liability for Plaintiff's underlying claims of fraud. Plaintiff alleges that Defendants "agreed to use each other's respective credit cards to pay down each other's recurring credit card debts," and, in furtherance of this scheme, "permit[ed] Silvertown to use one or more of each Defendant's credit cards in recurrent fashion to pay off debts of other Defendants." (*Id.* ¶¶ 180–81.) Initially, Silvertown promised Defendants it would either repay the debts directly to their card-issuing banks or transfer them funds so that they could pay the debts themselves. (*Id.* ¶ 26.) However, after the lending scheme became "untenable," (*id.* ¶ 29), Silvertown informed Defendants that it would be "unable to repay their debts" or "provide funds to them," (*id.* ¶ 30), and Defendants, "using suggestions by . . . TransMedia . . . and with Silvertown's assistance and cooperation, worked to shift their debt onto" Plaintiff through fraudulent chargebacks, (*id.* ¶ 32). Specifically, Plaintiff alleges that Defendants committed fraud by making material misrepresentations to their credit card issuing banks, resulting in the banks initiating the chargebacks, and that Plaintiff justifiably relied on Defendants' misrepresentations in reimbursing the banks, causing Plaintiff's injuries. Although Plaintiff alleges that each Defendant contacted their own credit card issuing bank and initiated the chargebacks for the charges they put on their respective credit cards, the Court understands these actions to be overt acts in furtherance of the ongoing conspiracy, as Plaintiff alleges Defendants collectively engaged with Silvertown and TransMedia for the purpose of shifting their debts to Plaintiff. As Plaintiff alleges, "[i]n the absence of the conspiracy and collusion by and among . . . Defendants, Silvertown and Defendants would have been unable to perpetrate the scheme complained of and [Plaintiff] would have avoided all or a significant

portion of the pecuniary damages it incurred as a result of the scheme." (*Id.* ¶ 182); *see Grove Press, Inc.*, 649 F.2d at 123 ("The damage for which recovery may be had in a civil action is not the conspiracy itself but the injury to the plaintiff produced by specific overt acts." (quoting *Rutkin*, 229 F.2d at 252)). Although ultimately discovery may show otherwise, at this stage of the proceeding, Plaintiff has plausibly alleged joint liability on the part of Defendants for the underlying claims of fraud. Accordingly, Plaintiff's fraud claims may be aggregated to meet the amount in controversy requirement against these Defendants, and the Court therefore exercises subject matter jurisdiction over them.[4]

**c. Plaintiff's fraud and unjust enrichment claims against the Moving Defendants are time-barred**

The Moving Defendants argue that Plaintiff's claims are time-barred because they accrued more than four years before the Amended Complaint was filed, and, under New York's borrowing statute, Plaintiff's fraud claims "are subject to Georgia's four-year statute of limitations" or Tennessee's three-year statute of limitations, and Plaintiff's unjust enrichment claims "are subject to New York's three-year statute of limitations." (Defs.' Mem. 8–11, 11 n.4.)

Plaintiff argues that its claims are not time-barred because (1) its financials are "rolled up" into and reported by its parent company, U.S. Bank National Association ("U.S. Bank"), as part of U.S. Bank's financials "in accordance with applicable [Securities Exchange Commission]

---

[4] Plaintiff alleges that non-moving Defendants Sussman Bleier, Ashley Jungreisz, and Solomon Levy also initiated chargebacks that were less than $75,000. (*See* Am. Compl. ¶ 138 (Sussman Bleier, $56,500), ¶ 147 (Asher Jungreisz, $36,100), ¶ 156 (Solomon Levy, $4,000).) Because the Court finds that Plaintiff's claims are aggregable, the Court notes that it also has subject matter jurisdiction over the claims against these Defendants. *See Tronox Inc. v. Kerr-McGee Corp. (In re Tronox Inc.)*, 855 F.3d 84, 95 (2d Cir. 2017) ("[F]ederal courts have an 'independent obligation to consider the presence or absence of subject matter jurisdiction *sua sponte*.'" (quoting *Joseph v. Leavitt*, 465 F.3d 87, 89 (2d Cir. 2006))).

and other regulatory requirements," and thus the economic injury Plaintiff suffered "was felt in Minnesota," where U.S. Bank is headquartered and where the statute of limitations for fraud and unjust enrichment claims is six years, (Pl.'s Opp'n 9–10); and (2) "if the Court decides to apply the Georgia statute of limitations and not that of Minnesota, [Plaintiff] should benefit from any applicable Georg[ia] tolling provisions," (*id.* at 11–13). Plaintiff alleges it is incorporated in Georgia and has its principal place of business in Tennessee. (Am. Compl. ¶ 2.)

"Under the law of New York, the forum state, the first step in a choice of law analysis is to determine whether an actual conflict exists between the laws of the jurisdictions involved." *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 433 (2d Cir. 2012) (citing *In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993)); *see also Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 176 (2d Cir. 2021). Where there is no conflict, "a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it." *Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004).

"Where jurisdiction is predicated on diversity of citizenship, a federal court must apply the choice-of-law rules of the forum state." *Thea v. Kleinhandler*, 807 F.3d 492, 497 (2d Cir. 2015) (citing *Forest Park Pictures*, 683 F.3d at 433); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). With respect to statutes of limitation, "New York's 'borrowing statute,' C.P.L.R. § 202, dictates that '[w]hen a nonresident plaintiff sues upon a cause of action that arose outside of New York, the court must apply the shorter limitations period . . . of either: (1) New York; or (2) the state where the cause of action accrued.'" *2002 Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assur. Co.*, 717 F. App'x 35, 37 n.1 (2d Cir. 2017) (alterations in original) (citing *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 627 (2d Cir. 1998)). "New York

follows 'the traditional definition of accrual — a cause of action accrues at the time and in the place of the injury." *Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 710 (2d Cir. 2002) (quoting *Glob. Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 529 (1999)). "Where . . . the 'injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss.'" *Id.* (quoting *Glob. Fin. Corp.*, 93 N.Y.2d at 529); *see also Luv N' Care, Ltd. v. Goldberg Cohen, LLP*, 703 F. App'x 26, 28 (2d Cir. 2017) (same); *Deutsche Bank Nat'l Tr. Co. v. Barclays Bank PLC*, 34 N.Y.3d 327, 335 (2019) (same). For purposes of New York's borrowing statute, a corporation resides in the location of its principal place of business. *See Luv N' Care, Ltd.*, 703 F. App'x at 28 ("Courts within the Second Circuit have consistently held that a business entity's residence is determined by its principal place of business." (quoting *Robb Evans & Assocs. LLC v. Sun Am. Life Ins.*, No. 10-CV-5999, 2012 WL 488257, at *3 (S.D.N.Y. Feb. 14, 2012))); *id.* at 28 n.1 (noting that "[t]he New York Court of Appeals has not specifically addressed whether a corporation's residence is determined (for purposes of the borrowing statute) by its principal place of business or its state of incorporation," but that "[i]t would seem that an economic harm has greater effect on a for-profit enterprise's activities at its principal place of business").

Tennessee has a three-year statute of limitations for both fraud and unjust enrichment claims. *See UnitedHealthCare Servs., Inc. v. Team Health Holdings, Inc.*, No. 21-CV-364, 2022 WL 1481171, at *4 (E.D. Tenn. May 10, 2022) ("The statute of limitations for fraud, negligent misrepresentation, and unjust enrichment in Tennessee is three years when the gravamen of the complaint sounds in fraud or misrepresentation." (citing Tenn. Code Ann. § 28-3-105)); *Precision Tracking Sols., Inc. v. Spireon, Inc.*, No. 12-CV-626, 2014 WL 3058396, at *4–5 (E.D. Tenn. July 7, 2014) (applying Tennessee's three-year statute of limitations to fraud claims and

unjust enrichment claims based on fraud). Under New York law, the statute of limitations for fraud claims is "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff discovered the fraud, or could with reasonable diligence have discovered the fraud," *Zirvi v. Flatley*, 838 F. App'x 582, 586 (2d Cir. 2020) (citing N.Y. C.P.L.R. § 213(8)), and the statute of limitations for unjust enrichment claims seeking monetary damages is three years, *Lia v. Saporito*, 909 F. Supp. 2d 149, 167 (E.D.N.Y. 2012) ("In New York, . . . unjust enrichment claims seeking monetary damages are governed by the three (3)-year statute of limitations under Section 214(3) of the [N.Y. C.P.L.R.].").

Because Tennessee's three-year statute of limitation for fraud claims is shorter than New York's six-year statute of limitation, the Court applies Tennessee's statute of limitation to Plaintiff's fraud claims. Because Tennessee and New York have the same three-year statute of limitation for unjust enrichment claims, there is no choice-of-law issue with respect to these claims. Plaintiff filed the Amended Complaint naming the individual Defendants in this action on July 16, 2021. (Am. Compl.) Under Tennessee's three-year statutes of limitation, any claims that accrued before July 16, 2018, are time barred. The latest chargeback alleged in the Amended Complaint is dated February 5, 2016, and Plaintiff alleges it was damaged immediately upon the initiation of each chargeback. Because the latest chargeback occurred more than two years after Tennessee's applicable three-year statutes of limitations expired, Plaintiff's claims are time barred.[5]

---

[5] Georgia has a four-year statute of limitations for both fraud and unjust enrichment claims. *See Curtis Inv. Co., LLC v. Bayerische Hypo-und Vereinsbank, AG*, 341 F. App'x 487, 494–95 (11th Cir. 2009) ("[A] four year statute of limitations applies to fraud claims." (citing Ga. Code. Ann. § 9–3–31)); *Raak Techs., Inc. v. Marx CryptoTech, LP*, No. 15-CV-4019, 2016 WL 9451440, at *4 (N.D. Ga. May 2, 2016) ("The plaintiff's unjust enrichment claim is subject to a four-year statute of limitations, O.C.G.A. § 9–3–26."); *Majeed v. Randall*, 632 S.E.2d 413,

Plaintiff argues that Minnesota's six-year statutes of limitation apply because that is where Plaintiff's parent company, U.S. Bank, is headquartered and Plaintiff's financials are "rolled up" into U.S. Bank's and reported by U.S. Bank. (Pl.'s Opp'n 10.) However, Plaintiff cites no authority for the proposition that it may avail itself of the statute of limitations of the state in which its parent corporation is located, (Defs.' Reply 4–5), and at least one court has declined to accept a similar argument.[6] *See, e.g.*, *IKB Int'l S.A. v. Morgan Stanley*, No. 653964/2012, 2014 WL 5471650, at *3–4 (N.Y. Sup. 2014) (determining that location of parent corporation is not the location of injury where the plaintiff argued its losses "flowed" to its parent and parent and subsidiary were "closely financially intertwined" where, among other things, the plaintiff did not claim or demonstrate that it "was not a separate entity with its own losses"), *aff'd*, 36 N.Y.S.3d 452 (App. Div. 2016).

Accordingly, Plaintiff's fraud and unjust enrichment claims are time barred.[7]

**d. Plaintiff fails to state a claim for conspiracy**

Defendants argue that the Court must dismiss Plaintiff's conspiracy claim "because there is no independent claim for conspiracy under New York law, and in any event, the fraud claim on which the conspiracy claim is premised fails." (Defs.' Mem. 24.)

---

416 (Ga. Ct. App. 2006) ("The statute of limitation applicable to fraud is the four-year statute established in OCGA § 9–3–31."). Therefore, Plaintiff's claims are also time barred under Georgia's statutes of limitations. Because the Court finds that Tennessee's statutes of limitation apply to Plaintiff's claims, the Court declines to address Plaintiff's argument in the alternative that the Georgia statute should be tolled.

[6] In addition, as noted above, under New York law, the applicable statute of limitations for unjust enrichment claims seeking monetary relief is three years, not six, and therefore even if the Court applied Minnesota's statute, Plaintiff's unjust enrichment claims would be barred under the applicable New York statute.

[7] Because the Court finds that Plaintiff's claims are time barred, it declines to address Defendants' arguments in the alternative that Plaintiff fails to state these claims.

Plaintiff acknowledges that a "claim of conspiracy cannot stand alone and must be dismissed *if* the underlying independent tort has not been adequately pleaded" but argues that it has adequately pleaded its fraud claims and thus "the Court should not dismiss the civil conspiracy claim." (Pl.'s Opp'n 25.)

"New York does not recognize an independent tort of conspiracy." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006). "While a plaintiff may allege, in a claim of fraud or other tort, that parties conspired, the conspiracy to commit a fraud or tort is not, of itself, a cause of action." *Hoeffner v. Orrick, Herrington & Sutcliffe LLP*, 924 N.Y.S.2d 376, 377 (App. Div. 2011).

Because Plaintiff's fraud claims are time barred and a civil conspiracy claim is not an independent cause of action, the Court dismisses Plaintiff's conspiracy claim.

**e. Leave to amend**

Plaintiff requests "the opportunity to move to file an amended complaint pursuant to Rule 15" if the Court "perceives any deficiencies in the Amended Complaint." (Pl.'s Opp'n 25 n.2.) Defendants have not responded to this request.

Rule 15 of the Federal Rules of Civil Procedure provides that "[l]eave to amend should be 'freely give[n] . . . when justice so requires,' but 'should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party[.]'" *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 28 (2d Cir. 2016) (second and third alterations in original) (citation omitted) (first quoting Fed. R. Civ. P. 15(a)(2); and then quoting *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008)); *see also Kainz v. Bernstein*, 841 F. App'x 249, 253 (2d Cir. 2020) (noting that leave to amend should be freely given).

Because Plaintiff's fraud and unjust enrichment claims are time barred and Plaintiff's

civil conspiracy claim cannot stand alone, the Court denies Plaintiff leave to amend as futile.

## III. Conclusion

For the reasons stated above, the Court grants the Moving Defendants' motion and dismisses Plaintiff's fraud and unjust enrichment claims against them as time barred and Plaintiff's civil conspiracy claim against them for failure to state a claim.

Dated: September 30, 2022
Brooklyn, New York

SO ORDERED:

/s/ MKB
MARGO K. BRODIE
United States District Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
ELAVON, INC.,

Plaintiff,

v.

ERWIN GANZFRIED, JOSEPH KATZ, JOSEPH MERING, SHLOMO KORNHAUSER, DEVORAH MERING, MORDECHAI KOHN, MORDECHAI LEVI, NAFTULI MORGENSTERN, JUDY BERGER, SARAH T. LEVI, SHLOMO BERGER, SOLOMON LEVY, SUSSMAN BLEIER, and ASHER JUNGREISZ,

Defendants.
---------------------------------------------------------------X

JUDGMENT

20-CV-908 (MKB)

A Memorandum and Order of Honorable Margo K. Brodie, United States District Judge, having been filed on September 30, 2022, granting the Moving Defendants' motion; and dismissing Plaintiff's fraud and unjust enrichment claims against them as time barred and Plaintiff's civil conspiracy claim against them for failure to state a claim; it is

ORDERED and ADJUDGED that the Moving Defendants' motion is granted; that Plaintiff's fraud and unjust enrichment claims are dismissed against them as time barred;and that Plaintiff's civil conspiracy claim are dismissed against them for failure to state a claim.

Dated: Brooklyn, New York
September 30, 2022

Brenna B. Mahoney
Clerk of Court

By: _/s/Jalitza Poveda_
Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELAVON, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ERWIN GANZFRIED, JOSEPH KATZ, JOSEPH MERING, SHLOMO KORNHAUSER, DEVORAH MERING, MORDECHAI KOHN, MORDECHAI LEVY, NAFTULI MORGENSTERN, SARA BERGER, SARAH T. LEVI, SHLOMO BERGER, SOLOMON LEVY, SUSSMAN BLEIER and ASHER JUNGREISZ,<br><br>Defendants. | Civil Action No.: 1:20-cv-0908-MKB-RER<br><br>**NOTICE OF APPEAL** |

Notice is hereby given that **ELAVON, INC.**, plaintiff in the above-captioned action, hereby appeals to the United States Court of Appeals for the Second Circuit from the Clerk's Judgment entered in this action on October 4, 2022 (ECF No. 78).

Dated: September 13, 2023

Respectfully submitted,

**THE GINZBURG LAW FIRM, P.C.**

*/s/ Daniel Ginzburg*
By: Daniel Ginzburg
Mailing Address
200 Village Center Drive, Unit 7045
Freehold, New Jersey 07728
(732) 284-3841 (tel)
daniel@ginzburglawfirm.com
*Counsel to Plaintiff Elavon, Inc.*

JA-166

22-2886
*Elavon v. Mering*

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

At a stated term of The United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 27th day of June, two thousand twenty-three.

PRESENT:
ROSEMARY S. POOLER,
SUSAN L. CARNEY,
BETH ROBINSON,
*Circuit Judges*.

---

ELAVON, INC.,

*Plaintiff-Appellant*,

v.

**ORDER**
Docket No. 22-2886

JOSEPH KATZ, JOSEPH MERING, SHLOMO KORNHAUSER, DEVORAH MERING, MORDECHAI KOHN, MORDECHAI LEVI, NAFTULI MORGENSTERN, JUDY BERGER, SARAH T. LEVI, SHLOMO BERGER, SOLOMON LEVY, SUSSMAN BLEIER, ASHER JUNGREISZ,

*Defendants-Appellees*,

SILVERTOWN OF NY, INC., ESTER WERZBERGER, CHAN FRIEDMAN, JOHN DOES # 1-10, ABC COMPANIES 110, ERWIN GANZFRIED,

*Defendants.*[*]

---

[*] The Clerk of Court is directed to amend the caption on this Court's docket to conform to the caption on this order.

Plaintiff-Appellant Elavon, Inc., noticed an appeal from the district court's judgment, entered October 4, 2022, dismissing Elavon's claims against some, but not all, of the Defendants in this action. The district court concluded that Elavon's fraud and unjust enrichment claims are barred by the applicable statutes of limitations and that Elavon failed to state a claim for civil conspiracy.

As relevant here, this Court has jurisdiction over "final decisions" of the district courts. 28 U.S.C. § 1291. "Generally, a final order is an order of the district court that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Rabbi Jacob Joseph Sch. v. Province of Mendoza*, 425 F.3d 207, 210 (2d Cir. 2005) (internal quotation marks omitted). A final decision must dispose of all of the claims *of all of the parties* to the underlying action. *See, e.g.*, *Transp. Workers Union of Am., Loc. 100 v. N.Y.C. Transit Auth.*, 505 F.3d 226, 230 (2d Cir. 2007). Elavon appeals from a judgment that is not a "final decision[]" under § 1291 because it does not resolve all of the claims of all of the parties to the litigation. Still pending before the district court is Elavon's motion to confirm an arbitral award against Defendants Silvertown of NY, Inc., Ester Werzberger, and Chan Friedman. Further, the judgment appealed from does not resolve Elavon's claims against the four individual Defendants who did not move to dismiss the operative complaint.[1]

Because the parties have identified no alternative basis for this Court to exercise its jurisdiction, the appeal is **DISMISSED** for lack of jurisdiction. For reasons of judicial efficiency, we direct the Clerk of Court to refer any further proceedings and subsequent appeals in this case to this panel.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

UNITED STATES SECOND CIRCUIT COURT OF APPEALS

Catherine O'Hagan Wolfe

[1] It appears that two of the non-moving individual Defendants, Asher Jungreisz and Solomon Levy, were never served with process. Although unresolved claims against unserved defendants do not pose an independent obstacle to our jurisdiction, *see Leonhard v. United States*, 633 F.2d 599, 608–09 (2d Cir. 1980), the other two non-moving Defendants, Erwin Ganzfried and Sussman Bleier, were served with process. A clerk's certificate of default was entered against Ganzfried and Bleier, but the district court has not entered a final judgment resolving Elavon's claims against them. Therefore, even putting aside Elavon's pending motion to confirm an arbitral award, the district court's judgment does not resolve Elavon's claims against all of the served Defendants.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELAVON, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ERWIN GANZFRIED, JOSEPH KATZ, JOSEPH MERING, SHLOMO KORNHAUSER, DEVORAH MERING, MORDECHAI KOHN, MORDECHAI LEVY, NAFTULI MORGENSTERN, SARA BERGER, SARAH T. LEVI, SHLOMO BERGER, SOLOMON LEVY, SUSSMAN BLEIER and ASHER JUNGREISZ,<br><br>Defendants. | Civil Action No.: 1:20-cv-0908-MKB-RER<br><br>**NOTICE OF APPEAL** |

Notice is hereby given that **ELAVON, INC.**, plaintiff in the above-captioned action, hereby appeals to the United States Court of Appeals for the Second Circuit from the Clerk's Judgment entered in this action on October 4, 2022 (ECF No. 78).

Dated: November 1, 2022

Respectfully submitted,

**THE GINZBURG LAW FIRM, P.C.**

*/s/ Daniel Ginzburg*
By: Daniel Ginzburg
Mailing Address
200 Village Center Drive, Unit 7045
Freehold, New Jersey 07728
(732) 284-3841 (tel)
daniel@ginzburglawfirm.com
*Counsel to Plaintiff Elavon, Inc.*